**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**EMMERICH NEWSPAPERS, INCORPORATED**                    **PLAINTIFF**

**V.**                    **CIVIL ACTION NO. 3:23-CV-26 TSL-MTP**

**PARTICLE MEDIA, INC.**                    **DEFENDANT**

**CONSOLIDATED WITH**

**EMMERICH NEWSPAPERS, INCORPORATED**                    **PLAINTIFF**

**V.**                    **CIVIL ACTION NO. 3:23-CV-391 TSL-MTP**

**PARTICLE MEDIA, INC.**                    **DEFENDANT**

---

**PARTICLE MEDIA, INC.'S MEMORANDUM IN SUPPORT OF**
**ITS MOTION TO EXCLUDE TESTIMONY OF ANTHONY L. HUFFMAN**

---

Defendant Particle Media, Inc. ("Particle Media") submits this memorandum in support of its motion to exclude the testimony of Plaintiff's damages expert, Anthony L. Huffman, from evidence in this case on the grounds that (1) he is not qualified to give the proffered testimony; (2) the testimony is unreliable because it is based on flawed methodologies developed not by Mr. Huffman, but by Wyatt Emmerich, the President of Plaintiff Emmerich Newspapers, Inc. ("Plaintiff"), who used insufficient and irrelevant facts and data; and (3) the testimony is unreliable because Mr. Huffman did not follow applicable American Institute of Certified Public Accountants ("AICPA") standards.[1] Moreover, Mr. Huffman's proffered testimony would not assist the trier of fact to understand the evidence or to determine a fact in issue, but instead would confuse and mislead the jury. Because Mr. Huffman's testimony fails to satisfy the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993),

---

[1] Particle Media reserves the right to object to Mr. Huffman as an expert, as well as any and all portions of his proffered testimony, after an opportunity for *voir dire* and the motions *in limine*.

Particle Media respectfully asks this Court to exercise its gatekeeping function and exclude Mr. Huffman's testimony regarding his opinions as to Plaintiff's alleged damages.

I.   <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

    A.   <u>NewsBreak</u>

Particle Media designed and developed NewsBreak, a free-access apps (Android and iOS) and a website that, among other things, (1) provides users with an easily accessible and personalized feed of local and national content and information; (2) indexes and links original and third-party content, making it easier for users to search, browse, and find content; (3) widens publishers' exposure to a broader network of readers than they otherwise could reach by driving traffic through links to their website; (4) helps users discover content without having to undertake voluminous searches by referring them to content based on their locations, preferences, and interests; and (5) provides an effective platform for publishers and contributors to enhance their visibility or generate revenue with tools to manage their content and connect with users directly. *See* Ex. 1, Zhong Decl. at ¶3.

Particle Media's objective in offering NewsBreak is to create value for users, publishers, and businesses. *See* Ex. 1, Zhong Decl. at ¶4. Consistent with that objective, it has entered into agreements with almost 300 publisher groups (who operate more than two thousand websites) permitting it to self-host their content in full on NewsBreak, meaning to host the content from NewsBreak's server. *Id.* at ¶4. These publisher groups created their profiles on the NewsBreak publisher platform, allowing them to amass "followers," interact with users, access engagement analytics, and have their content exposed. *Id.* at ¶4. Particle Media also refers significant traffic to publishers' websites. *Id.* at ¶4. NewsBreak drives more traffic to publishers than almost any other sources in the country. *See id.* at ¶4; Ex. 2, Sell Report at ¶126. Publishers value

NewsBreak's traffic because a significant portion of it consists of mobile users, who are often new to their platforms. *Id*. at ¶_. The traffic Particle Media provides is so valuable that some publishing partners have even paid NewsBreak for it. *Id*. Some publishers who receive direct traffic from NewsBreak also create profiles on the NewsBreak publisher platform. *Id*. at ¶4.

During the relevant period, from 2019 to 2021, users who opened the NewsBreak app or website viewed a news feed that, for each listed story, presented a headline and/or a thumbnail image and/or the first limited words of the article, all intended to promote the story. *See* Ex. 1, Zhong Decl. at ¶5. When an app user clicked on an item listed on the news feed or in a search result, she either (1) viewed the full article on NewsBreak, in the case of fully-hosted articles of publishers and creators with whom Particle Media has agreements, or (2) was taken directly to the publisher's website (i.e., the source of the article), with NewsBreak acting as a web browser. *Id*. When a website (computer or mobile) user clicked on an item listed on the news feed or in a search result, she was given a link to "Go to Publisher's website." *Id*. at ¶5.[2]

## B. **This Lawsuit**

Plaintiff owns companies that publish newspapers and operate associated websites. *See* [Dkt. 15], First Amended Complaint ("FAC") at ¶17. In or around 2021, Plaintiff owned 22 subsidiary publishing companies:

> (1) J.O. Emmerich & Associates, Inc., publishing the McComb *Enterprise-Journal*; (2) Delta Democrat Publishing, Inc., publishing the Greenville *Delta Democrat Times*; (3) Commonwealth Publishing, Inc., publishing the *Greenwood Commonwealth*; (4) Delta Press Publishing, Inc., publishing *The Clarksdale Press Register*; (5) Marion Publishing, Inc., publishing *The Columbia-Progress*; (6) Yazoo Newspaper, Inc., publishing the *Yazoo Herald*; (7) Sunland Publishing,

---

[2] And when a NewsBreak app user (mobile phone or device) clicked to "Share" an article, the link presented a user the option to go to the non-partner publisher's website either via the NewsBreak app, with the app acting as a web browser, or via another web browser like Safari. *See* Ex. 1, Zhong Decl. at ¶6. The NewsBreak programming offered both a website user or mobile browser user a link to a website user or mobile browser user to "Go to Publisher's website," which when clicked upon took the user to the non-partner publisher's website. *See id*.

Inc., publishing the *Northside Sun*; (8) Simpson Publishing, Inc., publishing the *Magee Courier* and *Simpson County News*; (9) Montgomery Publishing, Inc., publishing the *Winona Times* and the *Carrolton Conservative*; (10) Franklinton Publishing, Inc., publishing the Franklinton *Era-Leader*; (11) Charleston Publishing Company, Inc., publishing the *Charleston Sun-Sentinel*; (12) Clarion Publishing Company, Inc., publishing the *Dumas Clarion*; (13) Scott Publishing, Inc., publishing the *Scott County Times*; (14) Clarke Publishing, Inc., publishing the *Clarke County Tribune*; (15) Hattiesburg Publishing, Inc., publishing the *Pine Belt News*; (16) Tallulah Publishing, Inc., publishing the *Madison Journal*; (17) Louisville Publishing, Inc., publishing the *Winston County News*, the *Webster Progress-Times*, and *Choctaw Plain Dealer*; (18) Enterprise-Tocsin, Inc., publishing the Indianola *Enterprise-Tocsin*; (19) Grenada Star, Inc., publishing the *Grenada Star*; (20) Tate Record, Inc., which publishes the *Tate Record*; (21) Newton County Appeal, Inc., publishing the *Newton County Appeal*; and (22) Kosciusko Star-Herald, Inc., publishing the Kosciusko *Star-Herald*.

*See* [Dkt. 15], First Amended Complaint ("FAC") at ¶17; Ex. 2, Corporate Data. It appears the *Grenada Star* and the *Tate Record* were purchased in fiscal year 2021, and Rankin and Laurel subsidiaries were sold or closed in fiscal year 2016. *See* Ex. 3, EN Historical Financials at 3-4, 12.  Plaintiff has acknowledged that the subsidiary companies own any copyrights, and Plaintiff claims each subsidiary has assigned the ownership to Plaintiff. *See* Ex. 4, W. Emmerich Dep. at 35:20-37:18; Ex. 5, 2024 Conveyance.

In the past, stories from some of Plaintiff's publishers' sites appeared on the NewsBreak news feed in the form of a headline and/or a thumbnail image and/or the beginning words of the article, with a link that took the user directly to Plaintiff's website(s). *See* Ex. 1, Zhong Decl. at ¶7. There were also periods of time in 2019 to 2021 during which, because of an unintentional software glitch, some articles from the websites of Plaintiff and other non-partner publishers were inadvertently available in self-hosted full text on the NewsBreak app for users on the Android platform, who were not directed to the publishers' websites. *Id*. at ¶8. These are what Particle Media has referred to as "self-hosted" or "full text" articles. *Id*. at ¶8.

The self-hosted full text display of such articles was not an intended feature of the

NewsBreak app or a practice of Particle Media. *See* Ex. 1, Zhong Decl. at ¶9. In fact, Particle Media's company policy prohibits the display of self-hosted full text articles if the content originates from a non-partner publisher. *Id*. at ¶9. The technical glitch that led to such display first occurred in July 2019, when low-level engineers unfamiliar with Particle Media's policy and copyright law were trying to address a functionality issue related to non-mobile-friendly content and made full content available by mistake. *See id*. at ¶10; Ex. 1, 2022 PM 30(b)(6) at 37. Upon learning of the glitch, Particle Media took immediate actions to fix it and emphasized the policy not to self-host full text content from non-partner publishers. *Id*. The glitch occurred again in May 2020 when a different engineer tried to resolve a bug and accidentally removed one of the "logics" (*i.e.*, software code) that Particle Media had implemented to fix the glitch. *See* Ex. 1, Zhong Decl. at ¶10; Ex. 6, 2022 PM 30(b)(6) at 37-38. Upon discovering this glitch, Particle Media worked quickly to put the logic back in place. *Id*.

As early as <u>February 2020</u>, Plaintiff learned of Particle Media's use of content from its websites. *See* Ex. 7, Plaintiff's Discovery Resp. at 17. Plaintiff did not, however, send a cease and desist letter or submit a notification pursuant to the copyright policy on Particle Media's website. Instead, more than five months later, in August 2020, Plaintiff registered nine articles with the U.S. Copyright Office, and more than four months after that, on <u>January 15, 2021</u>, Plaintiff filed suit against Particle Media asserting copyright infringement claims and several state law tort claims. *See Emmerich Newspapers, Inc. v. Particle Media, Inc.*, Civil Action No. 3:21-CV-32-KHJ-MTP (S.D. Miss.). The filing of the lawsuit was the first time Particle Media became aware that the self-hosted full text content displayed as a result of the glitch included content from some of Plaintiff's publishers' websites. *See* Ex. 1, Zhong Decl. at ¶14. The Court in the 2021 case dismissed all but Plaintiff's copyright infringement claims as to nine registered

works, *see Emmerich Newspapers, Inc. v. Particle Media, Inc.*, 2022 WL 843209, at *4 (S.D. Miss. Mar. 21, 2022), and the parties later resolved the dispute.

Plaintiff filed Case No. 3:23cv26 in January 2023 and filed the FAC in April 2023, alleging Particle Media infringed 6,211 of its copyrights (listed in Ex. A to the FAC) and violated the Digital Millennium Copyright Act (the "DMCA") by (i) altering its CMI and republishing the altered CMI as to 33,734 articles (listed in Ex. D to the FAC), (ii) circumventing its paywalls as to 7,579 articles that appeared on the *Greenwood Commonwealth* and *Enterprise-Journal* websites, and (iii) trafficking in prohibited circumvention technology, *i.e.*, making NewsBreak available to users. *See* [Dkt. 15]. And Plaintiff filed Case No. 3:23cv391 in June 2023, asserting the same claims, but alleging infringement of 11,818 copyrights, including 30 pictures, for which Plaintiff purportedly received registrations after filing Case No. 3:23cv26 (listed in Ex. A and Ex. C to the Complaint). *See* [Dkt. 1]. On May 14, 2024, Plaintiff provided revised lists including copyright infringement claims as to 7,791 articles,[3] CMI claims as to 17,861 articles, and circumvention claims as to 2,406 articles (the "May 14 Lists").

On July 4, 2024, Plaintiff dismissed its claims as to certain articles ("Dismissed List"). *See* [Dkt. 158] and [Dkt. 158-1]. It appears that some of the articles on the Dismissed List were included in the May 14 Lists, meaning those numbers have gone down more. And on July 5, 2024, Plaintiff dismissed all claims related to every photograph covered by its group registrations with the exception of 29 specific photographs. *See* [Dkt. 159] and [Dkt. 159-1].

**C.  Plaintiff's Expert Designations**

On February 8, 2024, Plaintiff served its initial designation of experts, identifying Mr. Huffman as a retained expert on damages and Mr. Emmerich as an unretained expert on

---

[3] Plaintiff has referenced 7,792 articles, but there were 7,791 articles listed on the spreadsheet.

damages. *See* Ex. 8, Plaintiff's Initial Designation. The designation stated that Mr. Huffman

"may be called to testify regarding the actual damages suffered by Emmerich resulting from

Defendant's acts of copyright infringement and violation of the DMCA" and "will utilize the

three methodologies reflected in Exhibit 'A' to his report" which Plaintiff claims "[e]xperts in

the field of copyright and DMCA damage calculations would reasonably rely on … in forming

an opinion on the subject of [Plaintiff's] actual damages." *Id*. at 4. The numbers listed in the

designation were a Lost Revenue Methodology of $8,564,531, a Value of Articles Stolen

Methodology of $32,155,400, and an Ad Impressions Methodology of $6,443,294, the average

of which was stated as $15,319,481. *Id*.

Mr. Huffman's report, which was prepared for a different lawsuit, *see* [Dkt. 83] at 3-4,

stated only that (1) he will testify regarding the actual damages suffered by Plaintiff as a result of

Particle Media's alleged copyright infringement and violation of the DMCA; (2) in his opinion

there are three "credible and reasonable methods" by which to calculate actual damages,

reflected in Exhibit A to his report; and (3) the actual damages calculations in Exhibit A

"accurately reflect the damages suffered by Plaintiff[.]" *See* Ex. 9, Initial Huffman Report.

Exhibit A to the report did not include the three methodologies, but rather calculations related to

statutory damages under the DMCA. *Id*. at Ex. A. It included a footnote referencing a PDF

related to actual damages calculations. *See id.*; Ex. 10, Plaintiff's Initial Damages Calculations.

On April 11, 2024, after Particle Media filed various motions to strike, including one to

strike Mr. Huffman [Dkt. 82], Plaintiff filed a motion for leave to amend its expert designation,

representing, in part, that Mr. Huffman is not a retained expert and will be testifying from his

firsthand knowledge of activities in which he was personally involved before the commencement

of this lawsuit. *See* [Dkt. 84]. Plaintiff also provided a supplemental report from Mr. Huffman, adding a fourth paragraph regarding his expected testimony:

> I will testify about the decline in revenue and profits suffered by Emmerich during the years during which Particle was displaying Emmerich's 34,000 articles without Emmerich's consent. I will testify how this provided readers and advertisers with a cheaper substitute product and how such substitution can undermine the profitable and viability in a competitive market. I will testify about the diverse costs associated with producing news articles and how he arrives at a value per article, which is foundational to determining damages based on the number of articles stolen times the value per article. l will testify concerning the methodology employed by Particle concerning their revenue generated by Emmerich articles and how this methodology, by not including the news feed revenue, which caused a significant underestimation of the damages.

*See* Ex. 11, Huffman Supplemental Report at ¶(i)(4). And on May 30, 2024, Plaintiff provided its revised designation, including the same description of Mr. Huffman's expected testimony that appeared in Plaintiff' initial designation. *See* Ex. 12, Plaintiff's Revised Designation

On June 12, 2024, just before the deposition of Particle Media's damages expert, Plaintiff provided supplemental responses to Plaintiff's discovery requests, stating that a revised damages calculation worksheet and supporting documentation could be found on Plaintiff's Google Drive folder. *See* Ex. 13, June 12 Damages Email; Ex. 14, First Revised Damages Calculations. That version of the damages calculations, which revised various inputs, included a Lost Revenue Methodology total of $8,275,056, a Value of Articles Stolen Methodology total of $20,983,203, and an Ad Impressions Value Methodology total of $5,851,282, and an "Average Damages of the Three Methodologies" of $11,688,180 (the "First Revised Damages Calculations"). *Id*.

Five days later, on June 17, Plaintiff provided yet another damages calculation worksheet, this one with a Lost Revenue Methodology total of $7,027,896, a Value of Articles Stolen Methodology total of $20,983,203, and an Ad Impressions Value Methodology total of $5,851,282 ("Second Revised Damages Calculations"). *See* Ex. 15, June 17 Damages Email; Ex.

16, Second Revised Damages Calculations. Instead of averaging the three, the first two were averaged and added to the third, for a total of $19,834,331. *Id*.

Then on June 19, 2024, hours before Mr. Huffman's deposition, Plaintiff provided yet another version of the damages calculations, and this time, he also included an entirely new fourth methodology ("Third Revised Damages Calculations"). *See* Ex. 17, June 19 Damages Emails; Ex. 18, Third Revised Damages Calculations. After objections from Particle Media over the late production, Plaintiff's counsel stated that Plaintiff would withdraw the calculations. But on June 21, 2024, Plaintiff served a supplemental designation, amending the descriptions of Mr. Huffman's and Mr. Emmerich's expected testimony to include the Third Revised Damages Calculations. *See* Ex. 19, June 21 Correspondence at 6-8.

On June 24, 2024, Particle Media filed a motion to strike Plaintiff's June 21, 2024 supplemental revised designation. *See* [Dkt. 143]. The Court granted the portion of the motion as to the revised designations of Mr. Emmerich and Mr. Huffman, including the Third Revised Damages Calculations. *See* [Dkt. 163].

As demonstrated below, Mr. Huffman is not qualified to give the opinions stated in Plaintiff's designations and Mr. Huffman's reports. Moreover, his opinions are not based on sufficient facts or data, were not derived through a reliable methodology, and are in large part irrelevant to the facts and allegations at issue in this case. Because Mr. Huffman's opinions fail to meet the standards governing expert testimony under *Daubert* and Rule 702, the Court should exclude them.

II. **STANDARD OF REVIEW**

Under Rule of Evidence 702 and *Daubert*, this Court has a "gatekeeping" responsibility to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but

reliable." *Daubert,* 509 U.S. at 589. This "'gatekeeping' obligation applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141 (1999). "The party offering the expert [here, the Plaintiff,] must prove by a preponderance of the evidence that the proffered testimony satisfies the rule 702 test" by showing that it is both "reliable and relevant." *Mathis v. Exxon Corp.,* 302 F.3d 448, 459–61 (5th Cir. 2002).

Rule 702 states that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" only if the party offering him shows that:

> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and
>
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (emphasis added). "The requirement [in Rule 702] that the testimony 'assist the trier of fact' means the evidence must be relevant." *Mathis*, 302 F.3d at 460. The proposed expert's testimony must not be derived from speculation or personal opinion of a witness cloaked with the mantle of "expertise." *See Daubert*, 509 U.S. at 591-93; Fed. R. Evid. 702.

Mr. Huffman's proposed testimony does not satisfy the requirements of Rule of Evidence 702 and *Daubert*, and the Court should exclude the proffered testimony.

### III. ARGUMENTS AND AUTHORITIES

#### A. Mr. Huffman lacks the qualifications necessary to offer his proposed expert testimony regarding actual damages.

It is well-settled that "[p]arties offering expert testimony must prove the expert is qualified and will offer relevant and reliable testimony." *Kim v. American Honda Motor Co.*, 86

F.4th 150, 160 (5th Cir. 2023). Here, Plaintiff cannot even get past the first hurdle of the expert admissibility test for Mr. Huffman because he lacks the qualifications necessary to offer opinions regarding Plaintiff's alleged actual damages.

Mr. Huffman is a Certified Public Accountant who, by his own admission, is not a copyright expert but instead is simply "an expert in numbers." *See* Ex. 20, Huffman Dep. at 20:9-10, 38:25. He has no professional experience in copyright law. *Id.* at 24:23-25:1. And although he has served as an expert witness in other cases, he has never been engaged to, nor has he ever offered, an opinion on actual damages caused by an alleged copyright infringement or violation of the DMCA. *Id.* at 25:10. Indeed, in preparing to give his opinions for this case, Mr. Huffman did not even review applicable copyright law and/or consult with another CPA or other professional who has expertise in calculating copyright and DMCA damages. *Id.* at 23:25, 206:7-10. Instead, he only "did an internet search on damage calculations and on copyright violations." *Id.* at 19:13-16. However, when he was asked to identify the source of the information he had reviewed, Mr. Huffman testified "I don't remember the actual source of that information." *Id.* at 19:16-17. Finally, as discussed more fully below, Mr. Huffman's damages calculations are based entirely on three methodologies developed by Mr. Emmerich, Plaintiff's President, and it does not appear that Mr. Huffman had thoroughly reviewed these methodologies when he signed his supplemental expert report on April 8, 2024.

In *Wal-Mart Stores, Inc. v. Quore, Inc.*, 2009 WL 305801 (N.D. Miss. Feb. 3, 2009), the district court prohibited a professional engineer from testifying on behalf of the defendant as to the reasonableness of plaintiff's alleged damages. In granting the plaintiff's *Daubert* motion, the court found that the engineer was unqualified to make certain calculations because:

> [The engineer] testified he is not an expert in the field of calculating the value of asphalt as to the extent he considered it a betterment. He testified he relied on a

formula given him by Jim Scherocman. He did not know where the formula came from or how it was derived. Majors could not identify one single other source that used or approved of this formula. Based on this testimony, Majors was little more than an adding machine spitting out a number determined solely by the formula given him. He was not acting as an expert in determining the value of the betterments versus the value of the remedial measures.

*Id.* at *2.

Although *Quore* involved an engineer, as opposed to a CPA, who was offering an opinion on damages, the court's reasoning for finding that the engineer was not qualified is certainly applicable. Like the engineer in *Quora*, Mr. Huffman did not prepare the methodology or formula for the proffered damage calculations, but instead simply served as "an adding machine spitting out a number determined solely by the formula given him" by Mr. Emmerich. Accordingly, the Court should find that Mr. Huffman is not qualified pursuant to Rule 702 because Plaintiff cannot show how his testimony will "help the trier of fact to understand the evidence or to determine a fact in issue." *See* Fed. R. Evid. 702(a).

   **B.  Mr. Huffman's opinions and proffered testimony are unreliable.**

   **1.  The methodologies applied by Mr. Huffman are inherently unreliable.**

Plaintiff's revised expert designation states that "Mr. Huffman may be called to testify regarding the actual damages suffered by [Plaintiff] resulting from Defendant's acts of copyright infringement and violation of the DMCA" utilizing "three methodologies" (the Lost Revenue Methodology, the Value of Articles Stolen Methodology, and the Ad Impression Value Methodology), which would be averaged to come up with a damages number. *See* Ex. 12, Plaintiff's Revised Designation at 6. Plaintiff further claims that "[e]xperts in the field of copyright and DMCA damage calculations would reasonably rely on these kinds of facts or data in forming an opinion on the subject of [Plaintiff's] actual damages[,]" and that in arriving at

these figures, Mr. Huffman relied on Plaintiff's financial reports "previously provided to Smartnews in response to discovery requests." *Id.*

The purported details as to how Mr. Emmerich arrived at the figures for his three methodologies are referenced in footnote 1 of Exhibit "A" to Mr. Huffman's supplemental expert report. *See* Ex. 11, Supplemental Huffman Report at Ex. A. Although the spreadsheet, titled "damages caused by Newsbreak 230517.pdf," is a part of his report, Mr. Huffman repeatedly testified that he did not prepare the spreadsheet, nor did he develop any of the three methodologies outlined in the spreadsheet. *See* Ex. 20, Huffman Dep. at 18:7-11, 20:14-17, 26:20-21, 41:5-8, 43:9-12, 48:25-49:1, 53:4-10. Instead, Mr. Emmerich prepared the spreadsheet and came up with the three methodologies on his own. *Id.*[4] Further, regarding Exhibit "A" to his report, which purports to calculate statutory damages under the DMCA, Mr. Huffman acknowledged that he did not even know what the titles on the spreadsheet or the numbers themselves meant. *Id.* at 45:15-24.

Mr. Huffman's complete lack of involvement in the development of the three methodologies and the preparation of the spreadsheets referenced in his own expert report render wholly unreliable his anticipated testimony that any of the three methodologies and/or their average should be used by the trier of fact to calculate damages. Mr. Huffman even admitted as much in his deposition. When asked how he determined that the three methodologies were reliable, he answered: "I don't know that there is a barometer that says these are credible or not….I wasn't the author of it." *Id.* at 26:17-22. Moreover, when asked about averaging methodologies, Mr. Huffman testified that he did not find anything in the internet research he

---

[4] Mr. Huffman surprisingly acknowledged that may not have even reviewed the spreadsheet before Plaintiff produced it Particle Media. *Id.* 20:18-21, 43:13-19.

performed that would support calculating actual damages based on an average of Mr.

Emmerich's methodologies. *Id.* at 52:13-16.

The Fifth Circuit has stated that "the overarching goal of *Daubert's* gate-keeping

requirement is to ensure the reliability and relevancy of expert testimony [and] to make certain

that an expert … employs in the courtroom the same level of intellectual rigor that characterizes

the practice of an expert in the relevant field." *Black v. Food Lion, Inc.*, 171 F.3d 308, 311 (5th

Cir. 1999) (quoting *Kumho Tire*, 526 U.S. at 152).

A purported damages expert's reliance on methodologies (1) that have no support in the

law or any research that the expert has conducted and (2) that the expert concedes that there is no

"barometer that says [whether they] are credible or not" renders his opinions unreliable and

therefore inadmissible.

### 2.   Mr. Huffman bases his opinions on insufficient and irrelevant facts and data.

To be relevant and reliable, an expert opinion must (1) "help the trier of fact to

understand the evidence or to determine a fact in issue;" (2) be "based on sufficient facts or

data;" (3) be "the product of reliable principles and methods;" and (4) reflect "a reliable

application of the principles and methods to the facts of the case." Fed. R. Evid. 702. In this case,

Mr. Huffman's opinions and calculations as to Plaintiff's actual damages are unreliable because

each of the three methodologies developed by Mr. Emmerich (and supported by Mr. Huffman's

calculator) is based on insufficient facts and data and utilizes irrelevant information that results

in a gross overstatement of alleged damages.

### i.   The Lost Revenue Methodology

Under the Lost Revenue Methodology, Mr. Emmerich (1) used the "Actual Revenue"

from all of Plaintiff's publishing subsidiaries for fiscal years 2018 through 2021, (2) determined

the difference between the "Actual Revenue" numbers and the subsidiaries' "Normative Revenue" numbers (based on their collective growth rate from 2010 to 2017) to get a "Total Revenue Lost," (3) multiplied that "Total Revenue Lost" number by a 90% "marginal profit on incremental revenue," and (4) multiplied that number by 75.8% (the "percent of losses attributable to Newsbreak") to get "Damages Caused by Newsbreak" of $7,027,896. *See* Ex. 16, Second Revised Damages Calculations. There are significant problems with this methodology.

*__Irrelevant Years.__* Mr. Huffman testified that "the lost revenue methodology should only include years in which there are articles that are in question …." *See* Ex. 20, Huffman Dep. at 68:24-69:2. In this case, Plaintiff's claims relate to articles published from mid-2019 to mid-2021. Despite this, Mr. Huffman blessed Mr. Emmerich's Lost Revenue Methodology, which includes "damages" for fiscal year 2018 (July 1, 2017 to June 30, 2018) and fiscal year 2019 (July 1, 2018 to June 30, 2019). *See* Ex. 16, Second Revised Damages Calculations. Mr. Huffman approved of the inclusion of these years, not based on Mr. Huffman's own independent research, but instead "on discussions with Mr. Emmerich [about when] the actual infringement took place." *Id.* at 67:3-7. Mr. Emmerich acknowledged that after looking at a dated list of the articles in issue, at least 2018 should be removed. *See* Ex. 4, W. Emmerich Dep. at 10:19-11:15.

*__Irrelevant Articles.__* This methodology purports to calculate total damages caused to Plaintiff's Actual Revenue by NewsBreak, meaning it includes all of the approximately 33,000 articles from Plaintiff's sites that appeared in some form on NewsBreak instead of the number of articles currently at issue in this lawsuit. See Ex. 16, Second Revised Damages Calculations; Ex. 20, Huffman Dep. at 58:9-21. Plaintiff cannot recover on copyright and DMCA claims for articles that are not part of this case, especially given the fact that Plaintiff must have copyright

registrations covering all works brought as part of its copyright infringement claims. Again, Mr. Huffman simply followed Mr. Emmerich's lead.

**_Lack of Subsidiary-Specific Analysis._** Plaintiff has acknowledged that the subsidiary companies own any copyrights and claims that each subsidiary has assigned ownership to Plaintiff. *See* Ex. 4, W. Emmerich Dep. at 35:20-37:18; Ex. 5, 2024 Conveyance. But the Lost Revenue Methodology makes no effort to consider the alleged damages on a subsidiary-specific basis, instead lumping every subsidiary together regardless of the number of works from each publication that appeared in some form on NewsBreak. *See* Ex. 16, Second Revised Damages Calculations; Ex. 20, Huffman Dep. at 69-74; Ex. 21, Referral Traffic to Emmerich Websites; Ex. 22, Zoltowski Report at ¶35.[5]

For instance, Mr. Huffman failed to take into account that not every subsidiary was impacted by Particle Media's alleged conduct. *See* Ex. 20, Huffman Dep. at 69:19-70:6. In fact, he was not even aware when approving of the calculations that the revenue numbers for some of the subsidiaries were indisputably unaffected by Particle Media's alleged conduct because none of their content appeared in some form on NewsBreak. *See id*. at 69:19-70:6, 71:15-17. However, upon learning this, Mr. Huffman incredibly maintained that this would not change his opinion regarding the lost revenue calculations because "the methodology is taking the total revenues because it makes sense for the system under my assumption that every paper was impacted." *Id.* at 72:20-22. *See also id*. at 69:19-70:6 (stating his calculation would not change because "[w]ithout going back and comparing each newspaper on a year-to-year basis, the global revenue is the most conservative approach for doing that."). In other words, if not one single article from the Clarksdale Press Register, for example, appeared on the NewsBreak app or

---

[5] This list prepared by Mr. Emmerich only includes 18 of the 22 publishing subsidiaries. *Id.* And of the ones listed, one appears to have had no works on NewsBreak and another had almost none. *Id.*

website and the Clarksdale paper somehow lost revenue through no fault of Particle Media, Mr. Huffman would still pin that loss on Particle Media. *Id.* at 71:4-17.

Next, in arriving at the amount of alleged "Cumulative Losses" for the years 2018, 2019, 2020, and 2021, Mr. Emmerich's calculations subtract a "Normative Revenue" amount purportedly based on Plaintiff's subsidiary publishing companies' <u>collective</u> "growth rate from 2010 to 2017," a date range Mr. Emmerich pulled out of thin air. *See* Ex. 16, Second Revised Damages Calculations; Ex. 20, Huffman Dep. at 76:14-77:10.[6] Mr. Huffman, however, failed to take into consideration that some of Plaintiff's publishers were sold or acquired during that period of time, and that transfer of ownership is an event that would certainly impact Plaintiff's "global income." This is yet another example of Mr. Huffman simply signing his name to Mr. Emmerich's work.

***<u>Disregard of Factors Affecting Revenue.</u>*** Mr. Huffman's opinions regarding Mr. Emmerich's Lost Revenue Methodology are further flawed because the methodology attributes **<u>100%</u>** of the alleged "Cumulative Losses" from 2018 to 2021 to Particle Media and SmartNews, another company Plaintiff has sued for infringement and violation of the DMCA. *See* Ex. 16, Second Revised Damages Calculations; Ex. 21, Referral Traffic to Emmerich Websites. Mr. Emmerich uses referral traffic numbers, meaning the number of users that each company <u>directed to Plaintiff's publishers' websites</u>, to come up with a "Percent of losses attributable to NewsBreak." *Id*.

The methodology completely fails to take into account market and other external factors that may have impacted revenue from 2019-2021 such as the economy, changes in technology, COVID-19, and increased industry competition. *See* Ex. 16, Second Revised Damages

[6] In the Second Revised Damages Calculations, that number was -2.7%, and in the Third Revised Damages Calculations, the number was -0.4%. *See* Ex. 16, Second Revised Damages Calculations; Ex. 18, Third Revised Damages Calculations.

Calculations. According to Mr. Huffman, COVID-19 "probably had some impact on [revenue], but not significant." *Id.* 85:14-18. The basis for his opinion is that "the theft loss had started in '17 or '18, two years before COVID," *see* Ex. 20, Huffman Dep. at 85:22-24, although Plaintiff has produced no evidence in support of that claim, and there are no works at issue in this case from those years. But Mr. Emmerich testified that he was "thinking about adding some sort of COVID factor in there … depending on the extent to which I'm able to tweak the model." *See* Ex. 4, W. Emmerich Dep. at 84:17-20. Also asked if he contends Google and Facebook had no effect on Plaintiff's revenues during the years in question, Mr. Huffman stated that he would "be supposing." *See* Ex. 20, Huffman Dep. at 154:20-25.

Further, the publishing companies' revenue numbers typically included four categories of revenue: advertising; circulation; printing; and other. *See* Ex. 23,  Example P&L Comparison at 1. Mr. Emmerich and Mr. Huffman acknowledged that the print and "other" categories should be removed from the "Actual Revenue" numbers for purposes of the damages calculations, since they had nothing to do with content appearing on NewsBreak. *See* Ex. 20, Huffman Dep. at 56:12-57:18; 115:21-116:16.[7] However, Mr. Huffman did <u>not</u> take into account that some of the other lines of revenue may have decreased regardless of Particle Media's alleged conduct. For instance, line items under "Advertising Revenue" typically include phone book and magazine advertising, classified advertising, paid announcements (like obituaries and weddings), and finance charges (*i.e.*, money made from people who were late on payments). *See* Ex. 23, Example P&L Comparison at 1. And line items under "Circulation Revenue" typically include print subscriptions, rack sales, and counter sales. *Id.*

---

[7] The Second Revised Damages Calculations excludes printing, but includes "other." *See id.* at 115:21-116:16; Ex. 16, Second Revised Damages Calculations; Ex. 18, Third Revised Damages Calculations (excluding printing and other).

In Mr. Huffman's opinion, all items of revenue are "tied together" and "you've got to look at globally how all revenue was impacted." *See* Ex. 20, Huffman Dep. at 109:7-18. Instead of performing his own independent analysis as a CPA and determining what specific items of revenue should be included or excluded, Mr. Huffman stated that he "didn't make that determination," but rather was "validating the numbers on this spreadsheet that were generated," meaning he made sure the numbers matched the statements. *Id*. at 114:11-115: 14. He "relied on the preparer of that data [Mr. Emmerich] that understood how their business was impacted by the theft of the articles." *Id*. at 115:4-14.

**_Marginal Profit on Incremental Revenue is Guesswork._** Mr. Emmerich, without any credible support, applied a "Marginal profit on incremental revenue" rate of 90% tinstead of performing an incremental cost analysis on each individual item of revenue as he should have done. *See* Ex. 16, Second Revised Damages Calculations. ; Ex. 4, W. Emmerich Dep. at 126:3-14 (discussing his estimate); Ex. 22, Zoltowski Report at ¶30-31 (stating that "careful examination of costs is essential to determining the profitability of purported lost sales…"). Asked where that 90% came from, Mr. Huffman stated that he believed it was Wyatt's calculation and may have been an estimate. *See* Ex. 20, Huffman Dep. at 121:14-25.

For all of these reasons, Mr. Huffman's opinions regarding the Lost Damages Methodology are unreliable and based on insufficient and irrelevant facts and data, as would be any testimony from Mr. Huffman regarding "the decline in revenue and profits suffered by Emmerich during the years during which Particle was displaying Emmerich's 34,000 articles," as stated in his supplemental report. *See* Ex. 11, Huffman Supplemental Report at ¶(i)(4).

### ii.   Value of Articles Stolen Methodology

Mr. Huffman describes Mr. Emmerich's Value of Articles Stolen Methodology as "a

simple calculation of dividing 2020 expenses [$14,027,576] by [the] number of original articles produced [11,966] to get a cost to produce each article [$1,172] times the number of articles stolen [17,861]." *See* Ex. 20, Huffman Dep. at 123:20-23; Ex. 16, Second Revised Damages Calculations. The "Damages Caused by NewsBreak" under this theory total $20,938,203. *Id*. Like Mr. Emmerich's Lost Revenue Methodology, this methodology is rife with errors, speculation, and flawed assumptions that make it inherently unreliable when analyzed under the *Daubert* standards.

        ***Lack of Subsidiary-Specific and Expense-Specific Analysis.*** This methodology completely fails to consider the inputs on a <u>subsidiary-specific</u> basis, instead combining <u>all</u> of the expenses of <u>all</u> of Plaintiff's subsidiaries (1) regardless of whether the subsidiaries were affected by Particle Media's alleged conduct and (2) regardless of whether the particular expenses related to the cost to produce an article. *See* Ex. 16, Second Revised Damages Calculations; Ex. 20, Huffman Dep. at 127:2-8; Ex. 21, Referral Traffic to Emmerich Websites. Ex. 22, Zoltowski Report at ¶43. Asked if it would matter to his review whether some of the publications never had any content used on NewsBreak, Mr. Huffman testified that "no, it doesn't have any impact … [b]ecause the total costs are the total costs." *Id*. at 127:9-128:2. This logic completely ignores that fact that it was the specific subsidiaries that owned any copyrights as to the works that may have been assigned to Plaintiff. *See* Ex. 4, W. Emmerich Dep. at 35:20-37:18; Ex. 5, 2024 Conveyance.

        Also, these total expenses include expenses that were not impacted whatsoever by Particle Media's actions, as well as expenses for third-party print jobs. Ex. 20, Huffman Dep. at 143:10-11. Mr. Huffman testified that he believed it was appropriate to include them all, regardless of their relationship to the infringement claims because, in his own words, "expenses

20

are what they are." *Id.* at 143:10-11. But Mr. Emmerich agreed it is not fair to attribute expenses to the total number when some of the expenses had nothing to do with publishing. *See* Ex. 4, W. Emmerich Dep. at 98:25-99:4.

   ***Total Number of Articles is Complete Guesswork.*** Mr. Emmerich used the number 11,966 for "Emmerich Original Articles Produced in 2020." *See* Ex. 16, Second Revised Damages Calculations. Footnote 4 states: "In 2020, when Newsbreak theft peaked, Newsbreak stole an estimated 11,966 original articles from Emmerich. That is the estimated total number of original articles Emmerich produced that year." *Id.* Mr. Huffman testified that he does not know the basis of those estimations and that the information was provided by Mr. Emmerich. *See* Ex. 20, Huffman Dep. at 128:3-129:22. Mr. Emmerich admitted that he simply speculated as to the total number of articles produced in 2020, and that he assumed NewsBreak used <u>100%</u> of Plaintiff's articles that year. Ex. <u>4</u>, W. Emmerich Dep. at 81:17-82:2, 99:5-100:10 ("We were not tracking the number of articles we produced at that point in time"); 214:19-215:6 ("[we] looked at how many articles NewsBreak scraped from our website. And <u>we used that as the proxy for the number of original articles produced</u>") (emphasis added).  Of course that is not true because some publishers' content never appeared on NewsBreak. *See* Ex. 21, Referral Traffic to Emmerich Websites.

   Furthermore, Plaintiff has produced no evidence to support that 11,966 number, either in terms of number of articles produced in 2020 or number of articles used on NewsBreak in 2020. And Mr. Emmerich admits he was only trying to estimate "original" articles; he did not include all of the press releases, submissions, and announcements the subsidiaries' employees were involved in getting into the print issues and onto the websites. *See* Ex. 4, W. Emmerich Dep. at 99:8-25; Ex. 16, Second Revised Damages Calculations.

**_One Year._** "[T]otal operational costs were used in this calculation," meaning "whatever total expenses" were incurred in 2020. *See* Ex. 20, Huffman Dep. at 124:4-10, 18-19. Although he was not sure (because he did not come up with this methodology), Mr. Huffman surmised that Mr. Emmerich used 2020 for costs and articles because "that was the – possibly the peak year of theft." *Id*. at 126:1-4. Nonetheless, Mr. Emmerich seems to have used the 2020 calendar year in guessing the total number of articles produced but used the 2020 fiscal year (July 1, 2019 to June 30, 2020) for the total cost calculations. *See* Ex. 4, W. Emmerich Dep. at 214:19-215:6. Mr. Huffman said he did not know whether the number of articles used by Mr. Emmerich were for the calendar year or the fiscal year. *See* Ex. 20, Huffman Dep. at 126:8-16.

Like the previous methodology, Mr. Huffman's opinions regarding the Value of Articles Stolen Methodology are unreliable and based on insufficient and irrelevant facts and data.

### iii. Ad Impressions Value Methodology

Mr. Emmerich intends the third methodology, the Ad Impressions Value Methodology, to represent Particle Media's "Profits From Infringement." *See* Ex. 16, Second Revised Damages Calculations. It does not. Mr. Huffman did not prepare it and had not reviewed it until maybe three weeks before his deposition (after both of his reports had been submitted), *see* Ex. 20, Huffman Dep. at 146:3-23, and, like the first two methodologies, it is not reliable because it is based on insufficient and irrelevant facts and data.

**_Irrelevant Revenue._** Mr. Emmerich's "Click Through Ad Impressions NewsBreak Revenue" references a $26,243 figure provided by Particle Media, which represents the theoretical maximum revenue received by Particle Media for banner ads in relation to all content from Plaintiff's publishers' websites that appeared on NewsBreak, including articles (1) that Plaintiff did not own, (3) that are not copyrightable, and (3) that are not part of this lawsuit, with

no expenses or costs deducted. *See* Ex. 22, Zoltowski Report at ¶2; Ex. 24, PM Suppl. Resp. to Int. 12. So right out of the gate, the methodology includes irrelevant alleged revenues.

***Google's Alleged Cut is Irrelevant.*** Ads on NewsBreak during the time in question were handled by Google, Amazon, and Facebook. *See* Ex. 1, Zhong Decl. at ¶38. Those companies were paid by advertisers and then gave Particle Media a cut, <u>not the other way around</u>. *Id*. Nonetheless, despite the fact that he claims to be determining Particle Media's profits from infringement, Mr. Emmerich inexplicably adds "Google's Cut" back in to arrive at a "Total Click Through Ad Revenue" of $121,122. *See* Ex. 16, Second Revised Damages Calculations. Mr. Huffman acknowledged it may be inappropriate to include "Google's Cut" if the money passed from Google to Particle Media instead of Particle Media to Google. *See* Ex. 20, Huffman Dep. at 156:19-157:24. And even Mr. Emmerich testified that he should remove "Google's Cut." Ex. 4, W. Emmerich Dep. at 101:6-102:4. This error alone renders Mr. Emmerich's methodology (and therefore, Mr. Huffman's calculations) speculative and unreliable because he includes revenue from a party other than the alleged infringer.  *See* Ex. 22, Zoltowski Report at ¶48.

Moreover, "Google's Cut" of 35% is based on a screenshot of a lawsuit filed by the U.S. Department of Justice against Google, completely unrelated to Particle Media. *See* Ex. 16, Second Revised Damages Calculations at n. 11; Ex. 25, Google's Cut. Mr. Huffman testified that he does not know what the case is about and did not review the entire document from which the number was pulled or read the information around the rate to get context. *See* Ex. 20, Huffman Dep. at 147:18-148:12.

***Ads Per Page.*** Mr. Emmerich's calculations state that the number of three ads per page is based on the 2022 deposition of Particle Media's damages expert Neil Zoltowski, *see* Ex. 16, Second Revised Damages Calculations, but that ignores Mr. Zoltowski's clarification that there

was one ad slot per page view. *See* Ex. 26, 2022 Zoltowski Dep. at 60-61. But Mr. Huffman was

not aware of that part of Mr. Zoltowski's testimony because he only reviewed the specific page

referenced by Mr. Emmerich. *See* Ex. 20, Huffman Dep. at 148:113-23; Ex. 22, Zoltowski

Report at ¶49.

     ***"Total Value" is Bad Math with Irrelevant Numbers.*** Mr. Emmerich appears to be

trying to attribute revenue to Particle Media based on ads appearing on the NewsBreak app's

news feed. He arrives at a $5,851,282 "Total Value of All Articles Stolen" by multiplying the 48

"Inverse of Click Through Divided by News Feed Article" number by the $121,122 "Total Click

Through Ad Revenue" number (which, again, includes "Google's Cut" and two extra ad slots per

page view). *See* Ex. 16, Second Revised Damages Calculations. For the record, $121,122 times

48 equals $5,813,856, not $5,851,282. Nonetheless, because the $121,122 number is also based

on an underlying number ($26,243) that includes articles (1) that Plaintiff did not own, (2) that

are not copyrightable, and (3) that are not part of this lawsuit, *see* Ex. 24, PM Suppl. Resp. to Int.

12, the "Total Value of All Articles Stolen" is not tethered to the specific articles at issue in this

matter. *See* Ex. 22, Zoltowski Report at n. 63. Mr. Huffman testified that he was not aware that

the $26,243 number includes articles that are not relevant to this case. *See* Ex. 20, Huffman Dep.

at 149:20-25. He was also not aware that none of Particle Media's costs or expenses had been

deducted from that number. *Id*. at 150:2-5. He acknowledged that that could be relevant to the

calculation of profits. *Id*. at 150:2-151:14.

     ***Non-Party Click-Through Rates.*** Mr. Emmerich assumes a "Click Through Percentage"

of 0.69% based on the alleged click-through rates of two other companies, Google News and

Facebook News. *See* Ex. 16, Second Revised Damages Calculations. Plaintiff has made no

showing that those rates are relevant here. *See* Ex, 22, Zoltowski Report at ¶50.

Accordingly, Mr. Huffman's opinions regarding the Ad Impressions Value Methodology are unreliable and based on insufficient and irrelevant facts and data.

### iv.  Average and Average-Plus

In the First Revised Damages Calculations, Mr. Emmerich took the average of the three methodologies to arrive at a damages total of $11,688,180. *See* Ex. 14, First Revised Damages Calculations. Five days later, in the Second Revised Damages Calculations, Mr. Emmerich averaged the first two methodologies and added the third to come up with damages of $18,334,331. *See* Ex. 16, Second Revised Damages Calculations. And in the Third Revised Damages Calculations, which has been excluded, the number was $20,545,755, almost double what it was two weeks before. *See* Ex. 18, Third Revised Damages Calculations.

Mr. Huffman testified that he did not find anything in the internet research he performed that would support calculating actual damages based on an average of methodologies.  *See* Ex. 20, Huffman Dep. at 52:13-16. Moreover, the Copyright Act and the DMCA do not authorize double counting of the same amounts. 17 U.S.C. §§ 504(b), 1203(c)(2). Mr. Emmerich (and Mr. Huffman for that matter) did not acknowledge the existence of this limitation with respect to the quantification of actual damages and has not performed any analysis or evaluation to determine any double counting that may exist within the damages amount being proffered.

### 3.  Mr. Huffman has no knowledge of and can offer no opinions regarding Particle Media's methodology for calculating its maximum revenue.

Mr. Huffman's supplemental report states that he "will testify concerning the methodology employed by Particle concerning their revenue generated by Emmerich articles and how this methodology, by not including the news feed revenue, which [sic] caused a significant underestimation of the damages." *See* Ex. 11, Huffman Supplemental Report at ¶(i)(4). However, Mr. Huffman stated that he does not know if he reviewed the report of Particle Media's damages

expert and that he did not review Particle Media's methodology. *See* Ex. 20, Huffman Dep. at 41:9-42:16. Asked if he has any opinion about how Particle Media calculated their revenue generated from Plaintiff's articles, he stated: "I will based on conversations with Mr. Emmerich." *Id*. at 42:2-8. And asked if he had any opinion at the time of his deposition about how Particle Media calculated their revenue from Emmerich content, he stated: "I don't." *Id*. at 43:2-5. He certainly should not be permitted to testify at trial as to Particle Media's methodology for calculating its maximum revenue.

### 4. Mr. Huffman cannot offer any reliable or relevant expert opinion regarding the alleged effect of NewsBreak on readers and advertisers.

Mr. Huffman's supplemental report states that he will testify how NewsBreak's use of content from Plaintiff's publishers' websites "provided readers and advertisers with a cheaper substitute product and how such substation can undermine the profitable and viability in a competitive market." *See* Ex. 11, Huffman Supplemental Report at ¶(i)(4). But Mr. Huffman did not write that, and his agreement with the statement is based on nothing more than Mr. Huffman knowing that Plaintiff's revenue went down. *See* Ex. 20, Huffman Dep. at 37-39. Asked if he is an expert on the news industry, he said "Define 'expert.'" *Id*. at 37:10-11. And asked if he is an expert on what readers and advertisers would think, he stated: "I don't know that 'expert' is the right terminology, but I can read a set of financial statements…" *Id*. at 37:17-39:40. The opinions stated in Mr. Huffman's supplemental expert report cannot satisfy the standards of Rule 702 and *Daubert*, and should be excluded.

### C. Mr. Huffman failed to follow his own professional standards.

Mr. Huffman testified that he is not sure if the AICPA has standards or guidelines that CPAs must follow when serving as an expert witness. *See* Ex. 20, Huffman Dep. at 197:19-198:2. However, Mr. Huffman would almost certainly not deny that as a licensed CPA, he is

bound by the ethical standards of the AICPA Code of Professional Conduct.  Under the AICPA's Code of Professional Conduct and the standards for members performing forensic accounting services, including litigation services, CPAs must perform all work with professional competency. *See* Ex. 27, AICPA Statement of Standards for Forensic Services at ¶¶1,6. These standards "apply to all services performed by a member," and require a CPA to "obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any professional services performed."  *Id.* at ¶6.

The AICPA standard is consistent with Federal Rule of Evidence 702. In deciding the requirements of expert testimony, the Fifth Circuit has held that testimony cannot be based on "subjective belief or unsupported speculation." *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 275 (5th Cir. 1998).

Despite being bound by the AICPA Code of Professional Conduct and the AICPA Statement on Standards for Forensic Services, Mr. Huffman repeatedly admitted that that he did nothing to independently verify the facts and data underlying Mr. Emmerich's three methodologies despite the fact they serve as the foundations for Mr. Huffman's calculations and opinions. Mr. Huffman's testimony reveals that he blindly accepted financial projections and estimates and other uncorroborated representations from Mr. Emmerich and then based all of his opinions on that unverified information.

For example, as demonstrated above, Mr. Huffman blessed Mr. Emmerich's inclusion of numbers related to all subsidiary publishers, regardless of how much, if any, of their content appeared in some form on NewsBreak. And Mr. Huffman failed to account for the fact that some revenue items may have decreased despite being completely unrelated to NewsBreak. In his opinion "they're all tied together" and "you've got to look globally how all revenue was

impacted." *See* Ex. 20, Huffman Dep. at 109:7-18. Instead of performing his own independent analysis as to what items should and should not be included, he simply "relied on the preparer of the data [i.e., Mr. Emmerich] that understood how their business was impacted by the theft of the articles." *Id.* at 115:4-14. He similarly relied on Mr. Emmerich's determination that Plaintiff's "marginal profit" was 90% instead of personally confirming that figure. *Id.* at 200:21-23.

Mr. Huffman's lackadaisical approach to his duties as a potential expert in this Court as demonstrated by his failure to objectively verify critical information that forms the basis of his opinions—in violation of applicable AICPA standards and the requirements of Rule 702 and *Daubert*—render his opinions regarding Mr. Emmerich's methodologies unreliable and, thus, inadmissible.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Particle Media respectfully asks this Court to exclude Mr. Huffman's proposed testimony. Particle Media requests such other relief as the Court deems just and proper.

Respectfully submitted, this the 22nd day of July, 2024.

<div style="margin-left:40%">

Respectfully submitted,
**PARTICLE MEDIA, INC.**

By:    s/ *Stephen J. Carmody*
One of its Attorneys

</div>

OF COUNSEL:

Stephen J. Carmody, MSB #8345
Karen E. Howell, MSB #102243
BRUNINI, GRANTHAM, GROWER & HEWES, PLLC
Post Office Drawer 119
Jackson, Mississippi 39205
Telephone:     (601) 948-3101
Facsimile:     (601) 960-6902
scarmody@brunini.com
khowell@brunini.com