**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**EMMERICH NEWSPAPERS, INCORPORATED**                    **PLAINTIFF**

**V.**                         **CIVIL ACTION NO. 3:23-CV-26 TSL-MTP**

**PARTICLE MEDIA, INC.**                              **DEFENDANT**

**CONSOLIDATED WITH**

**EMMERICH NEWSPAPERS, INCORPORATED**                    **PLAINTIFF**

**V.**                         **CIVIL ACTION NO. 3:23-CV-391 TSL-MTP**

**PARTICLE MEDIA, INC.**                              **DEFENDANT**

---

**PARTICLE MEDIA, INC.'S MEMORANDUM IN SUPPORT
OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT OF
PLAINTIFF'S CIRCUMVENTION AND TRAFFICKING CLAIMS**

---

Plaintiff Emmerich Newspapers, Inc. accuses Particle Media, Inc. ("Particle Media") of (1) circumvention under 17 U.S.C. §§ 1201(a)(1) and (2) trafficking in prohibited circumvention technology under §§ 1201(a)(2) and (b), and seeks injunctive relief as a result. But Particle Media did not circumvent any technological measures that either effectively controlled access to works on the *Greenwood Commonwealth* and *Enterprise-Journal* websites or effectively protected a right of a copyright owner.

Regarding its circumvention claims under Sections 1201(a)(1) and (2), Plaintiff initially claimed *res ipsa loquitur*, arguing Particle Media <u>must</u> have hacked the alleged paywalls for its websites in order to gain access to the full text of articles on those sites, because otherwise it could not possibly have received that information. Significantly, however, Plaintiff has provided no tangible evidence whatsoever showing <u>when</u> the alleged paywalls on those sites were working, and when they were <u>not</u> working, or which articles were available in front of the

alleged paywalls or otherwise. And Plaintiff and its designated technical expert now concede that during the relevant time period, from 2019 to 2021, the websites shared the entirety of their articles' content with all visitors. In other words, Plaintiff now admits that during the relevant time period no effective paywalls were working. Having been forced, after months of discovery and depositions, to admit this indisputable fact, Plaintiff has now abandoned its *res ipsa loquitur* argument and instead contends Particle Media somehow "impaired" the newspapers' alleged paywalls by extracting text after the sites themselves provided access. But the uncontroverted evidence establishes that there was no circumvention, and that the alleged "technological measures" on the newspapers' websites did not effectively control access to the works published on the sites, nor did they protect the rights of a copyright owner. Accordingly, the undisputed facts show there has been no circumvention as a matter of law, and thus the Court should dismiss Plaintiff's circumvention and trafficking claims under Sections 1201(a) and (b).

As for Plaintiff's trafficking claims under Sections 1201(a)(2) and (b), in order for them to survive Plaintiff must also show that Particle Media traffics in technology that: (1) is "primarily designed or produced for the purpose of circumventing;" (2) "has only limited commercially significant purpose or use other than to circumvent;" or (3) "is marketed" by Particle Media "for use in circumventing." *See* 17 U.S.C. §§ 1201(a)(2) (regarding "technological measure that effectively controls access to a work") and 1201(b)(1) (regarding "protection afforded by a technological measure that effectively protects a right of a copyright owner") (emphasis added). No fair-minded jury could return a verdict in Plaintiff's favor on these claims, however, because NewsBreak's web crawler system was not designed for the purpose of circumventing and has broad commercially significant purposes and uses beyond the circumvention alleged by Plaintiff, and it has never been marketed for any circumventing use.

Nor is Plaintiff is entitled to injunctive relief. Proof of an ongoing or imminent injury is an indispensable prerequisite to forward-looking relief, but Plaintiff does not dispute that Particle Media no longer uses any content from its publishers' websites. Therefore, the Court should dismiss the request for injunctive relief as well.

In sum, the Court should dismiss Plaintiff's circumvention and trafficking claims with prejudice and deny its request for injunctive relief. At the very least, the statute of limitations bars at least Plaintiff's pre-January 12, 2020 DMCA claims.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  NewsBreak

Particle Media designed and developed NewsBreak, free-access apps (Android and iOS) and a website, that (1) provides users with an easily accessible and personalized feed of local and national content and information; (2) indexes and links original and third-party content, making it easier for users to search, browse, and find content; (3) widens publishers' exposure to a broader network of readers than they otherwise could reach by driving traffic through links to their website; (4) helps users discover content without having to undertake voluminous searches by referring them to content based on their locations, preferences, and interests; and (5) provides an effective platform for publishers and contributors to enhance their visibility or generate revenue with tools to manage their content and connect with users directly. *See* Ex. 1, Zhong Decl. at ¶3.

As has been widely recognized, the newspaper industry has been shrinking for decades, while at the same time television, online, mobile and social media have become the dominant source of news for most Americans. *See* Ex. 2, Sell Report at ¶11(i). In the face of such industry contraction, the traffic generated by news aggregators like NewsBreak has presented an

opportunity for news outlets, particularly for small publishers, by directing traffic to publishers' websites, often allowing news outlets to reach audiences beyond those the publishers could reach on their own. *Id.* at ¶11(ii).

Particle Media's objective in offering NewsBreak is to create value for users, publishers, and businesses. *See* Ex. 1, Zhong Decl. at ¶4. As a platform, Particle Media seeks to make information more accessible in order to help communities stay informed and connected and to allow users to live safer, more vibrant, and connected lives, all while promoting local news and information to a new generation of readers. *Id.* To that end, it has entered into agreements with almost 300 publisher groups (who operate more than two thousand websites) permitting Particle Media to host their content in full on NewsBreak, meaning to host the content from NewsBreak's server. *Id.* These publisher groups have created their profiles on the NewsBreak publisher platform, allowing them to amass "followers," interact with users, access engagement analytics, and have their content exposed. Particle Media also refers significant traffic to publishers' websites. *Id.* Particle Media also refers significant traffic to publishers' websites, ranking fourth for total traffic referral in 2021, more than Twitter and surpassed only by Google, Facebook and Google News. *See id.*; Ex. 2, Sell Report at ¶126. The traffic NewsBreak provides is so valuable that some publishing partners have even paid NewsBreak for it. *See id.*; Ex. 1, Zhong Decl. at ¶4. Some publishers who receive direct traffic from NewsBreak also create profiles on the NewsBreak publisher platform. *Id.*

During the relevant period, from 2019 to 2021, users who opened the NewsBreak (either on its website or in its mobile app) viewed a news feed that, for each listed story, presented a headline and/or a thumbnail image and/or the first limited words of the article, all intended to promote the story and thus encourage users to visit the publisher's own website in order to view

the full article. *See* Ex. 1, Zhong Decl. at ¶5. When a user of the NewsBreak mobile app clicked

on an item listed on the news feed or in a search result, she either (1) viewed the full article on

NewsBreak, in the case of fully-hosted articles of publishers and creators with whom Particle

Media has agreements, or (2) was taken directly to the those websites (i.e., the source of the

article), with NewsBreak acting as a web browser, just like Google's Chrome or Safari. *Id;* Ex. 3,

PM Discovery Resp. at Int. 17; Ex. 4, Gianturco Report at ¶¶10, 20.2, 20.2.5.4, 20.2.5.5.[1] When

a website (computer or mobile) user clicked on an item listed on the news feed or in a search

result, she was given a link to "Go to Publisher's website." *See* Ex. 1, Zhong Decl. at ¶5; Ex. 3,

PM Discovery Resp. at Int. 17.[2]

### B.  This Lawsuit

Plaintiff owns companies that publish newspapers and operate associated websites. *See*

[Dkt. 15], First Amended Complaint ("FAC") at ¶17. Stories from some of those sites previously

appeared on the NewsBreak news feed in the form of a headline and/or a thumbnail image and/or

the beginning words of the article, with a link that took the user directly to those websites. *See*

Ex. 1, Zhong Decl. at ¶7; Ex. 4, Gianturco Report at ¶20.2. There were also periods of time in

2019 to 2021 during which, because of a software glitch, some articles from the websites of

Plaintiff and other non-partner publishers were inadvertently made available in self-hosted full

---

[1] Particle Media has designated Mark D. Gianturco, Ph.D., as its expert in the field of computer science, software engineering, and technology. Dr. Gianturco received his Bachelor of Science in Computer Science from William and Mary, his Master of Science in Information Systems from George Mason University, and his Doctor of Philosophy in Information Technology (Software Engineering and Cloud Research) from George Mason University.

[2] When a website (computer) user clicked on an item listed on the news feed or in a search result, she was given a link to "Go to Publisher's website." *See* Ex. 1, Zhong Decl. at ¶5; Ex. 3, PM Discovery Resp. at Int. 17. And when a NewsBreak app user (on a mobile phone or device) clicked to "Share" an article, the link presented that user the option to go to the non-partner publisher's website either via the NewsBreak app, with the app acting as a web browser, or via another web browser like Safari. *See* Ex. 1, Zhong Decl. at ¶6. The NewsBreak programming offered both a website user and Safari user a link to "Go to Publisher's website," which when clicked upon took the user to the non-partner publisher's website. *See id.*; Ex. 5, Share Examples.

text on the NewsBreak app for users of the Android platform, who were not directed to the publishers' websites. *See* Ex. 1, Zhong Decl. at ¶8; Ex. 3, PM Discovery Resp. at Int. 17. These are what Particle Media has referred to as "self-hosted" or "full text" articles. *See* Ex. 1, Zhong Decl. at ¶8.

The self-hosted full text display of such articles was not an intended feature of the NewsBreak app or an intended practice of Particle Media. *See* Ex. 1, Zhong Decl. at ¶9; Ex. 3, PM Discovery Resp. at Int. 17; Ex. 4, Gianturco Report at ¶¶10, 10.1. In fact, Particle Media's company policy prohibits the display of self-hosted full text articles if the content originates from a non-partner publisher. *See* Ex. 1, Zhong Decl. at ¶9; Ex. 3, PM Discovery Resp. at Int. 17. The technical glitch that led to such display first occurred in July 2019, when low-level engineers unfamiliar with Particle Media's policy and copyright law were trying to address a functionality issue related to non-mobile-friendly content and made full content available by mistake. *See* Ex. 1, Zhong Decl. at ¶10; Ex. 6, 2022 PM 30(b)(6) at 37. Upon learning of the glitch, Particle Media took immediate actions to fix it by implementing a software patch and emphasized to employees the company's policy not to self-host full text content from non-partner publishers. *See* Ex. 1, Zhong Decl. at ¶10; Ex. 6, 2022 PM 30(b)(6) at 37. The glitch occurred again in May 2020 when a different engineer tried to resolve a bug and accidentally removed one of the "logics" (*i.e.*, software code) that Particle Media had implemented to fix the glitch. *See* Ex. 1, Zhong Decl. at ¶11; Ex. 6, 2022 PM 30(b)(6) at 37-38. Upon discovering this, Particle Media worked quickly to put the logic back in place. *Id.*

As early as <u>February 2020</u>, Plaintiff learned of Particle Media's use of content from its websites. *See* Ex. 7, Plaintiff's Discovery Resp. at 17. Plaintiff did not, however, send a cease and desist letter or submit a notification pursuant to the copyright policy on Particle Media's

website. *See id.*; Ex. 8, Particle Media Terms of Use. Instead, more than five months later, in August 2020, Plaintiff registered nine articles with the U.S. Copyright Office, and more than four months after that, on January 15, 2021, Plaintiff filed suit against Particle Media asserting copyright infringement claims and several state law tort claims. *See Emmerich Newspapers, Inc. v. Particle Media, Inc.*, Civil Action No. 3:21-CV-32-KHJ-MTP (S.D. Miss.). The filing of the lawsuit was the very first time Particle Media became aware that the self-hosted full text content displayed as a result of the glitch included content from some of Plaintiff's publishers' websites. *See* Ex. 1, Zhong Decl. at ¶14. The Court in the previous case dismissed all but Plaintiff's copyright infringement claims as to nine registered works, *see Emmerich Newspapers, Inc. v. Particle Media, Inc.*, 2022 WL 843209, at *4 (S.D. Miss. Mar. 21, 2022), and the parties later resolved the dispute.

Plaintiff filed Case No. 3:23cv26 in January 2023 and filed the FAC in April 2023, alleging, among other things, that Particle Media violated the DMCA by (1) circumventing its paywalls as to 7,579 articles that appeared on the *Greenwood Commonwealth* and *Enterprise-Journal* websites, and (2) trafficking in prohibited circumvention technology, *i.e.*, making NewsBreak available to users. *See* [Dkt. 15].[3] On May 14, 2024, Plaintiff provided revised lists, lowering its circumvention claims to 1,171 articles from the *Greenwood Commonwealth* and 1,260 articles from the *Enterprise-Journal*. And on July 4, 2024, Plaintiff eliminated an additional 188 articles from the lists. *See* [Dkt. 158-1]. On July 19, 2024, Plaintiff provided a list "of all remaining articles for which Emmerich assets claims based on circumvention of its paywalls" (the "Circumvention List"), including 2,114 articles. *See* Ex. 9, Circumvention List.

---

[3] Plaintiff filed Case No. 3:23cv391 in June 2023, asserting the same claims, but alleging infringement of articles and photos for which it purportedly received registrations after filing Case No. 3:23cv26.

### C.  **Plaintiff's Circumvention Claims – Facts**

Plaintiff claims that during the relevant period, from 2019 to 2021, the *Greenwood Commonwealth* and *Enterprise-Journal* websites operated behind "hard paywalls," meaning a reader could only get past a digital paywall to view full articles by paying a subscription fee and obtaining and using a legitimate username and password. *See* [Dkt. 49] at 3, 14, 15. Plaintiff previously argued that because content from those websites appeared on NewsBreak and Particle Media never obtained a username and password, Particle Media must have circumvented the alleged paywalls. *See* [Dkt. 49] at 15 ("*Res Ipsa Loquitor*."); [Dkt. 44] at 14-15 ("*ipso facto*, Particle circumvented [its] technological measures"). In support of that assertion, Plaintiff relied on affidavits of Wyatt Emmerich (Plaintiff's owner), Jack Ryan (publisher of the *Enterprise-Journal*), Tim Kalich (publisher of the *Greenwood Commonwealth*), and Gregory Griffith (a since-designated expert), which provided no technical details regarding how the alleged "hard paywalls" allegedly worked, but nevertheless concluded that Particle Media's web crawler had somehow "hacked" through them. *See* [Dkt. 48-1], Emmerich Aff. at ¶¶11-14; [Dkt. 48-2], Ryan Aff. at ¶¶6-7, 12-13; [Dkt. 48-3], Kalich Aff. at ¶¶6-7, 13-14; [Dkt. 48-6], Griffith Aff. at ¶¶15-17. In those same affidavits, however, Mr. Emmerich, Mr. Ryan, and Mr. Kalich acknowledged that not all of the articles on the *Greenwood Commonwealth* and *Enterprise-Journal* were behind paywalls. *See* [Dkt. 48-1], Emmerich Aff. at ¶11; [Dkt. 48-2], Ryan Aff. at ¶6; [Dkt. 48-3], Kalich Aff. at ¶¶6-7, 13-14. *See also* Ex. 10, Publisher Emails; Ex. 7, Plaintiff's Discovery Resp. at RFA 13; RFA 19; RFA 20.

In previous briefing, Particle Media explained that the full articles from the *Greenwood Commonwealth* and *Enterprise-Journal* websites must have been available to Particle Media's web crawler because, as a technical matter, the web crawler simply is not capable of

circumvention. *See* [Dkt. 66] at 21-22; [Dkt. 65-1], Zhong Decl. at ¶22; [Dkt. 65-2], PM

Discovery Resp. at Int. 16. This is demonstrated in part by the fact that content from other

Plaintiff websites affected by the glitch did not include full text, but rather included paywall

language. *See* [Dkt. 66] at 21-22; [Dkt. 65-1], Zhong Decl. at ¶22; [Dkt. 65-2], PM Discovery

Resp. at Int. 16; Ex. 11, Paywall Examples.

On March 8, 2024, Particle Media served its designation of experts, identifying Mark D.

Gianturco, Ph.D., as its expert in the field of computer science, software engineering, and

technology.[4] *See* Ex. 12, Particle Media's Designation. Through his review and analysis, Dr.

Gianturco determined that during the relevant timeframe, the *Greenwood Commonwealth* and

*Enterprise-Journal* websites fully exposed the text of their articles, meaning there was no active

paywall in place for either of those websites. *See, e.g.,* Ex. 4, Gianturco Report at ¶9. Regardless

of whether a website visitor was or was not a subscriber, both sites responded to HTTP requests

by providing the <u>full article text</u> in their HTTP responses. *Id.* Any visitor to the websites would

have been able to view full text articles simply by utilizing browser settings (or display screens)

available on all web browsers commonly in use. *Id.* at ¶9.1. Moreover, The Wayback Machine

illustrates that anyone could have viewed and copied the full text articles that were being shared

by the websites during the relevant time period. *Id.* at ¶27.5.[5]

On June 21, 2024, Plaintiff served its supplemental revised expert designation and Mr.

Griffith's Supplemental Expert Witness Report, attempting to challenge some of Dr. Gianturco's

---

[4] Dr. Gianturco received his Bachelor of Science in Computer Science from William and Mary, his Master of Science in Information Systems from George Mason University, and his Doctor of Philosophy in Information Technology (Software Engineering and Cloud Research) from George Mason University.

[5] The Wayback Machine (https://archive.org/web) is a repository designed to preserve versions of content deployed on the web over time, and is also known as the Internet Archive. *Id.* at ¶13(a).

findings. *See* Ex. 13, Supp. Griffith Report.[6] Significantly, Mr. Griffith does not dispute (nor can

he) that during the relevant time period, the *Greenwood Commonwealth* and *Enterprise-Journal*

websites shared the entirety of the articles' textual content to all users, and that all visitors could

see the entire article if they knew where to look. *See*, *e.g.*, Ex. 14, 2024 Griffith Depo. at 58:4-

22, 92:16-21, 94:3-9. Rather, Mr. Griffith contends that Particle Media circumvented the alleged

paywalls not by <u>accessing</u> the full text of the articles, but by "remov[ing] the computer code that

creates the paywalls" and then making the articles available to app users. *Id*. at 67:25-68:13.

Dr. Gianturco provided an additional declaration on July 1, 2024, reiterating that "[e]very

news article HTML page that the Emmerich websites served from the timeframe in question

provided the full article text content within it, and withheld none of it," and that "[t]here was no

circumvention necessary to obtain the full article text, [because] it was provided by the

Emmerich website for every webpage request." *See* Ex. 15, Gianturco Decl. at ¶11. He further

stated "[p]ublished research during the timeframe in question clearly shows that the mechanism

used by the plaintiff to create a purported paywall" is "known not to work[.]" *Id*. at ¶12.

**D.  <u>Plaintiff's Trafficking Claims – Facts</u>**

Plaintiff claims that (1) "[t]he NewsBreak app was designed to, and does, circumvent

technological measures put in place by copyright holders such as Emmerich to control access to,

or uses of, their copyright[ed] work in violation of 17 U.S.C. § 1201(a)(2) and (b)," and (2)

Particle Media "illegally traffics in prohibited technology by making the NewsBreak app

available to millions of users who use the app to hack Emmerich's websites and view his content

without paying the customary fee." *See* [Dkt. 15] at ¶¶81, 82. In addition to damages, Plaintiff

seeks an order enjoining Particle Media "from any further distribution of the NewsBreak app and

requir[ing] Particle [Media] to discontinue the use of this app by any existing users." *Id*. at ¶85.

---

[6] Particle Media's motion to strike the supplemental designation and report is pending. *See* [Dkt. 143].

Plaintiff does not and cannot contend that content from any of its publishers' websites currently appears on NewsBreak. *See* Ex. 16, EN 30(b)(6) at 21:1-10. Moreover, "[i]t is undisputed, and can be plainly shown, that during the time period in question, the [*Greenwood Commonwealth* and *Enterprise-Journal* websites] always provided HTML with full article text for every client request for the timeframe in question." *See* Ex. 15, Gianturco Declaration at ¶11. Thus, there was "no circumvention and no hacking." *Id*. Instead, the "technological measures" allegedly in place on the sites were not effective in controlling access and in protecting the rights of a copyright owner. *Id.* at ¶16. Regardless, NewsBreak's web crawler and parser still cannot constitute circumvention technology because they (1) are not "primarily designed" for the purpose of circumventing, (2) have broad commercially significant purposes and uses beyond the circumvention alleged by Plaintiff, and (3) have never been marketed for any circumventing use. *See*, *i.e.*, Ex. 1, Zhong Decl. at ¶¶24; Ex. 2, Sell Report at ¶¶11(i)-(ii), 126.

For these reasons and others, discussed in greater detail below, Plaintiff's circumvention and trafficking claims are wholly without merit.

## II.   <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Johnson v. World Alliance Fin. Corp.*, 830 F.3d 192, 195 (5th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Once the moving party has made an initial evidentiary showing that negates the existence of a genuine, material fact issue, the party opposing the motion must present competent summary judgment evidence of the existence of a genuine issue of fact." *Johnson*, 830 F.3d at 195. "The mere existence of a

11

scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252. The Court's inquiry asks whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. *Id*.

The irrefutable evidence in this case demonstrates that Particle Media did not circumvent technological measures that effectively controlled access to articles on the *Greenwood Commonwealth* and *Enterprise-Journal* websites or protected a right of a copyright owner. Plaintiff has not presented and cannot present evidence to create a genuine issue of material fact to the contrary. Therefore, Particle Media is entitled to dismissal of Plaintiff's circumvention and trafficking claims, and the Court should grant summary judgment in its favor.

Moreover, no fair-minded jury could return a verdict in Plaintiff's favor on its trafficking claims. NewsBreak is not "primarily designed or produced for the purpose of circumventing" a technological measure that effectively controls access to a work or protects a copyright owner's rights; the broad commercially significant purposes and uses of NewsBreak, including its crawler and parser, are undeniable; and Plaintiff can point to no evidence whatsoever that Particle Media has marketed NewsBreak for use in circumventing.

### III.  <u>ARGUMENTS AND AUTHORITIES</u>

**A.  <u>Circumvention – Particle Media did not circumvent any technological measures that effectively controlled access to works or effectively protected a right of a copyright owner.</u>**

**1.  <u>Plaintiff is guessing as to which articles were allegedly behind "paywalls" on the *Greenwood Commonwealth* and *Enterprise-Journal* websites, and this lack of specificity is fatal to its claims.</u>**

Plaintiff has admitted that it has no documents or tangible evidence showing (1) <u>when</u> the alleged paywalls on the *Greenwood Commonwealth* and *Enterprise-Journal* websites were up and when they were down, (2) <u>which articles were available when the alleged paywalls were</u>

down, or (3) which articles were in front of the alleged paywalls. *See*, *e.g.*, Ex. 7, Plaintiff's Discovery Resp. at RFP 24 (no documents or tangible evidence showing when the *Enterprise-Journal* paywall was up and down); RFP 27 (same as to the *Greenwood Commonwealth*); RFP 28 (no documents or tangible evidence showing which articles were not behind the *Greenwood Commonwealth* paywall); RFP 29 (same as to the *Enterprise-Journal*); Ex. 17, Ryan Depo. at 34:15-35:15; Ex. 18, Kalich Depo. at 21:23-22:12, 24:8-25:8. The lack of specificity and supporting evidence is fatal to Plaintiff's claims.

*__Enterprise-Journal.__* Though Plaintiff denied requests for admissions that it "does not know when the … *Enterprise Journal* paywall was up and when it was down" and that it "does not know which articles were available when the … *Enterprise Journal* paywall was up and when the paywall was down," Plaintiff's vague responses tellingly failed to identify any specific dates or articles, and gave no indication Plaintiff was capable of ever providing that information. *See* Ex. 7, Plaintiff's Discovery Resp. at RFA 14 and 15 (emphasis added).

Mr. Ryan testified that in reviewing Plaintiff's *Enterprise-Journal* circumvention list, he remembered several dates during which the alleged paywall likely would have been down.[7] *See* Ex. 17, Ryan Depo. at 31-32 (referencing May 10-14, 2019, October 12-14, 2020, and February 15-19, 2021). But he also testified that those were estimates based solely on his memory alone, and that specific paywall and article details are not available because the *Enterprise-Journal* switched website content management systems in late 2021. *Id*. at 26, 30-32, 34-35. Furthermore, though Plaintiff guesses, without any support, that "[t]he only articles which would have been available to Particle's web crawler during emergencies were the articles appearing in

---

[7] Mr. Ryan was deposed the day after the Court entered its Order noting that Plaintiff "does not identify either specific articles allegedly stolen from behind the … paywalls, the timeframe(s) in which they could have been accessed or the dates on which paywalls were allegedly breached." *See* [Dkt. 146] at 13, n. 7.

the current edition [of the *Enterprise-Journal*] at that precise moment," *see* Ex. 7, Plaintiff's Discovery Resp. at RFA 15,[8] Mr. Ryan testified that he does not know what would have been available when the alleged paywall was down. *See* Ex. 17, Ryan Depo. at 35:3-10.[9]

Although Plaintiff claimed in another discovery response that other than when the supposed paywall was lowered during emergencies, "all content [on the *Enterprise-Journal* website] was protected by paywalls during the relevant time," *see* Ex. 7, Plaintiff's Discovery Resp. at RFA 19 (emphasis added), Mr. Ryan directly contradicted that response by acknowledging that some articles were available in front of the paywall, either because they were COVID-related or simply because the staff thought they would be of interest to the public. *See* Ex. 17, Ryan Depo. at 21:2-11, 33:14-34:9, 38:1-12 ("From 2019 to 2021 …there was some content on our website that was not behind a paywall. It was accessible to anybody who went to the site."). He does not, however, recall which articles those were. *Id.*[10] And hundreds of the *Enterprise-Journal* articles included on Plaintiff's Circumvention List are currently available in front of the paywall. *See* Ex. 19, EJ Free Content; Ex. 17, Ryan Depo. at 38:19-24.

***Greenwood Commonwealth.*** The information Plaintiff provided regarding *Greenwood Commonwealth* articles is largely the same. Plaintiff claimed that "there were very few and brief

---

[8] Plaintiff also guesses without support that "there is no possible way Newsbreak's theft of all of the McComb articles could have occurred during brief times when the paywall was deactivated…." *Id.*

[9] Asked if he knows which articles would have been available when the supposed paywall was down, Mr. Ryan stated: "I think all of them. I mean, all of the ones that were posted during that time. I honestly don't know, say, if something had been written a year before and it was behind the paywall, I don't know if it would have been available." *Id.*

[10] Asked "Do you have any way of knowing any other content that was in front of the paywall [other than COVID-19 content]?" Mr. Ryan stated: "No. The information on that list that I went through, that was a best guess. You know, if a local sports team won a state championship then, yes, we would have put that in front of the paywall. If a sensational crime or a public safety incident occurred and we wanted to get it on the website right away instead of waiting until the next day to have it in the newspaper, we would put a version of the story on the website and in front of the paywall." *See* Ex. 17, Ryan Depo. at 33:14-34:9. In other words, even if a paywall actually existed, anything and everything could have been in front of it.

time periods when it lowered the paywalls as a public service during local emergencies, but on those occasions only the current day's content could be accessed and scraped in the manner followed by Particle." *See* Ex. 7, Plaintiff's Discovery Resp. at RFA 20. And Plaintiff claimed that "[o]therwise <u>all</u> content was protected by paywalls during the relevant time." *Id*. (emphasis added).[11] Incredibly, Plaintiff denied simple requests for admissions that it "does not know <u>when</u> the *Greenwood Commonwealth* paywall was up and when it was down" and that it "does not know <u>which articles</u> were available when the *Greenwood Commonwealth* paywall was up and when the paywall was down" on the grounds that the requests were "so broad, uncertain, and unintelligible that the plaintiff cannot determine the nature of the information sought." *See id*. at RFA 23 and 24 (emphasis added).[12]

Importantly, Plaintiff's evasive responses provided no information whatsoever regarding any dates and articles, and as with its *Enterprise-Journal* responses, Plaintiff simply guesses without any support as to what content would have been available to Particle Media and others when the alleged paywall was inactive. *Id*. at RFA 20, 23 and 24. In his deposition, Mr. Kalich admitted that "users would be able to access other articles besides just the current day's content." *See* Ex. 18, Kalich Depo. at 27:5-10.

Mr. Kalich testified "the only [local emergency] I can recall" during the relevant time period was from February 16-20, 2021. *See* Ex. 18, Kalich Depo. at 21:9-22.[13] However, that was based entirely on his memory, since like Mr. Ryan, he admitted he has no record of when

---

[11] Another request asked Plaintiff to "admit that not every article on the *Greenwood Commonwealth* website during the relevant time was behind a paywall," but Plaintiff claimed it was "so broad, uncertain, and unintelligible that the plaintiff cannot determine the nature of the information sought." *See id.* at RFA 22. Accordingly, Plaintiff refused to answer this straightforward request.

[12] As to the latter request, Plaintiff also repeated the "only the current day's content" language from its response Request for Admission No. 20. *See id*. at RFA 24.

[13] Like Mr. Ryan, Mr. Kalich was deposed the day after the Court entered its Order on Plaintiff's partial summary judgment motions.

the alleged paywall was up and when it supposedly was down, or of what articles were available when. *See id*. at 21:23-22:12, 24:8-25:8. Further, despite Plaintiff's claim that otherwise all content was protected, Mr. Kalich acknowledged that there was other locally produced content in front of the "paywall" between 2019 and 2021 and that there are no documents showing what those articles were. *Id*. at 22:13-23:14, 25:19-26:15.[14] Hundreds of the *Greenwood Commonwealth* articles included on Plaintiff's Circumvention List are currently available in full. *See* Ex. 20, GWC Free Content. Some are identified as "FREE CONTENT," and Mr. Kalich testified that tag was applied when articles were transferred from TownNews to the new system and he does not know "what it was when it was in the TownNews system." *Id*. at 28:1-10.

*__Plaintiff's Additional Reductions.__* On July 4, 2024, Plaintiff eliminated an additional 188 articles from its lists of allegedly infringed articles. *See* [Dkt. 158-1] at 1-4. According to Plaintiff, these articles represent "all articles published one week before and one week after the five periods when the McComb and Greenwood paywalls were taken down to aid in local emergencies." *Id*. at 1.[15] But even removing those articles, Plaintiff's lists are still nothing more than a guessing game wholly dependent on the fading memories of Mr. Kalich and Mr. Ryan years after the newspapers posted the articles. Each publisher admitted that there were <u>other</u> articles in front of the alleged paywalls but that they could not identify the specific articles. Further, there is no tangible evidence at all showing when the alleged paywalls were operating and when they were down, which articles were available when the alleged paywalls were down, or which articles remained in front of the alleged paywalls even when they supposedly were

---

[14] Mr. Kalich testified some COVID-related articles were in front of the paywall, and other articles may have also been placed in front of the paywall on an article-by-article basis. *Id*. at 22:13-23:14.

[15] Plaintiff references six date ranges, five provided by Mr. Ryan and one provided by Mr. Kalich. *Id*. Two of the ranges identified by Mr. Ryan are outside the time period relevant to this case.

operating. *See*, *e.g.*, Ex. 17, Ryan Depo. at 34:15-35:15; Ex. 18, Kalich Depo. at 21:23-22:12, 24:8-25:8; Ex. 7, Plaintiff's Discovery Resp. at RFP 24, RFP 27, RFP 28, RFP 29.

Circumvention claims are specific, and the related damages provisions speak in terms of "the violation," "each violation," and "per act of circumvention." *See* 17 U.S.C. §1203(c)(2), (c)(3)(A). Instead of direct, uncontroverted evidence, however, Plaintiff's circumvention allegations proffer rank speculation and conjecture. A reasonable jury could not possibly return a verdict for Plaintiff on its circumvention and trafficking claims based on such unsupported guesswork. *See Johnson*, 830 F.3d at 195. Thus, the Court should dismiss them with prejudice.

### 2. Particle Media did not circumvent any technological measures that effectively controlled access.

Plaintiff claims Particle Media violated Section 1201(a)(1)(A) of the DMCA, which states that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A). Plaintiff also claims Particle Media traffics in technology that circumvents "a technological measure that effectively controls access to a work." 17 U.S.C. § 1201(a)(2). But all of the evidence is to the contrary.

"[T]o '<u>circumvent a technological measure</u>' means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A) (emphasis added). "[A] technological measure '<u>effectively controls access to a work</u>' if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." 17 U.S.C. § 1201(a)(3)(B) (emphasis added). The DMCA's plain language "requires a plaintiff alleging circumvention (or trafficking) to prove that the defendant's <u>access</u> was unauthorized." *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 691 (D. Md. 2011) (quoting

*Chamberlain Grp. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1193 (Fed. Cir. 2004), *cert. denied*, 544 U.S. 923 (2005)) (emphasis added).

As discussed below, Plaintiff does not dispute that the *Greenwood Commonwealth* and *Enterprise-Journal* websites provided Particle Media (and any other user) with access to the full text of articles. For that reason alone, Plaintiff's circumvention and trafficking claims under Section 1201(a) fail. Moreover, as also discussed below, Plaintiff's claim that the alleged paywalls effectively controlled access ignores reality. For these reasons, the Court should dismiss Plaintiff's Section 1201(a) claims with prejudice.

### i. Particle Media did not violate Section 1201(a), which governs access to protected works.

Contrary to Plaintiff's unsupported allegations, Particle Media's web crawler did not "hack" the alleged paywalls on the *Greenwood Commonwealth* and *Enterprise-Journal* websites. Rather, it acted just as any ordinary web browser would, sending HTTP requests to the servers for those sites, which, in turn, provided HTTP responses. *See* Ex. 4, Gianturco Report at ¶¶20.2, 20.2.1, 20.2.2; Ex. 1, Zhong Depo. at 11:3-7. "It is undisputed, and can be plainly shown, that during the time period in question, the Emmerich websites at issue in this case always provided HTML with full article text for every client request[.]" *See* Ex. 4, Gianturco Decl. at ¶11 (emphasis added). *See also* Ex. 14, Griffith 2024 Depo. at 58:4-22, 92:16-21, 94:3-9 ("every browser or program making the – the request would have received the full content"). Unable to deny that its websites provided access to the full text, Plaintiff instead argues without support that Particle Media's parser[16] somehow "impaired" the alleged paywalls by "removing" paywall code while parsing the article text and then making the full text of the articles available to

---

[16] The parser is the part of Particle Media's web crawler system that sorts through the HTTP responses to extract information needed for content moderation, indexing, and operation of the newsfeed - the URL, headline, image, and body of the article. See Ex. 21, Zhong Depo. at 15-16; Ex. 1, Zhong Decl. at 21.

Android users of the NewsBreak app. Ex. 22, W. Emmerich Depo. at 61 ("circumvention isn't the grabbing of the article through the http request"). In other words, Plaintiff contends the parser impaired the "paywall" coding after the websites' servers had provided access to the full articles. Ex. 14, 2024 Griffith Depo. at 91-92 (Q: "Do you contend that the circumvention occurred after the full text had been provided in the HTTP response?" A: "Yes."). Even assuming *arguendo* that this is a true statement of how the Particle Media process worked – it is not – the parser's alleged action was not an act of circumvention as contemplated under Section 1201(a)(1)(A).

Section 1201(a)(1)(A) prohibits a person from "circumvent[ing] a technological measure that effectively controls access to a work protected under [Title 17 of the U.S. Code]." 17 U.S.C. § 1201(a)(1)(A) (emphasis added). "Circumvention is an essential part of a violation." *R. Christopher Goodwin & Assocs., Inc. v. SEARCH, Inc.*, 2019 WL 5576834, at *3 (E.D. La. Oct. 29, 2019) (emphasis added). "Avoid" and "bypass," "as well as the remainder of the words describing circumvent, imply that a person circumvents a technological measure only when he affirmatively performs an action that disables or voids the measure that was installed to prevent them from accessing the copyrighted material." *Burroughs Payment Sys., Inc. v. Symco Grp., Inc.*, 2011 WL 13217738, at *4 (N.D. Ga. Dec. 13, 2011) (citation omitted) (emphasis added). *See also Dish Network L.L.C. v. World Cable Inc.*, 893 F. Supp. 2d 452, 466 (E.D. N.Y. 2012). Conversely, "a person who engages in prohibited usage of a copyrighted work to which he has lawful access does not fall afoul of any provision of Section 1201." *Lasica v. Am. Online, Inc.*, 2015 WL 12791495, at *5 (C.D. Cal. Sept. 3, 2015) (quoting *Ass'n for Info. Media & Equip. v. Regents of the Univ. of California*, 2012 WL 7683452, at *9 (C.D. Cal. Nov. 20, 2012) (quoting *Nimmer on Copyright* § 12A.03[D][3])).

19

As courts have recognized, the circumvention prohibition centers on <u>accessing</u> protected works, not the <u>use</u> of such works after they are accessed. *See MGE UPS Sys., Inc. v. GE Consumer & Indus., Inc.*, 622 F.3d 361, 366 (5th Cir. 2010). Plaintiff's theory of circumvention—that Particle Media's parser somehow "impaired" coding like "(.subscriber-only)" in extracting the full text provided by the websites—is a complaint about use, not about the manner in which the articles were accessed. Plaintiff cannot maintain a "use" claim as a substitute for a circumvention claim. *Id*.

"Every news article HTML page that the Emmerich websites served from the timeframe in question provided the full article text content within it, and withheld none of it." Ex. 15, Gianturco Decl. at ¶11. *See also* Ex. 14, Griffith 2024 Depo. at 58:4-22, 92:16-21, 94:3-9. "There was no circumvention necessary to obtain the full article text, it was provided by the Emmerich website[s] for every webpage request." Ex. 15, Gianturco Decl. at ¶11. Particle Media did not circumvent paywalls on the *Greenwood Commonwealth* and the *Enterprise-Journal* sites, and, therefore, Plaintiff's claims under Section 1201(a) must fail.

> ii. **The "technological measures" in place on the *Greenwood Commonwealth* and *Enterprise-Journal* websites did not effectively control access to the works.**

A technological measure "effectively controls access to a work" if the measure, "in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." 17 U.S.C. § 1201(a)(3)(B). An access control measure is <u>not</u> effective if one <u>already has access</u> without the need for circumvention. *See Digital Drilling Data Syst., LLC v. Petrolink Services, Inc.*, 965 F.3d 365, 376 (5th Cir. 2020); *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 546-47 (6th Cir. 2004), *abrogated on other grounds, eBay Inc. v. MercExchange, L.L.C.*, 547

U.S. 399 (2006)). Here, the alleged paywalls on the *Greenwood Commonwealth* and the *Enterprise-Journal* websites were <u>not</u> effective access control measures because the servers for those sites provided <u>full text</u> articles in response to Particle Media's HTTP requests. Ex. 15, Gianturco Decl. at ¶11; Ex. 14, Griffith 2024 Depo. at 58:4-22, 92:16-21, 94:3-9.

Dr. Gianturco determined that during the relevant timeframe, the websites for the *Greenwood Commonwealth* and the *Enterprise-Journal* fully exposed the entirety of the articles that they displayed on their websites. *See* Ex. 4, Gianturco Report at ¶9. "Regardless of whether a website visitor was a paid subscriber, the websites responded to HTTP requests by providing full article text in their HTTP responses." *Id*. This meant that "[a]ny visitor to the Emmerich newspaper websites would be able to view full text for all articles that had partial text presented, simply by utilizing browser settings (or display screens) available on all web browsers commonly in use to view the full article content." *Id*. at ¶9.1. *See also id*. at ¶20.2.2 ("server returns exactly the same set of information to a website visitor and NewsBreak"); ¶26.4 ("the full text of articles on [the] websites were sent to all entities making HTML requests, whether they were users requesting through browsers or web crawlers").

Appendix D and Appendix F to Dr. Gianturco's initial report show how the *Enterprise-Journal* and *Greenwood Commonwealth* websites, respectively, provided full text content in response to HTTP requests. *See* Ex. 4, Gianturco Report at ¶¶27.3.1, 27.4.1, Appendix D, and Appendix F. It is true that they also show the HTML code generated for possible paywall functionality. *See id*. at ¶¶27.3.1, 27.4.1, Appx. D, and Appx. F. But the approach used by Plaintiff on its websites in an attempt to create purported paywalls was widely known in the industry to be ineffective. *See* Ex. 15, Gianturco Decl. at ¶12.

"Simply put, that technique involves putting all of the article content within HTML tags (<DIV> tags), and initially showing <u>all</u> of the article content on the client's [*i.e.*, user's] browser." *Id.* at ¶16 (emphasis added). Then, "[a]fter all of the content is loaded, code running on the client's browser (JavaScript) may instruct the browser to hide certain blocks of article text on the client's browser so that some of the content can no longer be seen." *Id.* The JavaScript may show (or pop up) "a new block of information prompting the user to login to view the rest of the article that has just been hidden." *Id.* This utilization of client-side business logic (known as a "client-side DOM-related" technique) to try to create a paywall "is well known to be ineffective." *Id.* at ¶16.1. It can fail for any of the following reasons:

- the client browser simply does not have JavaScript turned on;
- the client browser supports an older version of JavaScript than that used by the webpage;
- the client is using a browser that was not anticipated by the JavaScript developer;
- the client machine is slow, and/or the webpage times out;
- memory on the client machine cannot support the webpage size;
- the client browser is not able to render the page fully due to limited connection speed, or communication issues; or
- the user views the webpage in an HTML view.

*Id.* at ¶¶16.1.1-16.1.7. Any one of these scenarios can or will result in the full article text being shown to the user, with no pop-up or limitation ever being presented. *Id.* at ¶16.2. Plaintiff's own expert Mr. Griffith acknowledged many of these same issues.[17]

---

[17] *See* Ex. 14, 2024 Griffith Depo. at 100:20-102:11 (acknowledging that the method may not work on certain types of browsers configured in certain ways, that the method may not work if a user had an old browser and/or a browser that did not support JavaScript, and that the "paywall" may take longer to pop up if the user's internet was slow); *id.* at 114:2-18 ("What are the things that can affect the speed of a web page loading on a browser? … [I]t can be any number of things. It can begin with the speed of the server serving up the content. It can depend on the speed of the machine on the client side displaying the content. It can depend on the amount of data in the payload that's delivered from server to client. It can depend on the speed of your Internet connection. It can depend on the speed of -- it can depend on what other applications might be running at the time on your -- on the user's machine. So -- yeah. I mean, … it's a very lengthy list of things that could affect the speed at which a page is loaded."); *id.* at 115:1-15; *id.* at 116 ("No provider of data can guarantee the speed at which it can be transported to the user.").

Actually loading the *Greenwood Commonwealth* and *Enterprise-Journal* websites from the time period in question shows that the full text of articles is visible prior to the appearance of a pop-up box, which may appear more than 30 seconds after the full text has loaded, if at all. *See* Ex. 4, Gianturco Report at ¶27.5; Ex. 15, Gianturco Decl. at ¶16.2. Not every article on Plaintiff's circumvention lists is available on the Wayback Machine, but of those that are, it is possible to view and print full text copies. *See* Ex. 4, Gianturco Report at Figures 15-17; Ex. 23, GWC Full Text Examples; Ex. 24, EJ Full Text Examples. Mr. Griffith has attempted to dismiss this evidence, claiming the Wayback Machine is not a reliable way to know how the websites would have functioned at the time. But the scenarios listed above would have been in play on the websites during the relevant time period. *See* Ex. 15, Gianturco Decl. at ¶16. The weaknesses of client-side DOM-related logic flows prevent them from being effective solutions. *Id.* at ¶16.4.[18]

A similar situation was presented in *Lexmark*, where the plaintiff's printers contained programs that prevented them from functioning with non-Lexmark toner cartridges. 387 F.3d at 529-31. Another company sold its own microchip that allowed users to override Lexmark's program, and Lexmark sued for circumvention. *Id.* The Sixth Circuit held Lexmark's program did not control access to the printer because anyone who bought a printer could access and read the code. *Id.* at 564-47. The court expounded upon this rationale in the following analogy:

> Just as one would not say that a lock on the back door of a house "controls access" to a house whose front door does not contain a lock and just as one would not say that a lock on any door of a house "controls access" to the house after its purchaser receives the key to the lock, it does not make sense to say that this provision of the DMCA applies to otherwise-readily-accessible copyrighted works. Add to this the fact that the DMCA not only requires the technological measure to "control[ ] access" but also requires the measure to control that access "effectively" and it seems clear that this provision does not naturally extend to a technological measure that restricts one form of access but leaves another route wide open.

*Id.* at 547 (emphasis added).

---

[18] There are also a multitude of security weaknesses inherent in client-side approaches. *Id.*

Similarly, in *Digital Drilling Data Systems, LLC v. Petrolink Services, Inc.*, 965 F.3d 365 (5th Cir. 2020), the Fifth Circuit affirmed a finding that the plaintiff's technological measures did not "effectively control access" to a copyrighted database and agreed with the defendant's analogy "to a house with a lock on the back door but none on the front." *Id.* at 376. The plaintiff there cited case law stating that a technological measure need not be impenetrable in order to be "effective" under the DMCA, but the Fifth Circuit stated that the issue was not whether the measures were effective, but whether they controlled access, and they did not. *Digital Drilling*, 965 F.3d at 377.

Here, even if Plaintiff's alleged paywalls were access control measures, which is denied, they were not <u>effective</u> because access had already been granted. Any browser or web crawler that requested access to the articles received access to full articles. *See, e.g.,* Ex. 4, Gianturco Report at ¶¶9, 9.1, 20.2, 20.2.1, 20.2.2; Ex. 15, Gianturco Decl. at ¶11. As the court in *Lexmark* articulated, a door with a lock does not control access to a house if the house is otherwise readily accessible. *Lexmark*, 387 F.3d at 547. When Particle Media's web crawler knocked on Plaintiff's door and asked for data, Plaintiff opened the door and then handed Particle Media the data package requested. Particle Media did not circumvent anything to gain access to the data.

Because the "technological measures" in place on the *Greenwood Commonwealth* and *Enterprise-Journal* websites did not effectively control access to the works, the Court should grant Particle Media summary judgment on Plaintiff's Section 1201(a) claims.

### 3.  <u>Particle Media did not circumvent protection afforded by a technological measure that effectively protected a right of a copyright owner.</u>

For its claim under Section 1201(b), Plaintiff must show, among other things, that Particle Media traffics in technology that circumvents "protection afforded by a technological measure that effectively protects a right of a copyright owner." 17 U.S.C. § 1201(b)(1). Under

24

Section 1201(b), "to 'circumvent protection afforded by a technological measure' means avoiding, bypassing, removing, deactivating, or otherwise impairing a technological measure." 17 U.S.C. § 1201(b)(2)(A). Under the DMCA, "a technological measure 'effectively protects a right of a copyright owner under this title' if [it], in the ordinary course of its operation, prevents, restricts, or otherwise limits the exercise of a right of a copyright owner under this title." *Id*. at § 1201(b)(2)(B). Plaintiff claims Particle Media circumvented the alleged paywalls by "remov[ing] the computer code that creates the paywalls" and then making the articles available to app users. *See* Ex. 14, 2024 Griffith Depo. at 67:25-68:13. For all of the reasons discussed above, however, it is clear that Particle Media did not circumvent anything, and that the alleged "paywalls" did not effectively protect a right of a copyright owner under Title 17.

Plaintiff's own expert acknowledged that "every browser or program making the – the [HTTP] request [to the *Greenwood Commonwealth* and *Enterprise-Journal* servers] would have received the full content" from the articles on those sites. *See* Ex. 14, 2024 Griffith Depo. at 58:4-22, 92:16-21, 94:3-9. *See also* Ex. 4, Gianturco Report at ¶9; Ex. 15, Gianturco Decl. at ¶11. Thus, "[t]here was no circumvention necessary to obtain the full article text, it was provided by the Emmerich website[s] for every webpage request." *Id*. In fact, "[a]ny visitor to the Emmerich newspaper websites would have been able to view full text … simply by utilizing browser settings (or display screens) available on all web browsers commonly in use." *See* Ex. 4, Gianturco Report at ¶9.1 (emphasis added).

Moreover, the full text of articles was visible prior to the appearance of a pop-up box, which may have appeared more than 30 seconds after the full text loaded, if at all, making it possible for users to view and print full text copies. *See* Ex. 4, Gianturco Report at ¶27.5 and Figures 15-17; Ex. 15, Gianturco Decl. at ¶16.2; Ex. 23, GWC Full Text Examples; Ex. 24, EJ

25

Full Text Examples. Though Mr. Griffith attempts to blame this ease of access on the Wayback Machine, the reality is that the Wayback Machine simply shows why the client-side DOM-related technique is ineffective. *See* Ex. 15, Gianturco Decl. at ¶¶12, 16; *See* Ex. 14, 2024 Griffith Depo. at 100:20-102:11, 114:2-18, 115:1-15; 116.

It is clear that NewsBreak did not circumvent "protection afforded by a technological measure that effectively protects a right of a copyright owner." The Court should dismiss Plaintiff's trafficking claim under Section 1201(b) with prejudice.

## B. Trafficking – Particle Media did not and does not traffic in circumvention technology.

To succeed on its claims under Section 1201(a)(2) and (b)(1), Plaintiff must show that Particle Media traffics in technology that: (1) is "primarily designed or produced for the purpose of circumventing;" (2) "has only limited commercially significant purpose or use other than to circumvent;" or (3) "is marketed" by Particle Media "for use in circumventing." *See* 17 U.S.C. § 1201(a)(2). Neither claim can survive summary judgment, because the evidence clearly shows that Particle Media did not circumvent any technological measures or protections, and it certainly did not and does not traffic in circumvention technology.

### 1. NewsBreak is not "primarily designed or produced for the purpose of circumventing."

Particle Media's web crawler system crawls the websites of both partner and non-partner publishers in the same manner, using RSS feeds or fetching web pages. *See* Ex. 1, Zhong Decl. at ¶18.[19] The crawler does not perform any operations to attempt to bypass security mechanisms on the sites it visits, and it does not attempt to ascertain whether the information that it receives is a

---

[19] RSS feeds encode common information about the various components of a news article. *Id.* Many news organizations publish RSS feeds of their content. *Id.* If a website does not have an RSS feed, a search engine and/or news aggregator consumes content by fetching web pages. *Id.* Fetching a web page involves sending an HTTP request to a web server and receiving HTML text in response. *Id.*

subset of the information available were elevated privileges or security to be obtained. *See* Ex. 4, Gianturco Report at ¶30. The crawler simply utilizes the same mechanism that users with browsers utilize when they access websites using common tools like Google's Chrome browser or the Safari browser: it sends an HTTP request to a web server, and receives HTML text in response. *See id.*; Ex. 21, Zhong Depo. at 8:12-17. Once it receives the response, the NewsBreak parser is designed to (1) review the content related to a particular article in order to understand the content and filter any content that is illegal, explicit, or does not otherwise fit the criteria of the industry's content policies; and (2) extract and save the URL, headline, image, and text of the article for the purposes of content moderation, indexing, and use on the NewsBreak news feed. *See id.* at 9:21-10:4; Ex. 1, Zhong Decl. at ¶21; Ex. 4, Gianturco Report at ¶30. The web crawler and parser were not designed, primarily or otherwise, to circumvent paywalls or other protections. *See* Ex. 1, Zhong Depo. at 16:12-19.

The text in an HTML response is usually marked with <p> tags (or "paragraph tags"), and the parser attempts to extract whatever text appears between those tags. Ex. 21, Zhong Depo. at 8:12-17. That is exactly what the parser did here. *Id.* Websites that have effective protections in place do not provide the full text of articles in HTML responses to HTTP requests. *Id.* at 17:6-23. Plaintiff's argument NewsBreak's parser somehow did more than simply extracting any text between the paragraph tags in HTML responses it received relies on the use of additional <div> tags on the *Greenwood Commonwealth* and *Enterprise-Journal* websites, like "(.subscriber-only)." Particle Media's parser does not understand such customized freeform text coding. *See id.* at 9:12-16, 11:24-12:21; *see also* Ex. 15, Gianturco Decl. at ¶¶16.1.1-16.1.7 (describing why the coding is ineffective). Put simply, the parser was not designed to get around a paywall, and in fact cannot do so. *See* Ex. 21, Zhong Depo. at 16:12-19; Ex. 1, Zhong Decl. at ¶24.

Furthermore, the parser did not extract full text for the purpose of showing non-partner content to users. Ex. 21, Zhong Depo. at 9:21-10:4; *See* Ex. 1, Zhong Decl. at ¶27. When content from the *Greenwood Commonwealth* and *Enterprise-Journal* was self-hosted in full text on NewsBreak on Android devices, it was the result of a glitch, not an intended feature or design of the app. *See* Ex. 1, Zhong Decl. at ¶27; Ex. 3, PM Discovery Resp. at Int. 17; Ex. 21, Zhong Depo. at 9:21-10:21, 11:3-10; 13:7-10; 16:12-25; Ex. 4, Gianturco Report at ¶¶10, 10.1. It was Particle Media's intention that users be redirected to the non-partner publishers' websites, not that those websites' content be shown directly to users. *See* Ex. 1, Zhong Decl. at ¶27. And the fact that the parser is not designed for the purpose of impairing technological measures or protections is proven in part by the fact that content from other Plaintiff websites affected by the glitch did not include full text, but rather included paywall language. Ex. 11, Paywall Examples.

Given the evidence about how the NewsBreak web crawler and parser were designed and work, a fair-minded jury could not possibly find that they are "primarily designed or produced for the purpose of circumventing" a technological measure that effectively controls access to a work or protection afforded by a technological measure that effectively protects a right of a copyright owner. Therefore, the Court should dismiss Plaintiff's claims under Section 1201(a)(2)(A) and (b)(1)(A).

**2.  NewsBreak has broad commercially significant purposes and uses beyond the circumvention alleged by Plaintiff.**

Particle Media's objective in offering NewsBreak is to create value for users, publishers, and businesses, and NewsBreak's broad commercially significant purposes and uses are undeniable. *See* Ex. 1, Zhong Decl. at ¶4. Through its web crawler, parser, and other components, NewsBreak provides its millions of users with personalized news feeds of content and information; provides publishers with tools to manage content and connect with users;

indexes and links original and third-party content, enabling users to search, browse, and find content and publishers; and widens publishers' exposure to a broader network of readers. *Id.* at ¶3; Ex. 2, Sell Report at ¶11(ii). NewsBreak drives more traffic to publishers than almost any other sources, explaining why hundreds of publishers have entered into agreements allowing Particle Media to self-host their content, and hundreds more have created NewsBreak profiles. *See* Ex. 1, Zhong Decl. at ¶4; Ex. 2, Sell Report at ¶126. Accordingly, a fair-minded jury could not return a verdict for Plaintiff under Section 1201(a)(2)(B) and (b)(1)(B).

### 3.   Particle Media has never marketed NewsBreak for any circumventing use.

Plaintiff can point to no evidence whatsoever that Particle Media has ever marketed NewsBreak "for use in circumventing a technological measure that effectively controls access to a work" or "for use in circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner," because it has never happened. Thus, the Court should dismiss Plaintiff's trafficking claims under Section 1201(a)(2)(C) and (b)(1)(C).

### C.   The Court should dismiss Plaintiff's claim for injunctive relief.

In relation to its trafficking claims, Plaintiff asks the Court to enjoin Particle Media "from any further distribution of the NewsBreak app" and require Particle Media to "discontinue the use of this app by any existing users." [Dkt. 15] at ¶85. Under Section 1203(b)(1), the Court "may grant temporary and permanent injunctions on such terms as it deems reasonable to prevent or restrain a violation[.]" 17 U.S.C. §1203(b)(1). However, even in a copyright case, "[t]o be entitled to permanent injunctive relief, a plaintiff must show: '(1) that it has succeeded on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the

injunction will not disserve the public interest.'" *Humphrey v. Hall*, 2022 WL 902741, at *8

(S.D. Miss. Mar. 28, 2022) (quoting *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021)).

Plaintiff's request for injunctive relief on its trafficking claims are without merit because

it cannot satisfy the irreparable injury requirement. Plaintiff "must show a real and immediate

threat of future or continuing injury apart from any past injury." *Porter Teleo, LLC v. Print4One,*

*LLC*, 2020 WL 6277583, at *3 (S.D. Tex. Sept. 9, 2020) (citing *Aransas Project v. Shaw*, 775

F.3d 641, 663-64 (5th Cir. 2014)). Plaintiff does not dispute that Particle Media no longer uses

content from any of its publishers' websites. *See* Ex. 25, 2022 EN 30(b)(6) at 196:1-23; Ex. 16,

2024 EN 30(b)(6) at 21:1-10. In fact, Mr. Emmerich testified Plaintiff is not seeking injunctive

relief with regard to Plaintiff's business. *Id.* at 31:18-24.

The record before the Court does not support a finding that any of Plaintiff's works are

still being used today or likely will be in the future. *See Seven-Up Co. v. Coca-Cola Co*., 86 F.3d

1379, 1390 (5th Cir. 1996); *ZeniMax Media Inc.*, 2018 WL 4078586, at *5 (N.D. Tex. June 27,

2018). The Court need not address the remaining factors. *Id.* (citing *Enter. Int'l, Inc. v.*

*Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985); *eBay*, 547 U.S.

at 391. Because Plaintiff cannot "clearly [carry] the burden of persuasion" on an essential

element of injunctive relief, it is not entitled to the "extraordinary remedy" of a permanent

injunction. *See, e.g., Porter Teleo, LLC*, 2020 WL 6277583, at *3. Accordingly, the Court should

dismiss Plaintiff's claim for permanent injunctive relief.

### D.  Plaintiff's claims as to pre-January 12, 2020 are time-barred.

Civil actions under the Copyright Act, including actions for violation of the DMCA, must

be "commenced within three years after the claim accrued." 17 U.S.C. § 507(b). In *Graper v.*

*Mid-Continent Casualty Co.*, 756 F.3d 388 (5th Cir. 2014), the Fifth Circuit decided that "this

limitations period starts running 'once the plaintiff knows or has reason to know of the injury upon which the claim is based,' which is also known as the discovery rule." *Martinelli v. Hearst Newspapers, L.L.C.*, 65 F.4th 231, 233 (5th Cir. 2023) (quoting *Graper*, 756 F.3d at 393). The Fifth Circuit was recently asked to replace that rule with a holding that the clock starts when the infringing act/violation occurs, based, in part, on the Supreme Court's decision in *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014), but the Fifth Circuit explained that *Petrella* did not unequivocally overrule *Graper*. *See Martinelli*, 65 F.4th at 233.

Recently, however, the Supreme Court has signaled its willingness to entertain a resolution of the circuit split in the accrual/discovery rule.  In *Warner Chappell Music, Inc. v. Nealy*, 144 S. Ct. 1135, 1138-39 (2024), the Supreme Court opined:

> The question on which this Court granted certiorari is "[w]hether, under the discovery accrual rule applied by the circuit courts," a copyright plaintiff "can recover damages for acts that allegedly occurred more than three years before the filing of a lawsuit." … That question, which the Court substituted for Warner Chappell's, incorporates an assumption: that the discovery rule governs the timeliness of copyright claims. We have never decided whether that assumption is valid—i.e., whether a copyright accrues when a plaintiff discovers or should have discovered an infringement, rather than when the infringement happened. … But that issue is not properly presented here, because Warner Chappell never challenged the Eleventh Circuit's use of the discovery rule below. ... And as noted above, a division exists among the many Courts of Appeals applying a copyright discovery rule (11 at last count) about whether to superimpose a three-year limit on damages. … We therefore confined our review to that disputed remedial issue, excluding consideration of the discovery rule and asking only whether a plaintiff with a timely claim under the rule can get damages going back more than three years.

*Id.* at 1138-39 (internal citations omitted) (emphasis added). Particle Media urges this Court, and the Fifth Circuit, to reconsider the discovery rule and instead adopt the accrual rule.[20]

---

[20] "[W]hile some claims are subject to a 'discovery rule'…that is not a universal feature of the statute of limitations." *SCA Hygiene Prod. Aktiebolag v. First Qlt. Baby Prod., LLC*, 580 U.S. 328, 337 (2017). The Supreme Court has stated that "[i]f there are two plausible constructions of a statute of limitations, [it] generally adopt[s] the construction that starts the time limit running when the cause of action ... accrues because Congress legislates against the standard rule that the limitations period commences when the plaintiff has a complete and present cause

Accordingly, the Court should dismiss any DMCA claims brought by Plaintiff relating to articles published pre-January 12, 2020. *See* Ex. 26, Dated List.[21]

## IV.   CONCLUSION

For the foregoing reasons, Particle Media respectfully asks this Court to dismiss Plaintiff's circumvention and trafficking claims, request for injunctive relief, and time-barred claims with prejudice. Particle Media requests such other relief the Court deems just and proper.

Respectfully submitted, this the 22nd day of July, 2024.

Respectfully submitted,
**PARTICLE MEDIA, INC.**

By:   *s/ Stephen J. Carmody*
One of its Attorneys

OF COUNSEL:

Stephen J. Carmody, MSB #8345
Karen E. Howell, MSB #102243
Brunini, Grantham, Grower & Hewes, PLLC
Post Office Drawer 119
Jackson, Mississippi 39205
Telephone:     (601) 948-3101
Facsimile:     (601) 960-6902
scarmody@brunini.com
khowell@brunini.com

---

of action." *Rotkiske v. Klemm*, 589 U.S. 8, 13 (2019) (citations and quotations omitted) (emphasis added). Congress did not legislate against the standard rule in Section 507(b). The action is to commence within three years "after the claim accrued." 17 U.S.C. § 507(b).

[21] To the extent Plaintiff argues the statute of limitations was tolled by the parties' previous litigation, it was not, because, among other reasons, that lawsuit did not include any circumvention claims.