**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**EMMERICH NEWSPAPERS,**                                                          **PLAINTIFF**
**INCORPORATED**

**VS.**                                                          **CIVIL ACTION NO. 3:23CV26 TSL-MTP**

**PARTICLE MEDIA, INC. D/B/A NEWS**                                    **DEFENDANTS**
**BREAK and JOHN DOES 1-10**

**CONSOLIDATED WITH**

**EMMERICH NEWSPAPERS,**                                                          **PLAINTIFF**
**INCORPORATED**

**VS.**                                                          **CIVIL ACTION NO. 3:23CV391 TSL-MTP**

**PARTICLE MEDIA, INC. D/B/A NEWS**                                    **DEFENDANTS**
**BREAK**

---

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR**
**SUMMARY JUDGMENT**

---

COMES NOW Plaintiff Emmerich Newspapers, Incorporated ("Emmerich"), by and through counsel of record, pursuant to F.R.C.P. Rule 56, which files this Memorandum in Support of its Motion for Summary Judgment on the following issues:

1.      Whether Emmerich's claims are barred in whole or in part by the statute of limitations (17 U.S.C. § 507);

2.      Whether Particle circumvented technological measures put in place by Emmerich which effectively controlled access to its copyrighted works in violation of 17 U.S.C. §1201;

3.      Whether Particle removed or altered Emmerich's CMI from Emmerich articles without Emmerich's authorization or approval, and then subsequently provided and distributed those same articles under false CMI in violation of 17 U.S.C. §1202;

1

4.      Whether Particle committed copyright infringement by displaying thousands of Emmerich articles in "full-text" format in violation of 17 U.S.C. §106(5);

5.      Whether Particle committed copyright infringement by displaying thousands of Emmerich articles in frames on the NewsBreak app in violation of 17 U.S.C. §106(5).

There is no genuine issue of material fact on any of these issues. For the reasons set forth in detail below, the Court should grant summary judgment in Emmerich's favor on each of these issues.

## FACTUAL BACKGROUND

Emmerich is one of largest private newspaper chains in Mississippi.  It operates websites for each of its newspapers where readers can view its newspaper content online.  Each Emmerich article is presented under a unique digital filename or URL which usually includes, among other things,  the newspaper where the article appears and the headline of the article. Other times the URL includes identifying numbers or symbols referring to such copyright management information or links to such information. Any reader clicking on these URL's is automatically taken to the Emmerich website where the article appeared.  The reader then sees advertisements posted by Emmerich along with the story in question.

A reader on Emmerich's website is given a variety of options for sharing the article including links to Facebook and other social media sites. Emmerich's share buttons, which allowed sharing an Emmerich article on Facebook, Instagram, Twitter, Gmail or many other ways, employed Emmerich's unique and legitimate digital filename or URL. This URL ensures readers return to the legitimate Emmerich website to read the copyrighted content. *See* Ex. "F", Wyatt Emmerich Affidavit, ¶¶2-3; Ex. "I", Jack Ryan Affidavit, ¶¶2-3; Ex. "H", Tim Kalich Affidavit ¶¶2-4.

During the time frame in question a number of Emmerich websites (including, among others, the *Greenwood Commonwealth* and the *McComb Enterprise-Journal*) operated behind paywalls.  A reader could only view full articles by paying a subscription fee.  These paywalls were specifically intended to limit access to paying customers and motivate prospective readers to buy subscriptions. Ex. "F", Emmerich Affidavit ¶¶6-7; Ex. "I", Ryan Affidavit ¶¶6-11; Ex. "H" Kalich Affidavit ¶¶6-12.

During the time frame in question Particle utilized a web crawler to systematically steal content from Emmerich's websites (a process known as "scraping"). Particle's web crawler would scrape the entire web page for Emmerich articles, remove everything except the headline, image and news story, and then store that content in Particle's database. *See* Ex. J, First Zhong Deposition Transcript, p. 16-17. Snippets of these articles appeared on the NewsBreak news feed and readers "clicking through" were led to either a full-text view of the stripped-down Emmerich article in "self-hosted" mode or a Framed View, in which the entire Emmerich article appeared in a frame or window in the Particle app.

Particle, like Emmerich, makes its money through the display of ads. Unlike Emmerich, though, Particle does not produce its own news stories, but simply takes stories from legitimate news sites and displays them on its own platform surrounded by its own ads. Although Particle claims that in Framed View it is acting as a web browser, this is a subterfuge. In reality it is simply framing Emmerich's article on its own website under its own URL's, which is copyright infringement.

In *Particle 1*[1] Particle produced a list of 33,734 stolen Emmerich articles, of which 17,665 articles were self-hosted and the remainder appeared in Framed View from 2018 through 2021. None of the articles were republished with Emmerich's filenames; instead, the URLs/filenames were replaced with Particle's URLs/filenames.

As required by 17 U.S.C. § 411(a)3, prior to filing this lawsuit Emmerich sought and obtained copyright registrations for a total of 5,365 of the stolen articles which are original to Emmerich. Emmerich has produced updated lists of all of the articles in question which are numbered in chronological order. Plaintiff seeks statutory damages for the DMCA claims under 17 U.S.C. § 1203(c) and actual damages as to its infringement claims under 17 U.S.C. § 504(b).

Due to the automated nature of the process Particle's web crawler scooped up a massive number of original Emmerich articles and an equally massive number of arguably non-original articles which were published by permission on Emmerich's websites, such as AP stories, syndicated columns, obituaries and wedding announcements. In obtaining its copyrights Emmerich utilized the Copyright

---

[1] 3:21-cv-00032-KHJ-MTP Emmerich Newspapers, Incorporated v. Particle Media, Inc. et al

Office's group registration process, which expressly states that the registrations only apply to original works contained in the newspapers being registered.  Over the course of discovery Particle identified several categories of articles for which it contested originality, such as the aforementioned AP stories, syndicated columns, obituaries and wedding announcements.  In order to streamline and expedite resolution of the issues in this case Emmerich voluntarily dismissed every article in these contested categories along with several thousand more, along with all but 29 photos. **[***See*** Docs. 158, 159]**.

All of the remaining articles on the lists attached as Exhibits A through E are original Emmerich articles.  Emmerich has made a good faith effort to remove all articles in the contested categories.  Additionally, Emmerich has voluntarily reduced the number of photographs in issue to 29.  These photographs are covered by both group registrations and a separate registration for them.

Particle's practice of displaying full-text versions of Emmerich articles and photographs (both Self-Hosted and Framed Views) violates Emmerich's right to exclusive display of its own copyrighted works.  Its practice of removing Emmerich's URL's and displaying Emmerich's articles under false URL's violates the DMCA's prohibition on alteration of copyright management information.  And Particle's practice of removing Emmerich's HTML code intended to create paywalls violates DMCA's prohibition against circumvention of technological measures intended to limit access to copyrighted material.

## **STANDARD**

"Summary judgment is appropriate if the record evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Fed.R.Civ.P. 56(a); *Robinson v. Orient Marine Co*., 505 F.3d 364, 366 (5th Cir. 2007).  A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986). In determining whether a genuine dispute of material fact exists, the court views "all facts and evidence in the light most favorable to [the nonmovant] and draw[s] all reasonable inferences in [the non movant's] favor." *Voss v. Good*e, 954 F.3d 234, 237 (5th Cir. 2020).  "An issue is material if its resolution could affect the outcome of the action." *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010)

(quoting *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001)). "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir. 2010) (citation omitted).

      The Court is not permitted to make credibility determinations or weigh the evidence. *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009) (quoting *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007)). When deciding whether a genuine fact issue exists, "the court must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Sierra Club, Inc.*, 627 F.3d at 138. However, "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002) (citation omitted). Summary judgment is mandatory "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Brown v. Offshore Specialty Fabricators, Inc.*, 663 F.3d 759, 766 (5th Cir. 2011) (quoting *Celotex Corp.*, 477 U.S. at 322). *Davenport v. HansaWorld USA, Inc.,* (S.D. Miss. 2015) 2015 U.S. Dist. LEXIS 82037, *15-16.

**I.**     ***None of Emmerich's claims are barred by the statute of limitations. The instant suit was filed within three years of Emmerich's discovery of Particle's infringing conduct. The Fifth Circuit follows the discovery rule which means claims accrue upon discovery of the offending conduct, not upon the date the conduct occurred.***

      The Copyright Act states, "No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507. The central question, then, is when did Emmerich's cause of action "accrue."  In the Fifth Circuit the statute of limitations for copyright infringement only starts running "once the plaintiff knows or has reason to know of the injury upon which the claim is based, which is also known as the discovery rule." *Martinelli v. Hearst Newspapers, L.L.C.,* (5th Cir. 2023) 65 F.4th 231, 233, 2023 U.S. App. LEXIS 8914, *1-2.  In that case the Fifth Circuit expressly rejected the defendants request "to replace the discovery rule with a holding that the clock starts when an act of copyright infringement occurs." *Id.*

      And the United States Supreme Court recently affirmed that, in Circuits like ours which apply the

discovery rule, "There is no time limit on monetary recovery. [A] copyright owner possessing a timely claim for infringement is entitled to damages, *no matter when the infringement occurred.*" (emphasis added). *Warner Chappell Music, Inc. v. Nealy,* (May 9, 2024) 144 S. Ct. 1135, 1139, 218 L. Ed. 2d 363, 369, 2024 U.S. LEXIS 1978, *10. Less than two weeks later, on May 20, 2024, the Supreme Court denied the petition for certiorari in *Hearst Newspapers, L.L.C., et al., v. Antonio Martinelli* (Supreme Court Docket No. 23-474) thereby leaving the discovery rule intact in the Fifth Circuit. This means there are no backward limitations on damages for copyright complaints filed timely under the discovery rule.

There is no dispute that Emmerich only discovered Particle's infringing activity at the very earliest on February 10, 2020. That is the date when Brent Maze, one of Emmerich's publishers, sent an email to Wyatt Emmerich stating that he had seen an Emmerich article appearing on the NewsBreak app. Ex. F, Emmerich Affidavit, ¶6. The instant suit was filed January 12, 2023  -- less than three years after Emmerich first discovered Particle's infringing activity and well within the copyright statute of limitations. Even if the statute of limitations was not equitably tolled, Emmerich filed this suit within three years of discovering Particle's infringing conduct.

But the statute *was* equitably tolled because Emmerich exercised reasonable diligence in pursuing its claims against Particle. Equitable tolling should add at least another 14 months to the three-year look-back from January 12, 2023 (the date this suit was filed). All of the claims in this case were pending in *Particle 1* (which was filed on January 15, 2021 -- a mere 11 months after first learning of the infringing activity) until they were dismissed without prejudice on March 21, 2022 -- 14 months after suit was filed. See Ex. M. That would mean Emmerich's claims are timely for all articles stolen and republished by Particle after  November 12, 2018.

"Equitable tolling allows the court to preserve a plaintiff's claim when enforcement of the statute of limitations would be unjust." *Mejia v. Bros. Petroleum, LLC,* 2014 U.S. Dist. LEXIS 107363, 2014 WL 3853580, at *1 (E.D. La. Aug. 4, 2014), citing *Mohamed Hisham Eltayeb v. Deli Mgmt.,* 2024 U.S. Dist. LEXIS 40079, *3, 2024 WL 989490. "[T]he touchpoint of equitable tolling is reasonable diligence . . . ("The diligence required for equitable tolling purposes is 'reasonable diligence,' not 'maximum feasible diligence.'") (citations omitted). *Talley v. City of Austin,* (W.D. Tex. 2024) 2024 U.S. Dist. LEXIS

112356, *10, 2024 WL 3189263. "The Fifth Circuit has directed that "[w]hether diligence is 'reasonable' is an 'equitable, often fact-intensive inquiry' in which courts are instructed to avoid 'mechanical rules' and instead to 'draw upon decisions made in other similar cases for guidance.'" *Id., citing Palacios v. Stephens*, 723 F.3d 600, 605 (5th Cir. 2013) (quoting *Holland*, 560 U.S. at 650, 654).   Obviously, Emmerich showed "reasonable diligence" in pursuing all of the instant claims against Particle by actually filing suit and pursuing those claims for 14 months before they were dismissed without prejudice.

Finally, Emmerich had no idea of the volume of infringing activity which occurred prior to the date of the Maze email until August 23, 2021, when Particle for the first time produced a complete list of over 33,000 stolen articles.  Notably, Particle produced this list in PDF format with no dates included. This is arguably the real discovery date.

In sum, there is no valid argument that the copyright statute of limitations bars *any* of Emmerich's claims for *any* of the articles remaining in this lawsuit.

## II.   *Particle circumvented technological measures put in place by Emmerich which effectively controlled access to its copyrighted works in violation of  17 U.S.C. §1201.*

"Circumvention" is broadly defined in 17 USC §1201 a(3)(A) and  §1201 a(3)(B):

(3) As used in this subsection—

(A) to "circumvent a technological measure" means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner; and

(B) a technological measure "effectively controls access to a work" if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work**.**

Emmerich has identified 2,113 articles from the Greenwood Commonwealth and the McComb Enterprise Journal which were taken from behind hard paywalls and then republished by Particle.  *See* Ex. A.  They are listed chronologically and the dates of publication and theft are provided.   All of these articles are original to Emmerich. Emmerich has deleted all articles from these two websites which appeared during the limited timeframes when the paywalls were down in order to provide access during local emergencies, as well as one week prior and one week after each such event. As detailed below,

Particle intentionally removed, deactivated and impaired Emmerich's paywalls before saving Emmerich articles on Particle's server where they could be viewed for free hundreds of thousands of times.

In Greenwood and McComb Emmerich used a content management system called TownNews (now known as Blox). During the relevant time period Emmerich's other websites utilized an open-source system called Drupal. TownNews is one of the largest content management systems in the newspapers industry, with over 2,000 news sites representing over one quarter of all online news content providers**.** TownNews and Drupal perform the same function but in different ways.**[2]** *See* Ex. N, Second Wyatt Emmerich Affidavit, ¶ 3.

The TownNews paywall consisted of HTML code which generated a pop-up block when a reader tried to click-through. This block required the reader to subscribe before viewing the article, and assigned a unique user ID and password to the reader. This paywall was effective in the ordinary course of business and Emmerich generated millions of dollars in subscription revenue as a result of this paywall. *See* Ex. N, Second Wyatt Emmerich Affidavit, ¶ 4.

The TownNews paywall consisted of approximately 300 lines of HTML code inserted automatically by TownNews into every online Emmerich article. This HTML code appeared in every web page containing an Emmerich article. Emmerich went to great lengths to optimize the performance of its websites to ensure the paywalls worked properly and the *"subscriber-only, encrypted-content"* block appeared almost instantaneously. The Particle parser plucked Emmerich's headline, image and content but deleted the 300 lines of HTML code that created Emmerich's paywall. This was deletion and impairment of a copyright protection system and meets the statutory definition of circumvention in 1201. *See* Ex. N, Second Wyatt Emmerich Affidavit, ¶ 5.

An example of this HTML code inserted by TownNews to create a paywall in every article appears below:

---

[2] Particle claims that because its web crawler was blocked at Emmerich websites utilizing Drupal, this means Greenwood and McComb must *not* have been behind effective paywalls. However, as noted below, the TownNews paywalls utilized in Greenwood and McComb effectively controlled access to Emmerich's website in the ordinary course of their operation. They simply were not designed to prevent hacking by a sophisticated attacker like Particle.

```
19   { NodeList.prototype.forEach = Array.prototype.forEach; } /** IE11
     polyfill */
20         document.querySelectorAll(".subscriber-only.encrypted-
21   content").forEach(function(el){
           el.innerHTML = tncms.unscramble(el.textContent);
22         el.classList.remove("encrypted-content");
     });
23         document.querySelectorAll(".subscriber-only,.subscriber-
24   hide").forEach(function(el){ el.style.display = "" });
           __tnt.subscription.api.decrypt = function(){ return false; }
25   };
```

"[P]assword protection . . . and validation keys are technological measures within the meaning of the DMCA." *LivePerson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 510, 2015 U.S. Dist. LEXIS 3688, *12, 2015 WL 170348.  Furthermore, "[T]he legal standard does not require airtight protection." *Yout, LLC v. Recording Indus. Ass'n of Am., Inc.*, 633 F. Supp. 3d 650, 670, 2022 U.S. Dist. LEXIS 178462, *38-39.  "[A] technological measure need not establish an impenetrable barrier around a protected work to be 'effective' as a matter of law." Id. at *24. An ordinary consumer would have been blocked by Emmerich's paywalls at these websites, which is all  §1201(a)(3)(B) requires.

During discovery Particle described a three-step process by which it acquires third-party content for its app/website. *See* Ex. J, First Zhong Depo. pp. 15-20. Step one is "scraping," i.e., using a web crawler to systemically seek out news sites and scrape the entire web page for articles.  Each article is surrounded by vast amounts of HTML code including the TownNews paywall code -- a typical Emmerich news article will contain up to *150 pages* of HTML code. *See* Ex. N, Second Wyatt Emmerich Affidavit, ¶ 6.  It is undisputed that Particle's web crawler scraped or consumed the entire web page, including the TownNews paywall code, every time an Emmerich article was scraped:

> Q.   Okay. When the web crawler identifies a news article, does it consume the entire article or just portions of it?
> A.   **The input to the parser is a whole web page**, and we try to extract headline, image, and content.
> Q.   I want to make sure I understand the first part of your response.· Did you say that you -- you -- **the web crawler consumes the entire web page?**
> A.   **Yes**.
> Q.   Does the web crawler consume advertisements which are located within the body of the article?
> A.   **The input is a whole page.**

*See* Ex. J, First Zhong Depo., pp. 24-25 (emphasis added).   By definition this means Particle's web

crawler consumed the HTML code inserted by TownNews to create the paywall for Emmerich.

It is virtually impossible for website operators like Emmerich to prevent web crawlers from scraping their content.  Google and other search engines do this constantly in order to analyze content and direct internet traffic to appropriate sites.  Scraping is not a problem as long as the party doing the scraping (1) does not republish the content on their own platforms without permission and (2) does not make paywall-protected content available to non-subscribers.  *See* Ex. N, Second Wyatt Emmerich Affidavit, ¶ 7. Particle did both of these things.

It is undisputed that Particle programmed its web crawler to only identify and "parse" the headline, image and content for each article, which they then saved on their server.  Zhong explained the process:

> A.    Okay. Yeah.  Yeah, this is the diagram.  I will use the top part to answer this question. So yeah, there are multiple components in the system.  Here we have crawler and the parser and the database and the APP. So for the crawler to work, we take the input, the RSS, and the web pages, and we download them. That's what the crawler does. Then the results go into the parser. The parser will [parse] the content, things like title, image, and content. It will also generate a few useful information like the category of the page.  Then it will be saved -- in the database.

First Zhong Depo. pp. 16-17.   Particle admits that all of the other HTML code, including the TownNews paywall code, was discarded by its parser:

> Q.    **What happens to the rest of the HTML code that does not fall into the category of headline, image, or content?**
>
> . . . .
>
> A.    Yeah. The parsing process, like I just explained, is to get necessary component to do the analysis and the moderation, yeah. We do not need other component in the parsing stage. We only -- because later we redirect the traffic to the original website, so we do not save other information. The parser component only tries to extract title, content, image . . .
> Q.    **And is it accurate to say that the rest of the code is discarded?**
> A.    What we do is to extract what we need in the parser and to state those companies. I think that's what the company is doing. Yeah. That is the right way of referring what this component does.
> Q.    And so you don't save the rest of the HTML code?
> A.    **We do not save the rest of the HTML.**

*See* Ex. K, Second Zhong Depo., pp. 15-16 (emphasis added). Particle intentionally disregarded the

paywall HTML code. Zhong admitted that the parser could have been programmed to identify Emmerich's paywalls:

> Q.      And you're saying it would be impossible to program your parser to identify the paywall tags?
>
> MR. CARMODY:      Object to the form.
>
> A.      No.

*See* Ex. L, Particle 30(b)(6) Depo, p. 64.

*This* is where Particle removed, deactivated and impaired Emmerich's paywall. The circumvention did *not* occur when Particle scraped Emmerich's articles, which included all of the *"subscriber-only, encrypted-content"* HTML code inserted to prevent non-subscribers from viewing the article. Instead, it occurred during the "parsing" process when Particle's system cherry-picked each article's headline, image and content and then left everything else on the cutting room floor, *including the TownNews paywall code.* Particle then saved the stolen content on its server where anyone using the NewsBreak app could read the article in its entirety without the inconvenience of paying. Based on Particle's data there were over 276,996 NewsBreak page views of Emmerich's paywall-protected content for the articles remaining in this lawsuit, resulting in a direct loss in subscription revenue for Emmerich. *See* Ex. N, Second Wyatt Emmerich Affidavit, ¶ 8.

Particle retained an expert, Mark Gianturco, who was able to download the HTML code for four Emmerich articles from a website known as Wayback.org (approximately 150 pages of HTML code per article). Gianturco opined that, since he was able to download and then locate the content of the Emmerich article buried within those 150 pages of HTML code, this proves Emmerich's paywalls were not effective in their ordinary course of operation. *See* Gianturco Report, Ex. O.[3]

Mr. Gianturco's report and expert opinion are so riddled with deficiencies they cannot defeat Emmerich's motion for summary judgment. First, the 150 pages of HTML code retrieved by Mr. Gianturco is unintelligible to the ordinary reader. In fact, Mr. Gianturco candidly admitted that *he* did not

---

[3] The Gianturco Report and his deposition testimony have been marked "Confidential -- Attorneys Eyes Only" by Particle and Particle has objected to its use in this motion in the absence of a protective order sealing the document. This exhibit will be submitted upon entry of such an order.

know what much of the code represented or did**.** *See* Gianturco Report, Ex. O, p. 22.  No ordinary reader will download 150 pages of HTML code in order to seek out five or six paragraphs of a news story they can read by paying a small subscription fee.  *See* Ex. N, Second Wyatt Emmerich Affidavit, ¶ 9.

Second, Mr. Gianturco acknowledged that he never examined any of the stolen articles on Emmerich's original websites behind the paywalls as they worked in their original location.  There is no way he can feasibly compare the effectiveness of Emmerich's paywalls at their original site with their operation on an entirely different website. *See* Gianturco Report, Ex. O**,** p. 30, 35.

Third, Mr. Gianturco acknowledged that Wayback had inserted thousands of lines of its own code along with Emmerich's and TownNews' code, and confirmed that he had no idea what that code did or how it interacted with Emmerich's native code. *See* Gianturco Report, Ex. O**,** pp. 17-18, 22

Fourth, he admitted that he had no idea what steps Emmerich took to optimize the operation of its website to insure its paywalls worked effectively in their native format. *See* Gianturco Report, Ex. O**,** p. 32.

And fifth, he acknowledged that Emmerich's paywall *did* appear even on the Wayback Machine, albeit sometimes in a delayed fashion.  As noted above, he had no idea what impact Wayback's code may have had on the speed of implementing the paywalls and he had no idea what optimization settings on Emmerich's original websites were missing. *See* Gianturco Report, Ex. O**,** pp. 25-26.

In sum, it is indisputable that Emmerich operated two websites, *The Greenwood Commonwealth* and the *McComb Enterprise Journal*, which were paywall-protected by one of the top content management systems in the country.  It is indisputable that Particle scraped the entire web pages of thousands of articles from these two websites and then parsed or removed all of the HTML code which created the paywalls, thereby removing, deactivating and impairing the technological measures installed by Emmerich to limit access to its copyrighted works.  No reasonable jury could dispute that this is a violation of the DMCA's prohibition on circumvention of technological measures. Utilizing the stipulated number of page views per article (123), this yields 259,899 separate violative acts.

### III. *Particle removed or altered Emmerich's CMI from Emmerich articles without Emmerich's authorization or approval, and then subsequently provided and distributed those same articles under false CMI, having reasonable grounds to know, that it would induce, enable, facilitate, or conceal an infringement in violation of 17 U.S.C. §1202.*

17 U.S.C. § 1202 prohibits the provision and distribution of false copyright information:

(a) FALSE COPYRIGHT MANAGEMENT INFORMATION.—No person shall knowingly and with the intent to induce, enable, facilitate, or conceal infringement— (1) provide copyright management information that is false, or (2) distribute or import for distribution copyright management information that is false.

(b) REMOVAL OR ALTERATION OF COPYRIGHT MANAGEMENT INFORMATION.—No person shall, without the authority of the copyright owner or the law—

(1) intentionally remove or alter any copyright management information,

(2) distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or

(3) distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law, knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

"Copyright management information" is defined broadly under this section:

(c) DEFINITION.—As used in this section, the term "copyright management information" means any of the following information conveyed in connection with copies or phonorecords of a work or performances or displays of a work, including in digital form, except that such term does not include any personally identifying information about a user of a work or of a copy, phonorecord, performance, or display of a work:

(1)     The title and other information identifying the work, including the information set forth on a notice of copyright.

(2)     The name of, and other identifying information about, the author of a work.

(3)     The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.

(4)     With the exception of public performances of works by radio and television broadcast stations, the name of, and other identifying information about, a performer whose performance is fixed in a work other than an audiovisual work.

(5)     With the exception of public performances of works by radio and television broadcast stations, in the case of an audiovisual work, the name of, and other identifying information about, a writer, performer, or director who is credited in the audiovisual

work.

(6)     Terms and conditions for use of the work.

(7)     Identifying numbers or symbols referring to such information or links to such information.

(8)     Such other information as the Register of Copyrights may prescribe by regulation, except that the Register of Copyrights may not require the provision of any information concerning the user of a copyrighted work.

17 U.S.C. § 1202(c).

Emmerich has copyrights for 13,410 original articles which were distributed by Particle under altered URL's.  6,162 of these articles were viewed in self-hosted mode (*see* Ex. B) and another 7,248 were viewed in "Web View" (meaning, in a frame on the NewsBreak app) (*see* Ex. C).  They are listed chronologically and the dates of publication and theft are provided.   All of these articles are original to Emmerich. Emmerich has made a good faith effort to remove all third-party submissions, articles by other entities such as the Associated Press, obituaries, engagement/wedding  announcements  and legal notices from this lawsuit.[4]

Particle violated 17 U.S.C. §1202 by removing or altering Emmerich's copyright management information and then distributing Emmerich articles knowing the CMI had been removed or altered without Emmerich's permission, having reasonable grounds to know this would induce, enable and facilitate infringement of Emmerich's copyrights.  For purposes of this motion Emmerich will focus on Particle's removal and alteration of Emmerich's URL's, and provision and distribution of Emmerich's articles under false URL's. The Newsbreak counterfeit URL contained the word "Newsbreak" followed by an alpha-numeric sequence unique to every specific download. Ex. G, Griffith Affidavit, ¶ 8; Ex. F, Wyatt Emmerich Affidavit, ¶8.

---

[4] Pursuant to this Court's Order [Doc. # 146] Emmerich voluntarily dismissed every article in the contested categories as well as articles from Greenwood and McComb which might have been displayed during periods of local emergencies when the paywalls were down.  Emmerich has also provided dates of publication for each remaining article, listed them chronologically and numbered them sequentially.  Additionally, in discovery Emmerich asked Particle's corporate representative to specifically identify every remaining Emmerich article for which it contested ownership of valid copyrights.  Particle's corporate representative stated that he had never seen any such list and could not explain why any articles were being contested.  Particle 30(b)(6) Deposition, pp. 52-57.

After removing and deleting Emmerich's genuine CMI, Particle provided and distributed false CMI to replace the Emmerich CMI that it removed. *See* Ex. G, Greg Griffith Affidavit. ¶¶ 6-7. This was done to enable and facilitate Particle's infringement of Emmerich's copyrights -- the false URL directed the reader to Particle's website rather than to Emmerich's website  This false CMI was provided and distributed to millions of different individuals over several years at discrete points in time. This redirection could only be accomplished by altering the authentic Emmerich URL and replacing it with a counterfeit Newsbreak URL. The Newsbreak counterfeit URL contained the word Newsbreak followed by an alpha-numeric sequence unique to every specific page view.  Ex. G, Griffith Affidavit, ¶ 8; Ex. F, Wyatt Emmerich Affidavit, ¶¶ 8, 15.   An example of the manner in which NewsBreak generated counterfeit URL's appears below.  The first example is the URL from the copyright owner (not Emmerich newspaper but another publisher who is not a partner with Particle).   The second example is the same article under NewsBreak's counterfeit URL:



Additional examples are set forth in Ex. F, Wyatt Emmerich's Affidavit. The false CMI distributed by Particle each time a reader viewed a "self-hosted" article included the counterfeit URL or

digital filename, Newsbreak's counterfeit logo and a variety of "share" buttons which linked back to Particle's website rather than to Emmerich's websites. The revised, self-hosted article appeared under a new URL generated by Particle's system. At no point did the reader viewing a self-hosted article go to Emmerich's website. Ex. F,  Wyatt Emmerich Affidavit, ¶ 8.

Emmerich operates websites for each of its newspapers where readers can view its articles online. Each Emmerich article is presented under a unique digital filename or URL. Emmerich utilizes this naming convention to identify each article and limit its location to its own websites. *See* Ex. N, Second Emmerich Affidavit, ¶ 2.

Any reader clicking on this URL is automatically taken to the Emmerich website where the article appeared.  The reader then sees advertisements posted by Emmerich along with the story in question and a variety of links to other information regarding Emmerich newspapers and its copyright management policies. *See* Ex. N, Second Wyatt Emmerich Affidavit, ¶10.

As described in detail above, Particle's web crawler systematically scraped Emmerich's articles and then presented all or portions of them in three different formats: (1) full-text views in "self-hosted" mode; (2) full-text views in framed or "Web View" mode; and (3) the headline, image and lede on the NewsBreak news feed.  *None* of these formats utilized Emmerich's original URL and as a result none of the page views actually occurred on Emmerich's original websites.

Particle does not and cannot dispute that all page views in self-hosted mode occurred under altered URL's -- the parsed Emmerich articles were stored on Particle's servers and displayed in a completely different format which looked nothing like the original Emmerich website. This could only have occurred under an altered URL. At no point did the reader viewing a self-hosted article go to Emmerich's website. *See* Ex. F, Emmerich Affidavit, ¶ 8.  It would have been impossible for a reader to view the revised Emmerich Article in self-hosted mode on Particle's website under Emmerich's original filename. It could only be viewed on Particle's website under a different filename. *See* Ex. F, Emmerich Affidavit, ¶ 9.

To the extent Particle incorporated Emmerich's URL when it displayed Emmerich articles in a window or frame (i.e., "WebView"), Particle does not and cannot dispute that those page views occurred *under Particle's own URL* and not Emmerich's -- otherwise the reader would never have seen Particle's ads and Particle's share buttons. And all page views of Emmerich's headlines, image and lede on the news feed, by definition, occurred under Particle's URL.

After removing and deleting Emmerich's genuine URL, Particle provided and distributed false CMI to replace the Emmerich URL that it removed. *See* Ex. G, Greg Griffith Affidavit. ¶¶ 6-7. This was done to enable and facilitate Particle's infringement of Emmerich's copyrights - the false URL directed the reader to Particle's website where the reader could view Emmerich's article without going to Emmerich's website. This false CMI was provided and distributed to millions of different individuals at discrete points in time who viewed Emmerich articles on Newsbreak over several years.

This redirection could only be accomplished by altering the authentic Emmerich URL and replacing it with a counterfeit Newsbreak URL. When presented with a demonstration proving that Particle generate a new, unique URL for each page view, Zhong candidly admitted that the URL enabled the reader to view the Emmerich article in the NewsBreak app and *not* on Emmerich's original website:

> Q.      Okay. And then we have a URL, "https://share.NewsBreak.com," and then forward slash followed by an eight-digit identifier. Do you see that?
> A.      Yes. Okay. How was that URL generated?
> A.      **The URL here is a link used for the user to access the shared article, so it is basically a redirect URL. When the user clicks this URL, it will have a choice to either go to Particle Media's app** or go to the publisher's website directly.
> . . . .
> A.      **That URL is generated with the internal ID for us to identify that article.** It's just generate -- provided this ID to the user so **when user click, we are able to find** either the website to redirect to or **the article to display if the user choose to see it in our app.**

*See* Ex. K, Second Zhong Depo., p. 54-55 (emphasis added).  Note that elsewhere Zhong admitted that the "option" of going directly to Emmerich's website was actually only available on the desktop version, which Zhong admitted was a "tiny, tiny" fraction of NewsBreak's total business,[5]  and not on the mobile

---

[5] "We are an app.  Majority of our user is from app or mobile user. The web user is very, very tiny." Second Zhong Depo, p. 27.

app.  According to Particle's expert Blake Sell, "In 2021 mobile device users constituted 97% of Newsbreak's average monthly users."  *See* Ex. P, Sell Report, ¶125. So as a practical matter Particle's altered URL directed virtually all readers to view the Emmerich articles displayed in the NewsBreak mobile app and not on Emmerich's website.

As Particle's expert Blake Sell noted in his report, "The URL has one and only one purpose, as its name states: the location of the resource on the internet." *See* Ex. P, Sell Report, ¶ 47.  "A URL by definition changes when the resource such as a news article is located on a different server or in a different folder. Whenever the location of any object on the internet changes, the URL changes, by design, by function, by definition and by logic." *See* Ex. P, Sell Report, ¶ 49.  According to Particle's own expert, Particle's alteration of Emmerich's URL automatically directed the reader to a *different* location than Emmerich's original website where the article was displayed.  This fundamentally undermined Emmerich's ability to manage its copyrights. The genuine Emmerich URL ensures that Emmerich articles are displayed on Emmerich websites and apps and nowhere else. When Particle altered Emmerich's URLs, Particle undermined Emmerich's ability to manage its copyrights.

One of the central rights enjoyed by a copyright holder is the exclusive right to display its own copyrighted material.  17 U.S.C. § 106(5).  Hence, when Particle altered Emmerich's CMI by removing its URL's and replacing it with Particle's own every time the article was viewed or shared, it had reasonable grounds to know that it would induce, enable, facilitate, or conceal an infringement of Emmerich's rights under the Copyright Act.

17 U.S.C. § 1202 "protects the 'integrity of copyright management information by prohibiting any person from intentionally removing or altering CMI conveyed in connection with copies if he or she knows or has reasonable grounds to know it would 'induce, enable, facilitate, or conceal' copyright infringement." *Energy Intelligence Grp., Inc. v. Kayne Anderson Capital Advisors, L.P.*, (5th Cir. 2020) 948 F.3d 261, 276. The DMCA defines "copyright management information" to include "[t]he name of, and other identifying information about, the author of a work." *See* 17 U.S.C. § 1202(c)(2).

---

The purpose of 17 U.S.C. § 1202 is to safeguard the integrity of copyright management information (CMI), which is defined, in part, as information conveyed in connection with copies of a work, including the title of the work, the author of the work, the name of the copyright owner, and terms and conditions for use. 17 U.S.C. § 1202(c). Section 1202(a) makes it unlawful to provide false CMI or distribute or import for distribution false CMI knowingly and with the intent to induce, enable, facilitate, or conceal infringement. 17 U.S.C. § 1201. Section 1202(b) prohibits three kinds of acts: the removal or alteration of CMI, § 1202(b)(1); the distribution of CMI with deleted or altered CMI, § 1202(b)(2); and the distribution of works with deleted or altered CMI, § 1202(b)(3). All of these provisions require that the defendant take the prohibited act "knowing, or ... having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement...."

Emmerich charges in Count III, in pertinent part, that

> Each time Particle stole an Emmerich article it removed and altered Emmerich's copyright management information by changing Emmerich's digital filename and substituting its own digital filename in violation of 17 U.S.C. §1202(b)(1). Each time Particle re-published Emmerich's articles knowing that the copyright management information had been altered without authority of the copyright owner constituted a separate violation of 17 U.S.C. §1202(b)(2), entitling Emmerich to statutory damages for each such act in an amount not less than $2,500.00 or more than $25,000.00 per act. Each page view (4,178,871) constituted a separate act of republication with altered copyright management information by Particle.

Particle has stipulated that each article was viewed, on average, 123 times in either scenario. Applying this average to the number of articles identified above, there were 757,926 page views of articles with altered CMI in self-hosted mode and 891,504 page views in frames.

Particle has acknowledged that it altered Emmerich's URL for each and every page view -- meaning 1,649,430 violative acts. When asked why Newsbreak generated a unique URL for every page view Zhong explained that Particle wanted to know exactly when the article was viewed or shared, and the ever-changing eight-digit alpha numeric tag tracked this information:

> Q.    And is that why it's different every time?

> A.    Because this short URL includes the information of when the user shared this article, that's why each time it's different.

Particle 30(b)(6) Deposition, p. 32.

As this Court noted in its prior ruling,

> Particle does not deny that filenames can constitute CMI. *See Energy Intelligence Grp.,* 948 F.3d at 277 (quoting § 1202(c)(1)) ("Nothing in § 1202 indicates that a digital file name cannot be CMI. Rather, a PDF's file name may be CMI if it is 'conveyed in connection with copies' of the underlying work and contains a 'title and other information identifying the work.'"). But Particle does dispute that Emmerich's URLs constitute CMI, as opposed to merely internet addresses. In support of this contention, it points to examples of Emmerich articles that do not conform to Emmerich's professed file-naming practice, i.e., a file name that consists of the URL containing the title of the article and name of the newspaper in which it appeared. Particle does not explain, however, why file names that do conform to this practice would not constitute CMI.

Emmerich's URL's are copyright management information which Particle altered or removed before distributing Emmerich articles to online readers.   The Fifth Circuit has specifically addressed this question in *Energy Intelligence Grp., Inc. v. Kayne Anderson Capital Advisors, L.P.*, 948 F.3d 261 (5th Cir. 2020).

In that case, the plaintiff (EIG) published an online daily newsletter about the oil industry.  One of Kayne Anderson's employees would initially access this newsletter "by logging in to EIG's website with a username and password" which he shared with several other employees. *Id*. at *6.  When questions were raised about the propriety of multiple employees using the same access credentials, the employee asked that the newsletter be emailed to him as a PDF document which he would then simply forward to his colleagues. *Id*.   These employees, in turn, regularly forwarded the PDF document to other third parties after changing the name of the document to avoid detection by EIG.  This happened at least 425 times. *Id*.

EIG filed suit alleging, *inter alia,* violation of the DMCA by changing the digital file name and then sending the document to third parties with the new file name.  The defendant argued that, "as a matter of law, a PDF filename is not CMI because it is not listed in § 1202(c) and because downloading and renaming files is a common practice in the modern Internet era." Id. at **30. The Fifth Circuit flatly rejected both of these arguments, stating that

> **CMI is defined broadly.** It is "any of the following information conveyed in connection with copies . . . of a work," including "[t]he title and other information identifying the work," 17 U.S.C. § 1202(c)(1); "[t]he name of, and other identifying information about," the author, copyright owner, or performer, *Id.* § 1202(c)(2)-(4); or "[s]uch other

information as the Register of Copyrights may prescribe by regulation," *id.* § 1202(c)(8). **Nothing in § 1202 indicates that a digital file name cannot be CMI.** Rather, a PDF's file name may be CMI if it is "conveyed in connection with copies" of the underlying work and contains a "title and other information identifying the work." *See* 17 U.S.C. § 1202(c)(1). EIG presented evidence at trial indicating that the "DE" naming convention was "information identifying" each *Oil Daily* newsletter. **Therefore, the PDF file names of Oil Daily were CMI.**

(emphasis added) *Id.* at *30-31.

Note that digital filenames which met the definition of CMI here consisted only of the PDF filename "DE" followed by the date of the newsletter.  948 F.3d at 275. This is far less information than is typically included in Emmerich's URL's which include the headline of the article and name of the author. Even when Emmerich's URL's contain less information they include "identifying numbers or symbols referring to such information or links to such information" 17 U.S.C. §1202(c)(7). These URL's at a minimum are *links to CMI*, directing readers to the Emmerich's genuine website where the reader can find a host of information about the copyright owner including website menu items such as "who we are," "contact us," options to subscribe, a list of writers, history of the publication, etc.

Further, the Fifth Circuit confirmed that a separate violation of Section 1202 occurred each of the 425 times a Kayne Anderson employee forwarded the PDF under an altered file name to a third party, and that each such event supported an award of the minimum statutory damages of $2,500.00, totaling $1,062,500.00.  *Id.* at *38-39.

The exact same logic applies in this case.  Emmerich's URL's are digital file names which meet the definition of CMI set forth at 17 U.S.C. § 1202(c)(1), (3) and (7). These file names lead directly to Emmerich's websites. *See* Ex. A, Emmerich Affidavit ¶¶2-3. However, Particle removed these file names so that readers clicking through an Emmerich Article appearing on the NewsBreak news feed were sent to Particle's website rather than Emmerich's. The reader then viewed the Emmerich Article (without Emmerich's CMI and with Emmerich's ads replaced by Particle's ads) under a unique file name generated by Particle. The file name generated by Particle was different every time a page view occurred. *See* Ex. A,  Emmerich Affidavit, ¶13.

Similarly, in *Bodyguard Prods. v. RCN Telecom Servs*., LLC, 2022 U.S. Dist. LEXIS 185965, 2022 U.S.P.Q.2D (BNA) 964, 2022 WL 6750322, the plaintiff owned the copyrights to movies which were available online.  The defendant utilized a system called "BitTorrent" to illegally copy and distribute the plaintiff's movies.  The court noted that this system "copies the motion pictures from legitimate sources, and in the process often modifies the file title of the Work[s], or the Copyright Management Information ("CMI")." *Id*. at *3-4.  The original file name was modified by including  "a reference to popular websites facilitating piracy . . . such as YTS, Pirate Bay, or RARBG." *Id*.  Among other things, the Plaintiff alleged this was a violation of DMCA Sections 1202(a) (prohibiting distribution of false CMI) and (b) (prohibiting removal or alteration of CMI).

The defendants argued that merely adding additional words or symbols to the original file name did not constitute alteration of CMI or distribution of false CMI, but the Court, citing *Energy Intelligence*, rejected this argument out of hand.  "When construing the allegations of the FAC in Plaintiffs' favor, the Court finds Plaintiffs have adequately pled that the titles of Plaintiffs' Works, constituting CMI under section 1202(c)(1), were altered or falsified in violation of section 1202." *Id*. at *43.  *See also*, *After II Movie, LLC v. Grande Commc'ns Networks, LLC*, (W.D. Tex. 2023) 2023 U.S. Dist. LEXIS 15772, *25, 2023 WL 1422808 ("Plaintiffs allege that a file title of a legitimate digital copy of the work is CMI as defined in 17 U.S.C. § 1202(c) citing *Energy Intelligence;* The undersigned finds Plaintiffs have sufficiently pleaded that the CMI in issue was attached to legitimate copies of the Works"); *Izmo, Inc. v. Roadster, Inc.*, 2019 U.S. Dist. LEXIS 243999, *7, 2019 WL 13210561 ("In short, the file names "identify the work" and are therefore CMI"); *Millennium Funding, Inc. v. Priv. Internet Access, Inc.,* 2022 U.S. Dist. LEXIS 187487, *63, 2022 WL 7560395 (allegations that "YTS" was added to the file names of protected works were sufficient to allege altered CMI).

In sum, it is indisputable that Particle systematically removed Emmerich's URL's which led the reader to Emmerich's websites and then distributed Emmerich's articles under false URL's which led the reader to NewsBreak. No reasonable juror could dispute that this constituted removal or alteration of Emmerich's CMI and distribution of Emmerich's copyrighted material under false CMI in violation of 17

U.S.C. §§1201 and 1202. Utilizing the stipulated number of page views per article (123), this yields 891,504 violative acts in framed view and 757,926 in self-hosted view.

**IV.**   ***Particle committed copyright infringement by displaying thousands of Emmerich articles and 29 Emmerich Photographs in full text, self-hosted mode in violation of 17 U.S.C. §106(5).***

Emmerich has identified 3,446 original articles which were displayed by Particle in full-text format (*see* Ex. E). Emmerich has copyright registrations for all of these articles. They are listed on the exhibits chronologically and the dates of publication and theft are provided along with the Copyright Registration numbers.  All registrations have an effective date prior to the filing of this lawsuit.   All of these articles are original to Emmerich and have been properly registered. Emmerich has made a good-faith effort to remove all third-party submissions, articles by other entities such as the Associated Press, obituaries, engagement/wedding  announcements  and legal notices from this lawsuit. Additionally, Emmerich has obtained copyright registrations for 29 of its original photographs.  *See* Ex. P.  Particle cannot plausibly still claim that it is unaware of which articles or photographs are in dispute. Nor can it plausibly deny that it published the listed articles in full-text format.  Particle actually produced complete copies of these articles to Emmerich in *Particle 1.*

A sister court in this district has already ruled that this practice is not protected by the doctrine of fair use.  "The Court finds all factors weigh against fair use. Particle Media's display of the Registered Works in full-text format on the NewsBreak app is not fair use and is unprotected by the affirmative defense codified in § 107." *Emmerich Newspapers, Inc. v. Particle Media, Inc.,* 2022 U.S. Dist. LEXIS 141283, *12, 2022 WL 3222892 ("Particle 1").   Emmerich now seeks summary judgment that this practice, both as to articles and as to photographs, constituted copyright infringement (17 U.S.C. §501 et seq.). There is no genuine issue of material fact on this question and no reasonable jury could conclude otherwise. Emmerich is therefore entitled to judgment on the issue of liability as a matter of law.

To prevail on a claim of copyright infringement "a party must show that (1) he owns a valid copyright and (2) the defendant copied constituent elements of the plaintiff's work that are original." *Baisden v. I'm Ready Productions, Inc.*, 693 F.3d 491, 499 (5th Cir. 2012) (internal quotations and citation

omitted), cited in *Preston Wood & Assocs., LLC v. RZ Enters. USA* (S.D. Tex. 2018) 2018 U.S. Dist. LEXIS 94969, *5-10, Copy. L. Rep. (CCH) P31,282, 2018 WL 2722328.

Emmerich has produced copyright certificates covering all of the the articles in question, along with copies of articles which were reproduced in their entirety on Particle's website. There is no dispute that Particle scraped these articles from Emmerich's websites and then displayed them in their entirety on Particle's own website.

A certificate of registration from the Copyright Office gives rise to a rebuttable presumption that the copyright is valid. *See* 17 U.S.C. § 410(c) (certificates of registration "constitute prima facie evidence of the validity of the copyright[s]"); *Norma Ribbon & Trimming, Inc. v. Little*, 51 F.3d 45, 47 (5th Cir. 1995). Emmerich has presented uncontested evidence that it has Certificates of Registration for each of the articles at issue. *See* Doc. #15, B1 - B4 (Certificates of Registration).

A defendant who challenges the originality of copyrighted material has the burden to overcome the presumption of validity by presenting either (1) proof that the product was copied from other works, or (2) similarly probative evidence regarding the lack of originality. *See Lennar Homes of Texas Sales & Mktg., Ltd. v. Perry Homes, LLC*, 117 F. Supp. 3d 913, 930 (S.D. Tex. 2015) (citing *Masquerade Novelty, Inc. v. Unique Indus., Inc.*, 912 F.2d 663, 668-69 (3d Cir. 1990)). "To qualify for copyright protection, a work must be original to the author." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 345, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991).

"Originality" for copyright purposes does not require that the work be novel or express a meaningful underlying idea, only "that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *See Feist*, 499 U.S. at 345. "[T]he requisite level of creativity is extremely low; even a slight amount will suffice." *Id.* Indeed, the originality requirement amounts to "little more than a prohibition of actual copying." *Lennar Homes*, 117 F. Supp. 3d at 930 (quoting *Alfred Bell & Co. v. Catalda Fine Arts*, 191 F.2d 99, 103 (2d Cir. 1951)). Emmerich's articles clearly meet this standard.

Particle claims that the display of full-text Emmerich articles in self-hosted mode was the result of two separate, vaguely-explained "glitches" occurring nearly a year apart.  It claims that, upon learning

of the glitches, it took immediate action to correct the problem both times.  However, Particle ultimately admitted that the repair only applied to readers who voluntarily upgraded their app or to new users. Pre-existing NewsBreak users who did not upgrade could continue to view full-text Emmerich articles long after the glitch has supposedly been repaired. Mr. Zhong testified as follows:

> Q.      But users who did not upgrade would still be able to view the Emmerich articles
>          in full text, wouldn't they?
>
> MR. CARMODY: Object to the form.
>
> A.      When users use the old app, they will be affected by the glitch. At that time . . .
>          because we must have a way -- our app does not have the function of forcing user
>          to update because that is not a common practice when people developing app.
>          That was why we do not have this function.
>
> Q.      Well, it may not be common. But that doesn't mean it's impossible, does it?
>
> MR. CARMODY:· Object to the form. You can answer, Randy.
>
> A.      It is possible, but the reality was we do not have a -- a mechanism to force the
>          user update, and it is not common practice for majority of app developers.

*See* Ex. K, Second Zhong Depo, pp. 81-82.  So Particle absolutely knew that it was continuing to illegally publish Emmerich articles in full-text form even after the so-called glitch was repaired.   Zhong further admitted that Particle has no idea how many users voluntarily upgraded before Emmerich filed suit:

> Q.      Do you know how many NewsBreak users actually upgraded their app after the
>          glitch was supposedly fixed and before Emmerich filed suit?
>
> A.      I don't have that number. I'm not sure how to find out.

*Id*. at p. 84.

A common practice to correct programming errors is known as a "forced upgrade."  Using this approach, a user is required to upgrade before opening the app. *See* Ex. N, Second Wyatt Emmerich Affidavit, ¶ 11.  Particle failed to do a forced upgrade, claiming this would have been too hard:

> Q.      Why didn't Particle do a forced upgrade of the app to prevent Emmerich articles
>          from being displayed in full text form after the glitch was discovered?
>
> MR. CARMODY:· This is for you, Randy.

A.  Okay. Yeah. So in the user app, it is unusual for a app to force a user to upgrade whenever there is a change. Because of that, we do not have an in-place way of forcing user to upgrade. In order to have that function, we will have to release a new app. In that case, we already -- we already released a new app way to fix. It does not help if we release another version just to force the user to update before they use.

Id. at 80-81.

Alternatively, knowing the so-called "repair" did not apply to the millions of NewsBreak users who did not update their apps, Particle could and should have simply deleted all of Emmerich's articles stored on its database.  However, they willfully failed to do so:

Q.  Well, if you knew that users who did not upgrade their app would still be able to see the Emmerich articles in full text, why didn't you just delete all of the Emmerich articles from your database?

A.  First we were not aware of Emmerich at that time. We got notified by you -- by the lawsuit in 2021 you are affected. At the time when the glitch happened, we did not know exactly the whole list of possible publishers that are affected.

Q.  Well, you knew who your partners were and who the non-partners were, didn't you?

A.  We have thousands of websites. We cannot identify exactly which particular website got affected. It is a very complicated process.

*See* Ex. K, Second Zhong Deposition, p. 82.  This is demonstrably false. Particle did, in fact, know exactly which websites belonged to its partners and which belonged to non-partners.  They produced a complete list of its partners, and their websites, in discovery.  Knowing that the NewsBreak app was continuously allowing readers to view full-text articles from non-partner websites even after the so-called glitch repair, NewsBreak should have immediately deleted all non-partner content from its database.  No reasonable jury could dispute that Particle's failure to do so is proof positive of willing infringement.

Finally, with regard to Particle's claim of innocent infringement, while the Fifth Circuit has accepted the innocent infringement defense as a method of reducing statutory damages in copyright infringement cases, it is not an affirmative defense to copyright infringement.  *See Bobby Goldstein Prods. v. Habeeb*, (W.D. Tex. 2022) 2022 U.S. Dist. LEXIS 183123, *7, 2022 WL 5250284.

26

**V.**       ***Particle committed copyright infringement by displaying thousands of Emmerich articles in frames on the NewsBreak app in violation of 17 U.S.C. §106(5).***

Emmerich has the exclusive right to display its own copyrighted articles. 17 U.S.C. §106(5). Emmerich has identified  1,919 original articles which were displayed by Particle in framed or "WebView" (*see* Ex. C). Emmerich has copyright registrations for all of these articles. They are listed on the exhibit chronologically and the dates of publication and theft are provided along with the Copyright Registration numbers.  All registrations have an effective date prior to the filing of this lawsuit.   All of these articles are original to Emmerich and have been properly registered. Emmerich has removed all third-party submissions, articles by other entities such as the Associated Press, obituaries, engagement/wedding announcements  and legal notices from this lawsuit.  Particle cannot plausibly still claim that it is unaware of which articles or photographs are in dispute. Nor can it plausibly deny that it published these articles in frames in the NewsBreak app alongside its own ads.  A sister court has already ruled that the full-text reproduction of Emmerich articles by Particles is  not protected by fair use.

Particle does not claim that it displayed Emmerich articles in frames "by accident." Instead, it defends its actions with the duplicitous claim that it took readers to Emmerich's websites "with Newsbreak acting as a web browser."  *See, e.g.,* Zhong Declaration, para 5.  This is a euphemism for "framing," which is copyright infringement when done without the publisher's permission. In *Leader's Inst., LLC v. Jackson*, ((N.D. Tex. 2017) 2017 U.S. Dist. LEXIS 193555, 2017 WL 5629514) the defendants accused the plaintiffs of infringing their rights in copyrighted works by causing the plaintiffs' websites to "frame" the defendants' websites. By framing the copyrighted works, the defendants contended, the plaintiffs displayed the defendants' works. *Id.* at 15. The Court provided a succinct explanation of framing:

> Some technical background is necessary to explain framing. Webpages consist of data. This data is stored on computers. When a user instructs her web browser to access a webpage, the web-browser software interprets code stored on the computer that stores the website's data and displays the information as a webpage. *But a webpage can include code that instructs the web browser to retrieve code from another computer and to display that information at the same time as information retrieved from the first computer.*

27

> In such a situation, the user would  see the website she has visited framing the content the website instructed the web browser to retrieve from the other computer.

Id. at 28-29 (emphasis added).  This is precisely what Particle has admitted doing when the NewsBreak app "acts as a web browser."  It retrieves code (i.e., the Emmerich web page displaying the article) and displays that code at the same time as other information retrieved from the first computer ((i.e., Particle's ads and buttons).

As noted above, Particle has repeatedly admitted the NewsBreak app only ever took the reader to Emmerich's website *"with Newsbreak acting as a web browser."* This is a critical and damning admission. When NewsBreak "acted as a web browser" the reader was *not* actually taken directly to Emmerich's website.  Instead, Emmerich's website was fetched and displayed in a frame or window in *the NewsBreak app* which included ads and other features placed by Particle:

> Q.   Does the NewsBreak app, when it is acting as a browser, feature banner ads either above or below as part of the window?
>
> . . . .
>
> A.   So inside -- inside the screen, we have a window.  That window, the function is like a browser.  Outside the window, in this example, on your screen, we see the share, like, comment button.  If there is a banner ad, it is also show outside the window on the bottom of the window.

See Ex. K, Second Zhong Depo. pp. 44-45.  Mr. Zhong insisted on the comical distinction that Particle's banner ads only ever appeared outside the window where Emmerich's articles were displayed: "That's actually -- that's not --is not particularly important because if our banner ads show, it will be outside the window."  Id. at 48.  He never denied that the ads appeared *on the same screen* while Emmerich's articles were simultaneously appearing in a window on the screen.

When pressed, Zhong even admitted that Particle inserts features and material *inside* the window where the third-party content is being displayed.  For example, when scrolling through an article inside the window the reader is eventually presented with the option *"See Full Page" f*ollowed by a series of links to other articles.  Zhong admitted that all of these linked articles were inserted by Particle and did

not originate with the third-party publisher: "Okay. Correct. Yeah.  The things under the *"See Full Page"* is from Particle Media."  Id. at 51-52.

Zhong also admitted that Particle inserts its own "share" button which generate a variety of sharing options, including Copy link, Facebook, Twitter and Nextdoor. "Newsbreak provide a few options for you to share."  Id. at 52-53. And Zhong admitted that every share option generated a unique URL which began, "https://share.Newsbreak.com/" followed by an eight-digit alpha-numeric identifier, rather than Emmerich's URL associated with the article being shared.  When asked about the Newsbreak URL which appeared every time a reader attempts to copy or share, Zhong responded:

> Q.     And is that why it's different every time?
>
> A.     Because this short URL includes the information of when the user shared this article, that's why each time it's different.
>
> Q.     Thank you. That's all I needed

Particle 30(b)(6) Deposition, p. 32.  Later, Zhong explained the purpose of Particle's unique URL:

> A.     **The URL here is a link used for the user to access the shared article**, so it is basically a redirect URL.When the user clicks this URL it will have the choice to either go to Particle Media's app or go to the publisher's website directly.

See Ex. K, Zhong Second Depo. p. 54 (emphasis added).

Returning to the testimony of Mr. Sell, "The URL has one and only one purpose, as its name states: the location of the resource on the internet." *See* Ex. P, Sell Report, ¶47.  "A URL by definition changes when the resource such as a news article is located on a different server or in a different folder.  Whenever the location of any object on the internet changes, the URL changes. Id. at ¶49.

Combining the testimony of Zhong and Sell the conclusion is inescapable -- Particle generated its own, counterfeit URL every time a reader clicked through or shared an Emmerich article in order to direct the reader, not to Emmerich's website, but to *Particle's* website where the NewsBreak app displayed Emmerich's article in a frame or window surrounded by Particle's ads and Particle's "like", "comment" and "share" buttons.  This is a blatant violation of Emmerich's exclusive right to display its own articles, and this could only be achieved by altering the digital filename (i.e., the URL) under which Emmerich

originally posted the article.

This is classic "framing," which is copyright infringement when done without the publisher's permission. Particle displayed Emmerich's website in a window on its own website and profited by inserting ads above and below that window. Particle has never offered to share a dime of this revenue with Emmerich. A reader who was actually on Emmerich's website would never have seen an ad placed by Particle.

As further proof that Particle framed Emmerich's articles on its own website, Particle admitted that it inserts its own  "like," "comment" and "share" buttons below each article. When presented with a screen shot of an article displayed "with Newsbreak acting as a web browser," Zhong admitted that those buttons were placed there by Newsbreak and not by the publisher:

> Q.      Okay.  So the like button, the comment button and the share button at the bottom
> of this image is placed there by NewsBreak, correct?
>
> A.      Correct.

*See* Ex. K, Second Zhong Transcript, p. 38.

Zhong candidly admitted the manner in which Particle displayed Emmerich's content on the NewsBreak app:

> A.      Here you see a screen.  In the screen, we use a component from the operating
> system called "WebView."  It is a window. Inside the window, we put the URL,
> send the URL to the component so the component go directly to the website and
> display all the content . . . . At the bottom, where you see the "share," "like," that
> is extra function we add outside the window. . . . It is used to enhance user
> experience, to get more engagement data so as to better redirect traffic to the - to
> the original website.
>
> Q.      Is it fair to say that we're looking at the . . . website through a window at the -- on
> the NewsBreak app?
>
> A.      Here it is on NewsBreak app.  We display their content inside the window.
>
> . . . .
>
> Q.      Whose window?
>
> A.      Our window is from the operating system.  It is a standard component called
> "WebView."  It is a window which sends the URL to the window -- to the

component, and the component will show -- will go to the original website and render all the content inside the window.

Q.      By "render," you mean display all of the originating website inside the window.

A.      Correct.

*See* Ex. K, Second Zhong Deposition, p. 40.  This is what Particle means when it says the Newsbreak app "acts as a web browser." And Particle does not claim this form of display is accidental or the result of any glitch -- instead it preposterously insists the reader is actually on the originating website while they are viewing Particle ads and interacting with Particle "like," "comment" and "share" buttons. Obviously, no reader on Emmerich's website would ever see ads placed by Particle or use "like," "share" or "comment" buttons which fed information to Particle.

Owners of copyrights have the exclusive rights to publicly display copies of their copyrighted works. 17 U.S.C. § 106(5). "To display a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process." *Id.* § 101. And to publicly display a work is "to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times." *Id.* Federal law gives copyright owners a cause of action to use against copyright infringers. *Id.* § 501. Copyright owners can seek injunctions, damages, and attorney fees in copyright infringement cases. *Id.* §§ 502, 503, 505.

In *Leader's Institute* The Court concluded, "The facts of this case illustrate framing. The defendants have alleged, and the plaintiffs do not dispute, that when a user visited one of TLI's websites, TLI's website instructed the user's browser to display Magnovo's website under TLI's web address. Thus, TLI's content framed Magnovo's."  Id. at 29. The only difference here is that, instead of instructing the user's browser to to display Emmerich's website under Particle's web address, Newsbreak actually pushed the user's browser aside and performed the browsing functions itself.

The Court flatly rejected the Plaintiff's argument that framing is not copyright infringement:

> [T]he plaintiffs are incorrect; they publicly displayed Magnovo's copyrighted works. By framing Magnovo's copyrighted works, the plaintiffs displayed the works by "show[ing] a copy" of the works via a "process." 17 U.S.C. § 101. That process was the instructing of users' web browsers to display Magnovo's copyrighted works when those users visited one of the accused TLI domain names. And the plaintiffs displayed the copyrighted works publicly. By instructing users' web browsers to display Magnovo's content upon accessing TLI's publicly-accessible websites, the plaintiffs "transmit[ed] . . . a display of the [defendants'] work . . . to the public." *Id.* Thus, by framing the defendants' copyrighted works, the plaintiffs impermissibly displayed the works to the public. *See Id.* § 106(5) (conferring on copyright owner the exclusive right to display copyrighted works).

Id. at 29-30.

This finding is consistent with virtually every other case that has considered the question. See, e.g., *Prepared Food Photos, Inc. v. Chicken Joes, LLC*, (S.D. N.Y. 2024) 2024 U.S. Dist. LEXIS 18016, *3, 2024 WL 382529 ("[T]he Court joins other courts in this district in finding that embedding a work such as an image constitutes "display" that is actionable for infringing a copyright in the image); *McGucken v. Newsweek LLC*, No. 19-CV-9617 (KPF), 2022 U.S. Dist. LEXIS 50231, 2022 WL 836786, at *6 (S.D.N.Y. Mar. 21, 2022) (finding that Defendant "displayed" a photograph when it embedded it in an article published on its website); *Nicklen v. Sinclair Broad. Grp., Inc.*, 551 F. Supp. 3d 188, 194 (S.D.N.Y. 2021) ("The Copyright Act's text and history establish that embedding a video on a website 'displays' that video."); *Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 2018 U.S. Dist. LEXIS 25215 (granting partial summary judgment to plaintiff after finding "defendants' websites actively took steps to 'display' the image in violation of plaintiff's exclusive right to display); *Great Bowery v. Best Little Sites*, 2024 U.S. Dist. LEXIS 124525, 2024 WL 3416038 (a defendant who embeds a copyrighted image on a webpage, without hosting the image on its servers, may infringe the copyright holder's display rights).

Particle defends its conduct by arguing that it always gave readers "the option" of either viewing an article on Emmerich's website or viewing it in a window on the NewsBreak app "with NewsBreak acting as a web browser."   "When a website user clicked on an item listed on the newsfeed, she was given a link to the publisher's website."  See Zhong Declaration, ¶5. However, this does nothing to excuse

Particle's wrongful conduct on the millions of occasions when readers "opted" to view Emmerich Articles on NewsBreak's platform.

Moreover, Particle acknowledges that this "option" only appeared when the reader was viewing NewsBreak on a desktop (i.e., "a website user"), which constituted less than 3% of total pageviews. According to Particle's expert Blake Sell, "In 2021 mobile device users constituted 97% of Newsbreak's average monthly users." Sell Report, ¶125.

Q.      So there was no such option given to mobile app users, correct?

A.      **In the mobile user**, you just showed, it is -- it goes to the publisher's website. Because the website is not a partner, it always goes to the publisher's website.  In this case, **we do not need to ask**.

See Ex. K, Second Zhong Depo., pp. 34-35 (emphasis added).

No reasonable jury could dispute that, when the NewsBreak app "acted as a web browser" it impermissibly displayed Emmerich's articles in a frame on its own website along with its own ads and other features, all in violation of Emmerich's exclusive right to display its own copyrighted works.

RESPECTFULLY SUBMITTED, this the 22nd day of July, 2024.

BY: /s/ Wilson H. Carroll
Wilson H. Carroll (MSB#5894)

Wilson H. Carroll
WILSON CARROLL, PLLC
2506 Cherry Street
Vicksburg, Mississippi  39180
(601)953-6579
wilson@wilsoncarroll.com

## CERTIFICATE OF SERVICE

I, Wilson H. Carroll, hereby certify that I have this day filed the foregoing document via the Court's automated filing system, which automatically forwarded copies to all counsel of record.

So certified, this the 22nd day of July, 2024.

BY: /s/ Wilson H. Carroll
Wilson H. Carroll (MSB#5894)