**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**EMMERICH NEWSPAPERS, INCORPORATED**                    **PLAINTIFF**

**V.**                    **CIVIL ACTION NO. 3:23-CV-26 TSL-MTP**

**PARTICLE MEDIA, INC.**                    **DEFENDANT**

**CONSOLIDATED WITH**

**EMMERICH NEWSPAPERS, INCORPORATED**                    **PLAINTIFF**

**V.**                    **CIVIL ACTION NO. 3:23-CV-391 TSL-MTP**

**PARTICLE MEDIA, INC.**                    **DEFENDANT**

---

**PARTICLE MEDIA, INC.'S MEMORANDUM IN SUPPORT**
**OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT OF**
**PLAINTIFF'S COPYRIGHT MANAGEMENT INFORMATION CLAIMS**

---

Particle Media Inc.'s ("Particle Media") objective in offering the NewsBreak platform is to create value for users, publishers, and businesses. As one of the largest online traffic referral sources in the country, it does that in large part by referring users to publishers. Plaintiff Emmerich Newspapers, Inc.'s ("Plaintiff") claims that Particle Media violated the Digital Millennium Copyright Act ("DMCA") by intentionally deleting Plaintiff's copyright management information ("CMI") and then republishing its articles using false CMI are premised on mischaracterizations of how NewsBreak is intended to and does work. The evidence in this case confirms that Particle Media did not violate the DMCA because it did not knowingly provide false CMI with the intent to induce, enable, facilitate, or conceal an infringement, nor did it intentionally remove or alter any CMI or distribute works or copies of works knowing that CMI had been removed or altered while knowing or having reasonable grounds to know it would induce, enable, facilitate, or conceal an infringement. Moreover, hundreds of the works

encompassed by Plaintiff's CMI claims cannot support those claims because they are not owned by Plaintiff and/or fit within the categories of claims that Plaintiff has already relinquished. And many additional works also cannot support Plaintiff's claims because they were published before January 12, 2020, so any claims as to them are time-barred.

For all of these reasons, the Court should dismiss Plaintiff's claims under Section 1202 of the DMCA with prejudice.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. NewsBreak

Particle Media designed and developed NewsBreak, free-access apps (Android and iOS) and a website, that (1) provides users with an easily accessible and personalized feed of local and national content and information; (2) indexes and links original and third-party content, making it easier for users to search, browse, and find content; (3) widens publishers' exposure to a broader network of readers than they otherwise could reach by driving traffic through links to their website, especially where, as here, they do not have a mobile app; (4) helps users discover content without having to undertake voluminous searches by referring them to content based on their locations and preferences; and (5) provides an effective platform for publishers and contributors to enhance their visibility or generate revenue with tools to manage their content and connect with users directly. *See* Ex. 1, Zhong Decl. at ¶3.

The newspaper industry has been shrinking for decades, at the same time that television, online, mobile and social media have become the dominant sources of news for most Americans. *See* Ex. 2, Sell Report at ¶11(i).[1] In the face of such industry contraction, the traffic generated by news aggregators like NewsBreak has presented an opportunity for news outlets, particularly for

---

[1] Particle Media has designated Blake Pembroke Sell as its expert in the news/media industry. Mr. Sell's extensive experience and qualifications are set forth in his report. *See id.* at ¶¶1-7.

small publishers, by directing traffic to publisher's websites, often allowing news outlets to reach audiences beyond those the publishers could reach on their own. *Id*. at ¶11(ii).

As a platform, Particle Media seeks to make information more accessible in order to help communities stay informed and connected and to allow users to live safer, more vibrant, and connected lives, all while promoting local news and information to a new generation of readers. *See* Ex. 1, Zhong Decl. at ¶4. To that end, it has entered into agreements with almost 300 publisher groups (who operate more than two thousand websites) permitting Particle Media to host their content in full on NewsBreak, meaning to host the content from NewsBreak's server. *Id*. These publisher groups have created profiles on the NewsBreak publisher platform, allowing them to amass "followers," interact with users, access engagement analytics, and have their content exposed. Particle Media also refers significant traffic to publishers' websites. *Id*. Particle Media also refers significant traffic to publishers' websites, ranking fourth for total traffic referral in 2021, more than Twitter and surpassed only by Google, Facebook and Google News. *See id*.; Ex. 2, Sell Report at ¶126. The traffic NewsBreak provides is so valuable partners have even paid NewsBreak for it. *See id*.; Ex. 1, Zhong Decl. at ¶4. Some publishers who receive direct traffic from NewsBreak also create profiles on the NewsBreak publisher platform. *Id*.

During the relevant period, from 2019 to 2021, users who opened NewsBreak (either on its website or in its mobile app) viewed a news feed that, for each listed story, presented a headline and/or a thumbnail image and/or the first limited words of the article, all intended to promote the story. *See* Ex. 1, Zhong Decl. at ¶5. When a mobile app user clicked on an item listed on the news feed or in a search result, she either (1) viewed the full article on NewsBreak, in the case of fully-hosted articles of publishers and creators with whom Particle Media has agreements, or (2) was taken directly to those websites (i.e., the source of the article), with

NewsBreak acting as a web browser, just like Google's Chrome or Safari. *Id;* Ex. 3, PM Discovery Resp. at Int. 17; Ex. 4, Gianturco Report at ¶¶10, 20.2, 20.2.5.4, 20.2.5.5.[2] When a website (computer or mobile) user clicked on an item listed on the news feed or in a search result, she was given a link to "Go to Publisher's website." *See* Ex. 1, Zhong Decl. at ¶5; Ex. 3, PM Discovery Resp. at Int. 17.

When a NewsBreak app user clicks to "Share" an article, the link presents the option to go to the non-partner publisher's website via the NewsBreak app, with the app acting as a web browser, or via another web browser like Safari. *See* Ex. 1, Zhong Decl. at ¶6. The NewsBreak programming offers a link to both a website or Safari user to "Go to Publisher's website," which when clicked upon takes the user to the non-partner publisher's website. *See id.*; Ex. 5, Share Examples. In addition to directing users to the source site, the share URL allows a user to decide whether to view the publisher's website via the NewsBreak app, acting as a web browser, or via another browser, and it provides Particle Media with information regarding an articles' popularity and other information to better promote publishers' content. *See* Ex. 1, Zhong Decl. at ¶36. This is common in the industry. *Id.*; Ex. 6, 2024 Griffith Depo. at 35, 51-56. It is a minor function that allows a user to share a publisher's article by sending a link to the publisher's website, thereby amplifying traffic to that site and sharing aspects like user comments and "likes" or "follows," to help develop a sense of community among the users and drive usership. *See* Ex. 1, Zhong Decl. at ¶6.

---

[2] Particle Media has identified Mark D. Gianturco, Ph.D., as its expert in the field of computer science, software engineering, and technology. Dr. Gianturco received his Bachelor of Science in Computer Science from William and Mary, his Master of Science in Information Systems from George Mason University, and his Doctor of Philosophy in Information Technology from George Mason University.

### B.  <u>This Lawsuit</u>

Plaintiff owns companies that publish newspapers and run associated websites. *See* [Dkt. 15], First Amended Complaint ("FAC") at ¶17. In the past, stories from some of those sites appeared on the NewsBreak news feed in the form of a headline and/or a thumbnail image and/or the beginning words of the article, with a link that took the user directly to Plaintiff's website(s). *See* Ex. 1, Zhong Decl. at ¶7; Ex. 4, Gianturco Report at ¶¶10, 20.2, 20.2.5.4, 20.2.5.5. There were also periods from 2019 to 2021 during which, because of an unintentional software glitch, some articles from the websites of Plaintiff and other non-partner publishers were inadvertently made available in self-hosted full text on the NewsBreak app for users of the Android platform, who were not directed to the publishers' websites. *See* Ex. 1, Zhong Decl. at ¶8; Ex. 3, PM Discovery Resp. at Int. 17. These are what Particle Media has referred to as "self-hosted" or "full text" articles. *See* Ex. 1, Zhong Decl. at ¶8.

The self-hosted full text display of such articles was not an intended feature of the NewsBreak app or an intended practice of Particle Media. *See* Ex. 1, Zhong Decl. at ¶9; Ex. 3, PM Discovery Resp. at Int. 17; Ex. 4, Gianturco Report at ¶¶10, 10.1. In fact, Particle Media's company policy prohibits the display of self-hosted full text articles if the content originates from a non-partner publisher. *See* Ex. 1, Zhong Decl. at ¶9. The technical glitch that led to such display first occurred in July 2019, when engineers unfamiliar with Particle Media's policy and copyright law were trying to address a functionality issue related to non-mobile-friendly content and made full content available by mistake. *Id*. at ¶10; Ex. 7, 2022 PM 30(b)(6) at 37. Upon learning of the glitch, Particle Media took immediate actions to fix it by implementing a software patch and emphasized to employees the company's policy not to self-host full text content from non-partner publishers. *See id.*; Ex. 7, 2022 PM 30(b)(6) at 37. The glitch occurred again in May

2020 when a different engineer tried to resolve a bug and accidentally removed one of the "logics" (*i.e.*, software code) that Particle Media had implemented to fix the glitch. *See* Ex. 1, Zhong Decl. at ¶11; Ex. 7, 2022 PM 30(b)(6) at 37-38. Upon discovering this glitch, Particle Media worked quickly to put the logic back in place. *Id.*

One of NewsBreak's primary purposes is to widen publishers' exposure to a broader network of readers by sending readers to their websites. *See* Ex. 1, Zhong Decl. at ¶¶3, 30. Particle Media had no intent to do otherwise. *Id.*

As early as February 2020, Plaintiff learned of Particle Media's use of content from its websites. *See* Ex. 8, Plaintiff's Discovery Resp. at 17. At no time, however, did Plaintiff send a cease and desist letter or submit a notification pursuant to the copyright policy on Particle Media's website. *See id.*; Ex. 9, Particle Media Terms of Use. Instead, more than five months later, in August 2020, Plaintiff registered nine articles with the U.S. Copyright Office, and more than four months after that, on January 15, 2021, Plaintiff filed suit against Particle Media asserting copyright infringement claims and several state law tort claims. *See Emmerich Newspapers, Inc. v. Particle Media, Inc.*, Civil Action No. 3:21-CV-32-KHJ-MTP (S.D. Miss.). The filing of the lawsuit was the very first time Particle Media became aware the self-hosted full text glitch included content from Plaintiff's publishers' websites. *See* Ex. 1, Zhong Decl. at ¶14. The Court in the 2021 case dismissed all but Plaintiff's copyright infringement claims as to nine registered works, *see Emmerich Newspapers, Inc. v. Particle Media, Inc.*, 2022 WL 843209, at *4 (S.D. Miss. Mar. 21, 2022), and the parties later resolved the dispute.

Plaintiff filed Case No. 3:23cv26 in January 2023 and filed the FAC in April 2023, alleging, among other things, that Particle Media violated the DMCA by altering Plaintiff's CMI

and republishing the altered CMI as to 33,734 articles. *See* [Dkt. 15].[3] Plaintiff provided a revised CMI list on May 14, 2024, reducing its claim to 17,861 articles ("May CMI List").

On July 4, 2024, Plaintiff dismissed its claims as to certain articles, some of which were included on the May 14th CMI list. *See* [Dkt. 158] and [Dkt. 158-1].[4] On July 5, 2024, Plaintiff also dismissed all claims related to every photograph covered by its group registrations, with the exception of 29 specific photographs, *see* [Dkt. 159] and [Dkt. 159-1].

Plaintiff claims Particle Media violated Section 1202 of the DMCA by deleting Plaintiff's CMI and then republishing its articles using altered CMI. Specifically, Plaintiff claims Particle Media "displayed Emmerich's articles with altered CMI" by (1) using content from Plaintiff's publishers' websites on the NewsBreak news feed; (2) self-hosting full text content from Plaintiff's publishers' websites; and (3) acting as a browser. *See* [Dkt. 68] at 2-3. Plaintiff also contends that "[a]ny recipient of an Emmerich article 'shared' by a NewsBreak reader, of necessity, viewed that article under NewsBreak's false and altered CMI[.]" *Id*. at 15.

But the evidence in this case confirms that Particle Media did not knowingly provide false CMI with the intent to induce, enable, facilitate, or conceal an infringement, nor did it intentionally remove or alter CMI or distribute works or copies of works knowing that CMI had been removed or altered while knowing or having reasonable grounds to know it would induce, enable, facilitate, or conceal an infringement. Contrary to Plaintiff's mischaracterizations of how NewsBreak worked, Particle Media made fair use of certain limited portions of content from Plaintiff's sites on the NewsBreak news feed; the self-hosting of content was unintentional; and

---

[3] Plaintiff filed Case No. 3:23cv391 in June 2023, asserting the same claims, but alleging infringement of works for which Plaintiff purportedly received registrations after filing Case No. 3:23cv26.

[4] It appears some articles on the Dismissed List were included in the May CMI List. Out of an abundance of caution, the lists submitted with this motion are based on the May CMI List.

the app and shares directed users to Plaintiff's Uniform Resource Locators ("URLs").[5] Because the conduct, intent, and knowledge required under Section 1202 simply are not present, the Court should dismiss Plaintiff's claims under Section 1202 of the DMCA with prejudice.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Johnson v. World Alliance Fin. Corp.*, 830 F.3d 192, 195 (5th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Once the moving party has made an initial evidentiary showing that negates the existence of a genuine, material fact issue, the party opposing the motion must present competent summary judgment evidence of the existence of a genuine issue of fact." *Johnson*, 830 F.3d at 195. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252. The Court's inquiry asks whether a fair-minded jury could return a verdict for Plaintiff on the evidence presented. *Id*. It could not. Particle Media's intention was never anything other than to send users to Plaintiff's publishers' websites. Particle Media is entitled to dismissal of Plaintiff's CMI claims, and the Court should grant summary judgment in its favor.

---

[5] A URL is "a unique identifier used to locate a resource on the Internet. It is also referred to as a web address. URLs consist of multiple parts -- including a protocol and domain name -- that tell a web browser how and where to retrieve a resource." *See* https://www.techtarget.com/searchnetworking/definition/URL (last visited July 20, 2024).

## III. <u>ARGUMENTS AND AUTHORITIES</u>

### A. <u>Plaintiff's CMI claims are wholly without merit.</u>

Plaintiff asserts claims under Section 1202(a), (b)(1) and (b)(3) of the DMCA.[6] Under

Section 1202(a), "[n]o person shall <u>knowingly</u> and <u>with the intent to induce, enable, facilitate, or

conceal infringement</u> provide [CMI] that is false, or distribute or import for distribution [CMI]

that is false." 17 U.S.C. § 1202(a) (emphasis added). And under Section 1202(b)(1) and (b)(3),

> No person shall, without the authority of the copyright owner or the law —
>> (1) <u>intentionally</u> remove or alter any [CMI] [or] …
>> (3) distribute … works [or] copies of works … <u>knowing</u> that [CMI] has been
>>     removed or altered without authority of the copyright owner or the law,…
>
> <u>knowing</u>, or … <u>having reasonable grounds to know</u>, that it will induce, enable,
> facilitate, or conceal an infringement of any right under this title.

*Id.* § 1202(b) (emphasis added). All three of these claims require what has been called "double

scienter," meaning proof of both knowledge and intent.

To prove a violation of <u>Section 1202(a)</u>, a plaintiff must establish three elements: "(1) the

provision or distribution of CMI; (2) that the defendant <u>knew</u> that the CMI was false; and (3) that

the Defendant acted with the <u>intent</u> to [induce, enable, facilitate, or] conceal copyright

infringement." *See Brittney Gobble Photography, LLC v. Sinclair Broad. Grp., Inc.*, 2021 WL

5359671, at *25 (D. Md. Nov. 17, 2021) (quoting *Michael Grecco Prods. v. Alamy, Inc.*, 372 F.

Supp. 3d 131, 137 (S.D.N.Y. 2019) (citations omitted)) (emphasis added).

Under <u>Section 1202(b)(1)</u>, a plaintiff must show that a defendant "(1) without authority

of the copyright owner or the law; (2) <u>intentionally</u> removed or altered [CMI]; [and] (3) <u>knowing</u>

or having <u>reasonable grounds to know</u> that the removal will induce, enable, facilitate, or conceal

---

[6] Plaintiff did not cite Section 1202(a) in the FAC, but the Court held that in its view, the allegations suggested a violation of that section. *See* [Dkt. 146] at n. 10. Similarly, the Court found that Plaintiff incorrectly cited Section 1202(b)(2) and that the applicable subsection is (b)(3). *See* [Dkt. 146] at 8.

an infringement of the federal copyright laws." *Frost-Tsuji Architects v. Highway Inn, Inc*., 2014 WL 5798282, at \*4 (D. Haw. Nov. 7, 2014) (emphasis added).

And under <u>Section 1202(b)(3)</u>, a plaintiff must prove "(1) the existence of CMI in connection with a copyrighted work; and (2) that a defendant "distribute[d] ... works [or] copies of works"; (3) while "<u>knowing</u> that [CMI] has been removed or altered without authority of the copyright owner or the law"; and (4) while "<u>knowing or ... having reasonable grounds to know</u>" that such distribution "will induce, enable, facilitate, or conceal an infringement." *Zuma Press, Inc. v. Getty Images, Inc.*, 845 F. App'x 54, 57-58 (2d Cir. 2021) (quoting *Mango v. BuzzFeed, Inc.*, 970 F.3d 167, 171 (2d Cir. 2020) (quoting 17 U.S.C. § 1202(b))) (emphasis added).

Because the evidence shows Particle Media lacked such knowledge or intent, Plaintiff cannot make these showings, and its claims should be dismissed.

## 1. **Plaintiff's alleged CMI was not "conveyed in connection with" the works in a way that makes the information CMI.**

Plaintiff's Section 1202 claims also fail because Plaintiff's alleged CMI did not actually function as CMI. Under the Copyright Act, CMI consists of information "<u>conveyed in connection with</u>" copies of a work, including (1) the title and other information identifying the work; (2) the name of, and other identifying information about, the author or copyright owner of a work, (3) terms and conditions for use of the work, and (4) identifying numbers or symbols referring to such information or links to such information. 17 U.S.C. § 1202(c). "[T]he purpose of CMI is to provide the public with notice that a work is copyrighted." *Fashion Nova, LLC v. Blush Mark, Inc*., 2023 WL 4307646, at \*5 (C.D. Cal. June 30, 2023). Courts have found that "website information cannot serve as CMI where it does not provide the viewer with proper notice that the work is copyrighted." *Id*. at \*4 (citing *SellPoolSuppliesOnline.com LLC v. Ugly Pools Arizona, Inc.*, 344 F. Supp. 3d 1075, 1082 (D. Ariz. 2018), aff'd, 804 F. App'x 668 (9th

10

Cir. 2020) (holding that a copyright notice located on the bottom of a webpage was not CMI because it was "not in the body of, or around, the work at issue. …and so it was not 'conveyed in connection with' the work in a way that makes the information CMI")). Here, Plaintiff's alleged CMI did not accomplish this basic purpose and thus cannot support its Section 1202 claim.

### i.   Article URLs are not CMI for purposes of the Copyright Act.

In the FAC, Plaintiff offered the bare allegation that the URLs of the articles at issue constituted CMI. *See* [Dkt. 15] at ¶¶4, 37-49, 52, 76-79. Plaintiff claims the issue of whether URLs constitute CMI was "specifically addressed" by the Fifth Circuit in *Energy Intel. Grp., Inc. v. Kayne Anderson Cap. Advisors, L.P.*, 948 F.3d 261 (5th Cir. 2020), which was a case about PDF file names, not URLs.[7] As this Court has noted, Particle Media disputes Plaintiff's claim that the URLs were file names and has pointed to "examples of Emmerich articles that do not conform to Emmerich's professed file-naming practices, i.e., a file name that consists of the URL containing the name of the article and the name of the newspaper in which it appeared." *See* [Dkt. 146] at 18. But the Court stated that Particle Media did not explain "why file names that do conform to Plaintiff's professed practice would not constitute CMI." *Id.*

The answer is that a URL is not the same as a file name. "Whenever information is shown in a novel location, it must have a different URL – the URL is not an identifier associated with the particular content being shown on any webpage, but is rather a reference to where a user is going on the internet to retrieve information." *See* Ex. 10, Gianturco Decl. at ¶18.6.1. *See also* Ex. 2, Sell Report at ¶¶11(iii). That this is true is demonstrated by the fact a person who clicked on a URL for an article on a particular page within one of Plaintiff's websites would also see other articles on that same page, at that same address that were not identified in the URL – and

---

[7] In that case, the Fifth Circuit upheld a jury verdict, stating, in part, that "a PDF's file name <u>may</u> be CMI." *Id.* at 277 (emphasis added).

not owned by Plaintiff. *See* Ex. 11, URL Example (including AP articles). The content on a URL can and does change. *See* Ex. 10, Gianturco Decl. at ¶18.6.1. A URL does not inform the public that it is functioning as anything other than an address locator. *See* Ex. 10, Gianturco Decl. at ¶18.6.1; Sell Report at ¶¶11(iii). A viewer of a URL knows that it is the web address of some form of information that can be found on the internet, but the URL does not provide a viewer with proper notice that a particular work at that location is copyrighted. *See*, *e.g.*, *Fashion Nova*, 2023 WL 4307646, at *4-5.

Moreover, nearly 5,000 of the article URLs on Plaintiff's list did not even conform to Plaintiff's professed practice of using URLs containing the name of the article and the name of the newspaper in which it appeared, instead including parts of addresses like "/taxonomy/term/2302." *See* Ex. 12, URL List. Even if the URLs were treated as file names, words and numbers like these cannot put a viewer on notice of a copyright claim because they simply do not comply with the requirements for CMI. *See Fashion Nova,* 2023 WL 4307646, at *6 (citing *Pac. Studios Inc. v. W. Coast Backing Inc.*, 2012 WL 12887637, at *3 (C.D. Cal. Apr. 18, 2012)). It is also worth noting that URLs do not always stay active, and many, if not the majority, of the URLs on Plaintiff's CMI list no longer work.

In sum, the addresses of the articles in question do not function as CMI within the meaning of the Copyright Act, and the Court should dismiss Plaintiff's Section 1202 claims.

### ii.  __The other alleged types of CMI raised by Plaintiff in previous briefing also do not function as CMI within the meaning of the Copyright Act.__

In its previous summary judgment briefing, Plaintiff argued for the first time that its alleged CMI also included banners/logos, bylines, menu buttons, share buttons, copy link buttons, print PDF buttons, contact author buttons, other engagement features, and ads. *See* [Dkt. 44] at 2-5; [Dkt. 49] at 3-4. The Court noted Particle Media's objection to the Court's

consideration of these unpled allegations and stated: "arguments related to these belatedly-asserted categories of CMI will not be considered by the court." *See* [Dkt. 146] at n. 9 (citing *Cutrera v. Bd. of Sup'rs of Louisiana State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) ("A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court.")). For the same reason, the Court should not consider these other alleged types of CMI here.

Even if the Court were to consider these to be additional categories of CMI, however, Plaintiff has not demonstrated that any of this alleged CMI was conveyed in connection with all the works at issue, or that it actually functioned as CMI. *See* Ex. 13, Byline Examples. Plaintiff has not produced any evidence showing its referenced "menu" items were available during the time in question (2019 to 2021), and, in fact, the evidence shows that they were not. *See* Ex. 14, Menu Examples. As for the "buttons" Plaintiff claims constitute CMI, Plaintiff has not offered any basis to conclude that buttons appearing on a user's screen with short labels such as "print PDF" or "share" conveyed any information at all about any work, let alone information identifying particular works or their owner, or that a work is copyrighted. *See Fashion Nova*, 2023 WL 4307646, at *5; *SellPoolSuppliesOnline.com LLC*, 344 F. Supp. 3d at 1082. The same is true as to ads, which have no tie whatsoever to any work or copyright owner. *Id*. And Plaintiff has produced no evidence of the use of a "contact author" button during the relevant time period.

## 2.   Particle Media's conduct did not violate Section 1202 of the DMCA.

Plaintiff claims Particle Media intentionally removed and altered CMI in using Plaintiff's content on the NewsBreak news feed, self-hosting Plaintiff's content on NewsBreak, and operating the NewsBreak web browser. *See* [Dkt. 68] at 2-3. Plaintiff further contends that the NewsBreak browser could not work without "substituting false CMI in the form of NewsBreak's

URL," and that "[a]ny recipient of an Emmerich article 'shared' by a NewsBreak reader, of necessity, viewed that article under NewsBreak's false and altered CMI[.]" *Id.* at 15. These unsupported contentions are disproven by the reality of how the app actually works. Particle Media's intention was never anything other than to send users to Plaintiff's publishers' websites, and Plaintiff has not shown otherwise, nor can it.

> ### i. Particle Media made fair use of certain limited portions of content from Plaintiff's publishers' sites on the NewsBreak news feed.

Particle Media does not dispute that the NewsBreak news feed is not Plaintiff's website.[8] From 2019 to 2021, users who opened NewsBreak viewed a news feed that, for each listed story, presented a headline and/or a thumbnail image and/or the first limited words of the article, all intended to promote the story and thus encourage users to visit the publisher's own website in order to view the full article. *See* Ex. 1, Zhong Decl. at ¶5. The news feed is the result of Particle Media's web crawler system, which crawls the websites of both partner and non-partner publishers in the same manner, using Really Simple Syndication ("RSS") feeds or fetching web pages. *Id.* at ¶18. The crawler utilizes the same mechanism that users with browsers utilize when they access websites using common tools like the Google Chrome browser or the Safari browser: it sends a Hypertext Transfer Protocol ("HTTP") request to a web server, and receives Hypertext Markup Language ("HTML") text in response. Ex. 4, Gianturco Report at ¶30; Ex. 15, Zhong Depo. at 8:12-17. The NewsBreak parser is designed to then (1) review the content related to a particular article in order to understand the content and filter any content that is illegal, explicit, or does not otherwise fit the criteria of the industry's content policies; and (2) extract and save

---

[8] Plaintiff contends, without any evidentiary support, that the mere fact that its content appeared on the NewsBreak news feed necessarily means "Emmerich's URL had been removed and replaced with Particle's substitute URL," because "[o]therwise the reader would have gone directly to Emmerich's website." *See* [Dkt. 68] at 3. The news feed is designed to send the user to the location denoted by the URL, which would be totally defeated by removing the URL. *See* Ex. 1, Zhong Decl. at ¶30.

the URL, headline, image, and text of the article for the purposes of content moderation, indexing, and use on the news feed. *See id.* at 9:21-10:4; Ex. 1, Zhong Decl. at ¶21; Ex. 4, Gianturco Report at ¶30. This is the standard practice in the industry, so much so that Plaintiff's own expert admitted that his company does the same. *See* Ex. 1, Zhong Decl. at ¶21; Ex. 16, 2022 Griffith Depo, 13:5-15:11, 18:25-19:2, 21:12-22, 44:1-10.[9]

Newspaper banners, buttons, bylines, ads, etc. remain available and fully operational when the user clicks on an item on the NewsBreak news feed or share link and is taken to the publisher's website. Ex. 1, Zhong Decl. at ¶28.[10] There is no intentional removal or alteration of CMI by Particle Media, and there certainly is no intentional removal or alteration with the knowledge it would induce, enable, facilitate, or conceal an infringement. *Id.* at ¶29. The same was true during the glitch periods. *Id.* Particle Media's intent was and is to use Plaintiff's URLs on the NewsBreak news feed to direct traffic to Plaintiff's sites. Particle Media contends that its use of limited portions of the content from Plaintiff's publishers' websites on the NewsBreak news feed was a fair use of the works. *Id.* at ¶30.

"[A]nyone who ... makes a fair use of [a] work is not an infringer of the copyright with respect to such use." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 433 (1984). Fair use "can excuse what would otherwise be an infringing use of copyrighted material." *Estate of Barré v. Carter*, 272 F. Supp. 3d 906, 929 (E.D. La. 2017) (citation omitted).

---

[9] Mr. Griffith testified his company, EdgeTheory, which provides news aggregation services, consumes 60,000 news items and social media posts every day. *Id.* at 13:5-18, 18:25-19:2. If an RSS feed is available, it consumes headlines, excerpts of the articles as provided, and various metadata. *Id.* at 14:11-21. If not, it scrapes the source, extracting the entire article for purposes of analysis and then discarding "advertising, navigation, social sharing, [and] custom scripting." *Id.* at 15:5-11, 21:12-22, 44:1-10.

[10] In the previous case, Particle Media engineer Randy Zhong testified about the web crawler. Mr. Zhong did not testify in terms of "removing" or "stripping out" CMI, as alleged by Plaintiff; he testified that content is analyzed and extracted by the parser for use in content moderation and on the NewsBreak news feed. *See* Ex. 1, Zhong Decl. at ¶31; [Doc. 48-4] at 17-22. Mr. Zhong stated, in part, that the crawler downloads RSS feeds and web pages. By "downloads," Mr. Zhong was referring to the fetching process, not to what was saved in Particle Media's database. *See* Ex. 1, Zhong Decl. at ¶31.

Particle Media believes, and believed during the time period in question, that its aggregation of news media, including the NewsBreak news feed, falls within fair use. *See* Ex. 1, Zhong Decl. at ¶30. Plaintiff cannot show the conduct, knowledge, or intent required under Section 1202.[11]

### ii. The self-hosting of full text content on NewsBreak on Android devices was not an intended feature or design of the app.

As discussed above, there were periods from 2019 to 2021 during which, because of a software glitch, some articles from the websites of Plaintiff and other non-partner publishers were inadvertently available in self-hosted full text on the NewsBreak app for users of Android phone devices, who because of the glitch were not directed to the publishers' websites as they would have been had the Android version been operating normally. *See* Ex. 1, Zhong Decl. at ¶8. It bears repeating: this was not an intended feature of the app or an intended practice of Particle Media. *Id.* at ¶9; Ex. 4, Gianturco Report at ¶¶10, 10.1. In fact, Particle Media's company policy prohibits the display of self-hosted full text articles if the content originates from a non-partner publisher. *See* Ex. 1, Zhong Decl. at ¶9; Ex. 3, PM Discovery Resp. at Int. 17.

The technical glitch that led to the self-hosted full text display first occurred in July 2019, when low-level engineers unfamiliar with Particle Media's policy and copyright law were trying to address a functionality issue related to non-mobile-friendly content and made full content available by mistake. *See* Ex. 1, Zhong Decl. at ¶10; Ex. 7, 2022 PM 30(b)(6) at 37. The parsed content was not meant to be used to show self-hosted full text from non-partner publishers. *See* Ex. 1, Zhong Decl. at ¶27; Ex. 15, Zhong Depo. at 9:21-10:4.

Upon learning of the glitch, Particle Media took immediate actions to fix it and emphasized the policy not to self-host full text content from non-partner publishers. *See* Ex. 1, Zhong Decl. at ¶¶10; Ex. 7, 2022 PM 30(b)(6) at 37. When the glitch occurred again in May

---

[11] The uncontroverted evidence that Particle Media believes the normal operation of the news feed to be fair use at the very lease precludes summary judgment for Plaintiff.

2020 after a different engineer accidentally and unknowingly removed one of the logics Particle Media had implemented to fix the glitch, Particle Media worked quickly to put the logic back in place after discovering it. *See* Ex. 1, Zhong Decl. at ¶11; Ex. 8, PM Discovery Resp. at Int. 17; Ex. 7, 2022 PM 30(b)(6) at 34:15-35:8. Both times, Particle Media discovered the glitch and worked to fix it even though no publishers complained about the problem. *See* Ex. 1, Zhong Decl. at ¶¶10-12; Ex. 7, 2022 PM 30(b)(6) at 37:8-38:12. And even during the glitch periods, Particle Media identified the articles' sources. *See* Ex. 1, Zhong Decl. at ¶32; Ex. 17, Glitch Example. The NewsBreak logo, buttons, and share URLs were not conveyed as CMI. *See* Ex. 1, Zhong Decl. at ¶32. As stated above, the filing of the lawsuit was the very first time Particle Media became aware the self-hosted full text glitch included content from some of Plaintiff's publishers' websites. *See* Ex. 1, Zhong Decl. at ¶14.

Plaintiff cannot establish intent and knowledge as required under Section 1202(a) and (b) because Particle Media did not have the intent and knowledge required under Section 1202(a) and (b). Particle Media's objective in offering NewsBreak is to create value for users, publishers, and businesses. *See* Ex. 1, Zhong Decl. at ¶4. To accomplish that objective, it seeks to refer users to the websites of non-partner publishers like Plaintiff. *See id*; Ex. 18, Prince Email. Particle Media did not and does not want to hide the source of articles, which would defeat the entire purpose of NewsBreak. *See* Ex. 1, Zhong Decl. at ¶4. Even the articles that were accidentally self-hosted continued to identify the source of the content. *See id*. at ¶32; Ex. 17, Glitch Example. Indeed, separate and apart from its core objective of directing users to publishers' websites, there is good reason why Particle Media did not and does not want to appear to be the source of third-party content: Section 230 of the Communications Decency Act of 1996 provides online platforms with immunity from civil liability based on third-party content. *See* Ex. 1,

Zhong Decl. at ¶32. Moreover, the glitches only occurred for Android users; iOS and computer website users were always directed to Plaintiff's websites. *See* Ex. 1, Zhong Decl. at ¶13; Ex. 7, 2022 PM 30(b)(6) at 37:8-38:12.

Plaintiff previously claimed the availability of "self-hosted" content for Android users was not accidental because Particle Media "did the same thing" to articles from *The Commercial Dispatch* "long after [Plaintiff] filed suit and [Particle Media] claimed its 'glitch' had been fixed." *See* [Dkt. 44] at 6. In support, Plaintiff cited the affidavit of Peter Imes, publisher of *The Commercial Dispatch*. *See* [Dkt. 44] at 6 (citing [Dkt. 43-7], Imes Aff.). However, Mr. Imes testified he did not actually recall seeing full text articles from his publication on NewsBreak. *See* Ex. 19, Imes Depo. at 18:22-19:11. Particle Media has referred traffic to the site but denies full text articles have been self-hosted on NewsBreak. *See* Ex. 1, Zhong Decl. at ¶16. Videos produced by Plaintiff merely show the NewsBreak app acting as a browser, taking the user to *The Commercial Dispatch* website just as Google Chrome would do. *Id.*

Plaintiff has also argued there was no reason for Particle Media to store the full text of articles if it never intended to publish the full text. *See* [Dkt. 57] at 10. To the contrary, Particle Media stores the full text to ensure extraction, content moderation, and content characterization are correct and to create an index. *See* Ex. 1, Zhong Decl. at ¶22.[12] It is periodically deleted. *Id.* Particle Media never intended to publish the full text. *See* Ex. 15, Zhong Depo. at 9:21-10:4. As Plaintiff's expert acknowledged, there is a difference between not accidentally extracting articles and accidentally posting them. *See* Ex. 16, 2022 Griffith Depo. at 43:19-25.

Courts presented with circumstances such as these have repeatedly found that no DMCA violation occurred. For example, in *Zuma Press, Inc. v. Getty Images (US), Inc.*, the plaintiff

---

[12] Plaintiff's expert does the same thing in his own business. *See* Ex. 16, 2022 Griffith Depo. at 44:1-10 ("We extract the entire article for the purposes of doing keyword analysis, and then we send the article – we send the entirety of the article through our neural network to generate a summary.").

sued Getty Images for unauthorized alteration of CMI in violation of Section 1202(b). 845 F.

App'x 54 at 55-56. The defendant had indirectly acquired a license to display the copyrighted

material, but it was published with unauthorized changes to CMI that were made in error as the

result of an automated process initiated by a low-level engineers. *Id*. at 58. The mistake was

corrected after the defendant received notice. *Id.* The Second Circuit upheld summary judgment

in favor of the defendant, finding that the engineers neither knew nor had reasonable grounds to

know their conduct would induce or conceal a copyright infringement, and that their employer's

remediation suggested no one else nor the entity knew either. *Id*.

Likewise, in *Brittney Gobble Photography, LLC v. Sinclair Broad. Grp., Inc.*, 2021 WL

5359671 (D. Md. Nov. 17, 2021), the court granted summary judgment in favor of the defendant

on Section 1202(a) and (b) claims where plaintiff sued for publishing copyrighted materials with

altered CMI that resulted from errors by low-level employees. *Id*. at *25-27. The Court found

that the individuals involved neither knew or had reasonable grounds to know their conduct

would induce, enable, facilitate, or conceal infringement, and that their actions, including fixing

the problem, suggested no one else nor the entity itself had knowledge either. *Id*. (stating, in part:

"it strains credulity to argue that someone attempting to conceal copyright infringement would

do so by including the rightful copyright owner's name").

As in *Zuma Press* and *Brittney Gobble Photography*, a reasonable juror in this case could

find only that the purported changes to Plaintiff's CMI resulted from aberrations and mistakes.

Plaintiff cannot show that Particle Media had the intent and knowledge required to support

Plaintiff's Section 1202 claims, and, therefore, the Court should dismiss them with prejudice.

### iii.  NewsBreak directed users to Plaintiff's URLs.

When the NewsBreak app worked as intended, a user who clicked on a news feed item

from one of Plaintiff's websites was taken to Plaintiff's website, with the app acting as a web browser. *See* Ex. 1, Zhong Decl. at ¶5*;* Ex. 3, PM Discovery Resp. at Int. 17; Ex. 4, Gianturco Report at ¶¶10, 20.2, 20.2.5.4, 20.2.5.5. Plaintiff contends that NewsBreak acting as a browser "only created the appearance that the reader was on Emmerich's website" and that it "could only occur by eliminating Emmerich's original URL (which would direct a reader to Emmerich's website) and substituting false CMI in the form of NewsBreak's URL." [Dkt. 68] at 3. To the contrary, however, the app <u>did</u> direct users to Plaintiff's URL, showing the publisher's website <u>from the publisher's server</u>. *See* Ex. 1, Zhong Decl. at ¶33; Ex. 4, Gianturco Report at ¶¶10, 20.2, 20.2.5.4, 20.2.5.5; Ex. 20, Google Analytics; Ex. 21, Referral Traffic to Emmerich Websites; Ex. 18, Prince Email. "<u>The web server running the external website</u> fulfills a NewsBreak browser request," and the external webpage is retrieved and shown in the same manner as other web browsers (such as Chrome or Safari) operate when they show web pages. *Id*. at 20.2.5.5 (emphasis added).

Contrary to Plaintiff's unsupported assertion, when the NewsBreak app links users to a publisher's website, it does not engage in any activity that implicates Plaintiff's exclusive copyright rights. Section 106(5) of the Copyright Act states that a copyright owner has the exclusive right "to display the copyrighted work publicly." *See* 17 U.S.C.A. § 106(5); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1160 (9th Cir. 2007). Under Section 101 of the Act, "[t]o 'display' a work means to <u>show a copy of it</u>, either directly or by means of a film, slide, television image, or any other device or process…." 17 U.S.C. § 101 (emphasis added). Accordingly, to infringe the Section 106(5) right, a defendant must have publicly displayed the work from a copy, that is, from a fixation of the work. *Id*.

The meaning of "publicly display" was addressed in *Perfect 10, Inc. v. Amazon.com, Inc.*, where Perfect 10 sued Google and other companies, claiming that Google infringed its copyrighted images of nude models by, among other things, in-line linking and framing images that appear on a computer user's screen as a result of a search using the Google Image search engine. *Id.* at 1160-61.

The Ninth Circuit affirmed the district court's dismissal of that claim, holding that Google's framing and linking did not result in a "display" within the meaning of the Copyright Act. *Id.* The court first noted that under the Act's plain language, "a person displays a photographic image by using a computer to fill a computer screen with a copy of the photographic image fixed in the computer's memory." 508 F.3d at 1160. The court then applied the "Server Test," stating:

> a computer owner that stores an image as electronic information and serves that electronic information directly to the user ("i.e., physically sending ones and zeroes over the [I]nternet to the user's browser,") is displaying the electronic information in violation of a copyright holder's exclusive display right. Conversely, the owner of a computer that does not store and serve the electronic information to a user is not displaying that information, even if such owner in-line links to or frames the electronic information.

*Perfect 10, Inc.*, 508 F.3d at 1159 (citing 17 U.S.C.A. § 106(5)) (internal citations omitted). Under that test, Google's framing and linking did not constitute a "display," and thus did not infringe, because "[i]nstead of communicating a copy of the image, Google provides HTML instructions that direct a user's browser to a website publisher's computer that stores the full-size photographic image. Providing these HTML instructions is not equivalent to showing a copy." *Id.* at 1161.

Recently, in *Hunley v. Instagram, LLC*, 73 F.4th 1060 (9th Cir. 2023), the Ninth Circuit explained that the Server Test remains valid, noting that it has applied that test outside the

search-engine context, including in cases involving blogs, online bulletin boards, and "reverse image searches," *id.* at 1070–71 (citations omitted), and that no circuit court has disapproved of it. *Id.* at 1071 (citing *Society of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 55 (1st Cir. 2012) (declining to adopt or reject Server Test); *Flava Works, Inc. v. Gunter*, 689 F.3d 754 (7th Cir. 2012)). Applying the server test here, it is clear that Particle Media does not "display" any of Plaintiff's works when its NewsBreak service acts as a browser and directs users to a publisher's own websites, for the simple reason that NewsBreak does not serve the information from the publisher's website directly to the user. *Perfect 10, Inc.*, 508 F.3d at 1159-116.  In fact, it does the opposite, by delivering the user to the publisher's website where the <u>publisher</u> may then display its content to that user. *See* Ex. 1, Zhong Decl. at ¶33; Ex. 3, PM Discovery Resp. at Int. 17; Ex. 4, Gianturco Report at ¶¶10, 20.2, 20.2.5.4, 20.2.5.5. And the referral traffic proves it. *See id.*; Ex. 4, Gianturco Report at ¶¶10, 20.2, 20.2.5.4, 20.2.5.5. Ex. 20, Google Analytics; Ex. 21, Referral Traffic to Emmerich Websites; Ex. 18, Prince Email.

In sum, NewsBreak did not "eliminate" Plaintiff's original URL and replace it with a NewBreak URL; NewsBreak directed users <u>to Plaintiff's original URL</u>. *See* Ex. 1, Zhong Decl. at ¶33; Ex. 20, Google Analytics; Ex. 21, Referral Traffic to Emmerich Websites; Ex. 4, Gianturco Report at ¶¶10, 20.2, 20.2.5.4, 20.2.5.5. No reasonable juror could find that Particle Media knowingly provided false CMI with the intent to induce, enable, facilitate, or conceal an infringement or that it intentionally removed or altered CMI or distributed copies of works knowing CMI had been removed or altered while knowing or having reasonable grounds to know that the removal would induce, enable, facilitate, or conceal an infringement.

### iv.  <u>There is nothing nefarious about the NewsBreak share URL.</u>

Plaintiff contends that "[a]ny recipient of an Emmerich article 'shared' by a NewsBreak

reader, of necessity, viewed that article under NewsBreak's false and altered CMI[.]" *See* [Dkt. 68] at 15. That is not the case. When a NewsBreak user clicked to "Share" an article, the link presented a phone user with the option to go to the non-partner publisher's website either via the NewsBreak app, with the app acting as a web browser, or via another mobile web browser like Safari. *See* Ex. 1, Zhong Decl. at ¶6. The NewsBreak programming offered a link to both a website user and a mobile web browser user to "Go to Publisher's website," which when clicked upon took the user to the non-partner publisher's website. *See id.*; Ex. 5, Share Examples. Particle Media did not conceal the copyright owner's identity or provide altered or false CMI. *See* Ex. 1, Zhong Decl. at ¶37. When the app worked as intended, the NewsBreak share URLs directed users to the Plaintiff's websites/servers via Plaintiff's URLs; the users did not view the articles at the NewsBreak URLs. *See id.* at ¶5, 33; Ex. 4, Gianturco Report at ¶10. In addition to directing users to the original site, the purposes of the NewsBreak share URL include (1) allowing a user to decide whether to view the publisher's website via the NewsBreak app, acting as a web browser, or via another browser, (2) providing a product experience to app users, and (3) providing Particle Media with information regarding which articles are popular and other information to better promote publishers' content. *See* Ex. 1, Zhong Decl. at ¶36. They did not and were not intended to facilitate or conceal infringement. *Id.*

The use of redirect or interim URLs is common in the industry. *See* Ex. 1, Zhong Decl. at ¶37; Ex. 2, Sell Report at ¶173; Ex. 22, Sell Depo. at 50:19-53:21. Particle Media's technical expert, Dr. Gianturco, and media expert, Mr. Sell, discussed the following example.



The Google interim link redirects to the NBC link below showing the full article:

https://www.nbcnews.com/news/us-news/rust-armorer-hannah-gutierrez-reed-guilty-manslaughter-rcna142136

*See* Ex. 2, Sell Report at ¶173; Ex. 10, Gianturco Decl. at ¶18.6.2.1. Mr. Sell testified that "if you hover over any article within Google News, you will also see that Google generates a URL, which has [the] Google News server name in it and that, in fact, is creating a Google News URL for that piece of content and that when the user does click it, the user is eventually … sent to a location which is [the] original publication website." *See* Ex. 22, Sell Depo. at 50:19-53:21. And Dr. Gianturco stated that it is "important to note that just as Google provides URLs that point the user back from Google's search aggregation page back to the original content URL," NewsBreak's share URL operates in the same manner, "directing NewsBreak app users back to Emmerich sites." Ex. 10, Gianturco Decl. at ¶18.6.2.1.

Plaintiff's expert Mr. Griffith testified that the Google link example helps Google organize the preview of the article on its servers. *See* Ex. 6, 2024 Griffith Depo. at 35. He further stated: "[W]hen you click the interim or redirect link at Google for an Emmerich Newspapers article, the viewer does not view the article at that URL. The point of the redirect URL is to do usually a couple of things. It's to record the fact that the user clicked on it and when they clicked

on it and various other information about the user that can be obtained through header

information and other HTTP request information." *Id*. at 51-53. Mr. Griffith elaborated:

> [I]t's in Google's interest to know, number one, that you clicked on it. So maybe you
> went to Google and you searched on -- you searched on this Rust Alec Baldwin case,
> and this article popped up. But a number of articles are going to pop up, and you're
> going to make a choice of clicking one or more of those articles. So if you click that
> article at NBC News, that is sort of an implication to Google that they have done
> well or, at least, from the results that they've returned to you, this is the one that you
> prefer the most, okay? So they – that's valuable user information to them. Now,
> they're also going to want to know things like what – what's the time stamp of your
> click event. And they're going to want to know what browser are you using; what
> operating system are you using; where are you located. And all of that information
> and more can usually be found in your -- in your HTTP request header."

*See* Ex. 6, 2024 Griffith Depo. at 55-56. Mr. Griffith also discussed the information included in

the Google redirect link, stating, in part that "what happens is there is a script at Google – at

news.google.com that takes that lengthy identifier … , and it looks up in one of Google's

databases the URL that is -- that is stored there. That -- you know, there's obviously some kind

of, you know, translation process in place …. So there's a script at news.google.com/articles that

interprets that long code of numbers and letters and resolves it." *See id*. at 53-55.

Mr. Griffith's testimony about Google's feature equally articulates why Particle Media

uses its share URLs and how they work. *See* Ex. 1, Zhong Decl. at ¶¶36-37. The share URLs are

not used by NewsBreak as CMI. *Id*. As described above, they are used to allow a user decide

whether to view the publisher's website via the NewsBreak app, acting as a web browser, or via

another browser, and to provide Particle Media with article and user information. *Id*. at ¶37.

When the app worked as intended, the NewsBreak share URLs directed users to the Plaintiff's

websites/servers using Plaintiff's URLs; users did not view the articles at the NewsBreak URLs.

*See id*.; Ex. 4, Gianturco Report at ¶10.

The NewsBreak share URLs were not false or altered CMI, and Particle Media did not make them available with the intent to induce, enable, facilitate, or conceal copyright infringement. No fair-minded jury could return a verdict for Plaintiff on its Section 1202 claims.

3. **The Court should dismiss Plaintiff's claims as to hundreds of works because Plaintiff cannot show ownership and/or they fit within the categories of claims relinquished by Plaintiff.**

Ownership and copyrightability are directly related to Plaintiff's claims regarding its alleged use of CMI. The simple fact is that Plaintiff does not even own hundreds of the items included on its CMI list, including (1) content from Mississippi Today, the Associated Press, and others; (2) press releases; (3) syndicated columns; (4) content submitted by schools, other community groups and organizations, and individuals; (5) calendars and schedules; (6) honor rolls; and (7) other non-original content. Plaintiff has relinquished any claims related to articles that fall within these categories. *See* Ex. 8, Plaintiff's Discovery Resp. at Int. 26-37, 45-46 and RFA 1-12, 17-18.[13] Particle Media has identified more than 400 additional articles on the CMI list as to which Plaintiff is not the owner and has relinquished any claims. *See* Ex. 23,

---

[13] Plaintiff has relinquished any claims as to (1) articles published third parties, including Mississippi Today, the AP, Y'all Politics, and Bigger Pie; (2) lunch menus; (3) legal notices; (4) obituaries; (5) engagement, wedding, anniversary, birth, and birthday announcements; (6) classified ads and/or streaming ads; ; (7) letters to the editor; (8) press releases; (9) articles from Mississippi State University (including the Mississippi State Extension), the University of Mississippi, the University of Southern Mississippi, the University of Tennessee, Jackson State University, Delta State University, Belhaven University, Mississippi College, Millsaps College, Coahoma Community College, East Central Community College, East Mississippi Community College, Hinds Community College, Holmes Community College, Ittawamba Community College, Mississippi Delta Community College, Northeast Mississippi Community College, Pearl River Community College, and/or Southwest Mississippi Community College; (10) honor rolls; (11) submissions by schools and other community groups or organizations; (12) syndicated columns; (13) land transactions; (14) jail dockets; (15) crime reports; (16) arrest reports; (17) police reports; (18) fire reports; (19) 911 calls; (20) emergency calls; (21) public notices; (22) court decisions; (23) calendars; and (24) schedules. *Id.*

Relinquished Claims.[14] Because Plaintiff does not own these works, the Court should dismiss Plaintiff's claims as to the articles listed in Exhibit 23.

Moreover, Plaintiff claims ownership of hundreds of additional works submitted by people with whom it purports to have work for hire agreements, but the parties entered into the "agreements" long after the works in question were created and do not comply with 17 U.S.C. § 101(2). Under Section 101, a work for hire is allowed in two circumstances: "(1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned for use as a contribution to a collective work …, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. .…" 17 U.S.C. § 101(2) (emphasis added).

"There is a conflicting line of cases over whether or not [a] work-for-hire agreement is effective for conferring owner status after the work is completed." *Looney Ricks Kiss Architects, Inc. v. Bryan*, 2010 WL 4068885, at *5 (W.D. La. Oct. 14, 2010) (emphasis added). "The Seventh Circuit, in promoting a bright-line rule, has held that the parties must sign the work-for-hire agreement before the copyrighted work is created in order for the work-for-hire agreement to be valid." *Id.* (citing *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 413 (7th Cir. 1992) ("The writing must precede the creation of the property in order to serve its purpose of identifying the (noncreator) owner unequivocally.") (emphasis added). *See also Gladwell Government Services, Inc. v. County of Marin*, 265 F. App'x 624, 626 (9th Cir. 2008) ("plain

---

[14] Exhibit 23 includes, as to each listed article, (1) an identification number; (2) the headline; (3) the URL; and (4) the summary. An electronic version will be provided to the Court and Plaintiff. Particle Media is also providing the Court and Plaintiff with a hard drive containing evidence that supports this summary, saved using the identification number and headline of each article. As to each listed article, the evidence consists of the online version. This list is not exhaustive, as some of the articles that are on this list are also on Plaintiff's May 14 Copyright Infringement List, and Plaintiff's lack of ownership and/or relinquishment is noted in Exhibit 14 to Particle Media's Motion for Partial Summary Judgment as to Plaintiff's Copyright Infringement Claims. Particle Media also expects to discover additional articles on the list that are not owned by Plaintiff and/or have been relinquished.

language of the statute indicates a work-for-hire agreement cannot apply to works already in existence."). In contrast, the Second Circuit has held that in certain circumstances writings executed after creation of the works at issue can satisfy the writing requirement of Section 101(2) **if** they "confirm[ ] a prior agreement, either explicit or implicit, made before the creation of the work." *Est. of Kauffmann v. Rochester Inst. of Tech.*, 932 F.3d 74, 77 (2d Cir. 2019).

Regardless of which rule is applied here, however, the agreements produced by Plaintiff are completely ineffective in retroactively granting Plaintiff ownership status. This is because the agreements were "signed" in 2022 and 2023, and **none** of them includes confirmation of any prior agreement made before the creation of the works. *See* Ex. 24, "Work for Hire" Summary.[15] Accordingly, the Court should dismiss Plaintiff's copyright claims as to all of the works written by the individuals listed in Exhibit 24.

**B. Plaintiff's Section 1202 claims for pre-January 12, 2020 articles are time-barred.**

Civil actions under the Copyright Act, including actions for violation of the DMCA, must be "commenced within three years after the claim accrued." 17 U.S.C. § 507(b). In *Graper v. Mid-Continent Casualty Co.*, 756 F.3d 388 (5th Cir. 2014), the Fifth Circuit decided that "this limitations period starts running 'once the plaintiff knows or has reason to know of the injury upon which the claim is based,' which is also known as the discovery rule." *Martinelli v. Hearst Newspapers, L.L.C.*, 65 F.4th 231, 233 (5th Cir. 2023) (quoting *Graper*, 756 F.3d at 393). The Fifth Circuit was recently asked to replace that rule with a holding that the clock starts when the infringing act/violation occurs, based, in part, on the Supreme Court's decision in *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014), but the Fifth Circuit explained that *Petrella* did not unequivocally overrule *Graper*. *See Martinelli*, 65 F.4th at 233.

---

[15] As noted in the summary, many of the alleged agreements were not signed by either party. *See id*. The files for the agreements were too large to file through ECF, but a copy will be on the hard drive provided to the Court and Plaintiff's counsel.

The Supreme Court has recently signaled its willingness to entertain a resolution of the circuit split in the accrual/discovery rule.  In *Warner Chappell Music, Inc. v. Nealy*, 144 S. Ct. 1135, 1138-39 (2024), the Supreme Court opined:

> The question on which this Court granted certiorari is "[w]hether, under the discovery accrual rule applied by the circuit courts," a copyright plaintiff "can recover damages for acts that allegedly occurred more than three years before the filing of a lawsuit." … That question, which the Court substituted for Warner Chappell's, incorporates an assumption: that the discovery rule governs the timeliness of copyright claims. <u>We have never decided whether that assumption is valid—i.e., whether a copyright claim accrues when a plaintiff discovers or should have discovered an infringement, rather than when the infringement happened</u>. … <u>But that issue is not properly presented here</u>, because Warner Chappell never challenged the Eleventh Circuit's use of the discovery rule below. ... And as noted above, a division exists among the many Courts of Appeals applying a copyright discovery rule (11 at last count) about whether to superimpose a three-year limit on damages. … We therefore confined our review to that disputed remedial issue, excluding consideration of the discovery rule and asking only whether a plaintiff with a timely claim under the rule can get damages going back more than three years.

*Id.* at 1138-39 (internal citations omitted) (emphasis added). Particle Media urges this Court, and the Fifth Circuit, to reconsider the discovery rule and instead adopt the accrual rule.[16]

Accordingly, the Court should apply the accrual rule and dismiss any DMCA claims brought by Plaintiff relating to articles published pre-January 12, 2020.[17]

## CONCLUSION

---

[16] "[W]hile some claims are subject to a 'discovery rule'…that is not a universal feature of the statute of limitations." *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 580 U.S. 328, 337 (2017). The Supreme Court has stated that "[i]f there are two plausible constructions of a statute of limitations, [it] generally adopt[s] the construction that starts the time limit running <u>when the cause of action ... accrues</u> because Congress legislates against the standard rule that the limitations period commences when the plaintiff has a complete and present cause of action." *Rotkiske v. Klemm*, 589 U.S. 8, 13 (2019) (emphasis added). Congress did not legislate against the standard rule in Section 507(b). The action is to commence within three years "<u>after the claim accrued</u>." 17 U.S.C. § 507(b) (emphasis added).

[17] To the extent Plaintiff argues the statute of limitations was tolled by the parties' previous litigation, it was not, because, among other reasons, that lawsuit did not include any circumvention claims.

For the foregoing reasons, Particle Media respectfully asks this Court to dismiss Plaintiff's claims under 17 U.S.C. § 1202 with prejudice. Particle Media requests such other relief as the Court deems just and proper.

Respectfully submitted, this the 22nd day of July, 2024.

Respectfully submitted,
**PARTICLE MEDIA, INC.**

By:    s/ *Stephen J. Carmody*
One of its Attorneys

OF COUNSEL:

Stephen J. Carmody, MSB #8345
Karen E. Howell, MSB #102243
BRUNINI, GRANTHAM, GROWER & HEWES, PLLC
Post Office Drawer 119
Jackson, Mississippi 39205
Telephone:      (601) 948-3101
Facsimile:      (601) 960-6902
scarmody@brunini.com
khowell@brunini.com