**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

EMMERICH NEWSPAPERS, INCORPORATED                    **PLAINTIFF**

**V.**                    **CIVIL ACTION NO. 3:23-CV-26 TSL-MTP**

PARTICLE MEDIA, INC.                    **DEFENDANT**

**CONSOLIDATED WITH**

EMMERICH NEWSPAPERS, INCORPORATED                    **PLAINTIFF**

**V.**                    **CIVIL ACTION NO. 3:23-CV-391 TSL-MTP**

PARTICLE MEDIA, INC.                    **DEFENDANT**

---

**PARTICLE MEDIA, INC.'S MEMORANDUM IN SUPPORT
OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT OF
PLAINTIFF'S COPYRIGHT INFRINGEMENT CLAIMS**

---

Plaintiff Emmerich Newspapers, Inc. ("Plaintiff") continues to assert copyright infringement claims against Particle Media, Inc. ("Particle Media") for works it does not own and for which it has no valid certificates of registration, and many of Plaintiff's claims are time-barred under the statute of limitations. Furthermore, there is no merit to Plaintiff's claim that the NewsBreak app acting a web browser constitutes copyright infringement. For these reasons, the Court should grant partial summary judgment in Particle Media's favor and should also dismiss Plaintiff's copyright infringement claims as to the articles and photographs listed in Exhibits 13-17, 21 and 25 attached to Particle Media's motion.

I.   **FACTUAL AND PROCEDURAL BACKGROUND**

A.   **NewsBreak**

Particle Media designed and developed NewsBreak, free-access apps (Android and iOS) and a website, that (1) provides users with an easily accessible and personalized feed of local and

national content and information; (2) indexes and links original and third-party content, making it easier for users to search, browse, and find content; (3) widens publishers' exposure to a broader network of readers than they otherwise could reach by driving traffic through links to their website, especially where, as here, they do not have a mobile app; (4) helps users discover content without having to undertake voluminous searches by referring them to content based on their locations and preferences; and (5) provides an effective platform for publishers and contributors to enhance their visibility or generate revenue with tools to manage their content and connect with users directly. *See* Ex. 1, Zhong Decl. at ¶3.

The newspaper industry has been shrinking for decades, at the same time that television, online, mobile and social media have become the dominant sources of news for most Americans. *See* Ex. 2, Sell Report at ¶11(i).[1] In the face of such industry contraction, the traffic generated by news aggregators like NewsBreak has presented an opportunity for news outlets, particularly for small publishers, by directing traffic to publisher's websites, often allowing news outlets to reach audiences beyond those the publishers could reach on their own. *Id.* at ¶11(ii).

Particle Media's objective in offering NewsBreak is to create value for users, publishers, and businesses. *See* Ex. 1, Zhong Decl. at ¶4. Consistent with that objective, it has entered into agreements with almost 300 publisher groups (who operate more than two thousands of websites) permitting Particle Media to host their content in full on NewsBreak, meaning to host the content from NewsBreak's server. *Id.* These publisher groups have created profiles on the NewsBreak publisher platform, allowing them to amass "followers," interact with users, access engagement analytics, and have their content exposed. Particle Media also refers significant traffic to publishers' websites. *Id.* Particle Media also refers significant traffic to publishers'

---

[1] Particle Media has designated Blake Pembroke Sell as its expert in the news/media industry. Mr. Sell's extensive experience and qualifications are set forth in his report. *See id.* at ¶¶1-7.

websites, ranking fourth for total traffic referral in 2021, more than Twitter and surpassed only by Google, Facebook and Google News. *See id*.; Ex. 2, Sell Report at ¶126. The traffic NewsBreak provides is so valuable partners have even paid NewsBreak for it. *See id*.; Ex. 1, Zhong Decl. at ¶4. Some publishers who receive direct traffic from NewsBreak also create profiles on the NewsBreak publisher platform. *Id*.

During the relevant period, from 2019 to 2021, users who opened NewsBreak (either on its website or in its mobile app) viewed a news feed that, for each listed story, presented a headline and/or a thumbnail image and/or the first limited words of the article, all intended to promote the story. *See* Ex. 1, Zhong Decl. at ¶5. When a mobile app user clicked on an item listed on the news feed or in a search result, she either (1) viewed the full article on NewsBreak, in the case of fully-hosted articles of publishers and creators with whom Particle Media has agreements, or (2) was taken directly to those websites (i.e., the source of the article), with NewsBreak acting as a web browser, just like Google's Chrome or Safari. *Id;* Ex. 3, PM Discovery Resp. at Int. 17; Ex. 4, Gianturco Report at ¶¶10, 20.2, 20.2.5.4, 20.2.5.5.[2] When a website (computer or mobile) user clicked on an item listed on the news feed or in a search result, she was given a link to "Go to Publisher's website." *See* Ex. 1, Zhong Decl. at ¶5; Ex. 3, PM Discovery Resp. at Int. 17.

When a NewsBreak app user clicks to "Share" an article, the link presents the option to go to the non-partner publisher's website via the NewsBreak app, with the app acting as a web browser, or via another web browser like Safari. *See* Ex. 1, Zhong Decl. at ¶6. The NewsBreak programming offers a link to both a website or Safari user to "Go to Publisher's website," which

---

[2] Particle Media has identified Mark D. Gianturco, Ph.D., as its expert in the field of computer science, software engineering, and technology. Dr. Gianturco received his Bachelor of Science in Computer Science from William and Mary, his Master of Science in Information Systems from George Mason University, and his Doctor of Philosophy in Information Technology from George Mason University.

when clicked upon takes the user to the non-partner publisher's website. *See id.*; Ex. 5, Share Examples. In addition to directing users to the source site, the share URL allows a user to decide whether to view the publisher's website via the NewsBreak app, acting as a web browser, or via another browser, and it provides Particle Media with information regarding an articles' popularity and other information to better promote publishers' content. *See* Ex. 1, Zhong Decl. at ¶36. This is common in the industry. *Id.*; Ex. 6, 2024 Griffith Depo. at 35, 51-56.

### B.  **This Lawsuit**

Plaintiff owns companies that publish newspapers and operate associated websites. *See* [Dkt. 15], First Amended Complaint ("FAC") at ¶17. In the past, stories from some of those sites appeared on the NewsBreak news feed in the form of a headline and/or a thumbnail image and/or the beginning words of the article, with a link that took the user directly to Plaintiff's websites. *See* Ex. 1, Zhong Decl. at ¶7; Ex. 4, Gianturco Report at ¶¶10, 20.2, 20.2.5.4, 20.2.5.5. There were also periods of time in 2019 to 2021 during which, because of an unintentional software glitch, some articles from the websites of Plaintiff and other non-partner publishers were inadvertently made available in self-hosted full text on the NewsBreak app for users of Android phone devices, who were not directed to the publishers' websites. *See* Ex. 1, Zhong Decl. at ¶8; Ex. 3, PM Discovery Resp. at Int. 17. These are what Particle Media has referred to as "self-hosted" or "full text" articles. *See* Ex. 1, Zhong Decl. at ¶8.

The self-hosted full text display of such articles was not an intended feature of the NewsBreak app or an intended practice of Particle Media. *See* Ex. 1, Zhong Decl. at ¶9; Ex. 3, PM Discovery Resp. at Int. 17; Ex. 4, Gianturco Report at ¶¶10, 10.1. In fact, Particle Media's company policy prohibits the display of self-hosted full text articles if the content originates from

a non-partner publisher. *See* Ex. 1, Zhong Decl. at ¶9; Ex. 3, PM Discovery Resp. at Int. 17.[3] The technical glitch that led to such display first occurred in July 2019, when low-level engineers unfamiliar with Particle Media's policy and copyright law were trying to address a functionality issue related to non-mobile-friendly content and made full content available by mistake. *See* Ex. 1, Zhong Decl. at ¶10; Ex. 7, 2022 PM 30(b)(6) at 37. Upon learning of the glitch, Particle Media took immediate actions to fix it and emphasized the policy not to self-host full text content from non-partner publishers. *See* Ex. 1, Zhong Decl. at ¶10; Ex. 7, 2022 PM 30(b)(6) at 37. The glitch occurred again in May 2020 when a different engineer tried to resolve a bug and accidentally removed one of the "logics" (*i.e.*, software code) that Particle Media had implemented to fix the glitch. *See* Ex. 1, Zhong Decl. at ¶11; Ex. 7, 2022 PM 30(b)(6) at 37-38. Upon discovering this glitch, Particle Media worked quickly to put the logic back in place. *Id*.

As early as February 2020, Plaintiff learned of Particle Media's use of content from its websites. *See* Ex. 8, Plaintiff's Discovery Resp. at 17. At no time, however, did Plaintiff send a cease and desist letter or submit a notification pursuant to the copyright policy on Particle Media's website. *See id*.; Ex. 9, Particle Media Terms of Use. Instead, more than five months later, in August 2020, Plaintiff registered nine articles with the U.S. Copyright Office, and more than four months after that, on January 15, 2021, Plaintiff filed suit against Particle Media asserting copyright infringement claims and several state law tort claims. *See Emmerich Newspapers, Inc. v. Particle Media, Inc.*, Civil Action No. 3:21-CV-32-KHJ-MTP (S.D. Miss.). The filing of the lawsuit was the very first time Particle Media became aware the self-hosted full text glitch included content from Plaintiff's publishers' websites. *See* Ex. 1, Zhong Decl. at ¶14. At the time Plaintiff filed the 2021 lawsuit, the glitch was nearly resolved. *Id.* at ¶14. The Court

---

[3] Moreover, additional advertising revenue was generated from the glitch, and no ads were inserted into articles. *See* Ex. 1, Zhong Decl. at ¶10.

in the 2021 case dismissed all but Plaintiff's copyright infringement claims as to nine registered works, *see Emmerich Newspapers, Inc. v. Particle Media, Inc.*, 2022 WL 843209, at *4 (S.D. Miss. Mar. 21, 2022), and the parties later resolved the dispute.

Plaintiff filed Case No. 3:23cv26 in January 2023 and filed the FAC in April 2023, alleging Particle Media infringed 6,211 of its copyrights (listed in Ex. A to the FAC) and violated the DMCA. *See* [Dkt. 15]. Plaintiff also filed Case No. 3:23cv391 in June 2023, asserting the same claims, but alleging infringement of 11,818 copyrights, including 30 pictures, for which Plaintiff purportedly received registrations after filing Case No. 3:23cv26 (listed in Ex. A and Ex. C to the Complaint). *See* [Dkt. 1]. On May 14, 2024, Plaintiff provided a revised copyright infringement list including 7,791 total articles. *See* Ex. 10, May Infringement List.[4]

On July 4, 2024, Plaintiff dismissed its claims as to certain articles ("Dismissed List"). *See* [Dkt. 158] and [Dkt. 158-1]. It appears that some of the articles on the Dismissed List were included in the May Infringement List, meaning that number has gone down more.[5] On July 5, 2024, Plaintiff also dismissed all claims related to every photograph covered by its group registrations, with the exception of 29 specific photographs, *see* [Dkt. 159] and [Dkt. 159-1].

As explained more fully below, the evidence in this case confirms Plaintiff has no valid claim of ownership or copyright registration as to thousands of the works included on the May Infringement List. It also confirms that Plaintiff's claims for pre-June 20, 2020 works are barred by the statute of limitations. Particle Media is entitled to dismissal of Plaintiff's claims as to these articles. Moreover, the NewsBreak app directs users to publishers' own websites, where the

---

[4] Plaintiff has referenced 7,792 articles, but there were 7,791 on the Plaintiff's May 14, 2024, list.

[5] Out of an abundance of caution, Particle Media's lists submitted with this motion are based on the May Infringement List, as Particle Media does not have a copy of an updated infringement list.

works are then displayed by the publishers themselves. This is not copyright infringement, and the Court should grant summary judgment in favor of Particle Media on that issue.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Johnson v. World Alliance Fin. Corp.*, 830 F.3d 192, 195 (5th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Once the moving party has made an initial evidentiary showing that negates the existence of a genuine, material fact issue, the party opposing the motion must present competent summary judgment evidence of the existence of a genuine issue of fact." *Johnson*, 830 F.3d at 195. The Court's inquiry asks whether a fair-minded jury could return a verdict for Plaintiff on the evidence presented. *Id*. It could not. The Court should grant summary judgment in Particle Media's favor.

## III.  ARGUMENTS AND AUTHORITIES

### A.  The Court should dismiss Plaintiff's copyright infringement claims as to thousands of works because Plaintiff cannot show ownership and registration.

An action for copyright infringement requires Plaintiff to prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). *See Norma Ribbon & Trimming, Inc. v. Little*, 51 F.3d 45, 47 (5th Cir. 1995). "Copyright ownership is shown by proof of originality and copyrightability in the work as a whole and by compliance with applicable statutory formalities." *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1340 (5th Cir. 1994).

A certificate of registration creates a <u>rebuttable</u> presumption that a copyright is valid and that the registrant owns it. 17 U.S.C. § 410(c). But a defendant may rebut the presumption by

offering evidence to disprove the validity of the copyright or by demonstrating that the work at issue is unprotectable. *Jane Envy, LLC v. Infinite Classic, Inc.*, 2016 WL 797612, at *4 (W.D. Tex. Feb. 26, 2016). *See also Norma Ribbon & Trimming*, 51 F.3d at 47. For instance, a defendant who challenges the originality of copyrighted material may overcome the presumption by presenting proof the material was copied from other works or similarly probative evidence regarding the lack of originality. *Preston Wood & Assocs., LLC v. RZ Enterprises USA, Inc.*, 2018 WL 2722328, at *2 (S.D. Tex. June 6, 2018); *see also Lennar Homes of Texas Sales & Mktg., Ltd. v. Perry Homes, LLC*, 117 F. Supp. 3d 913, 930 (S.D. Tex. 2015). Where evidence "casts doubt on the question, validity will not be assumed." *Utopia Provider Sys., Inc. v. Pro– Med Clinical Sys., L.L.C.*, 596 F.3d 1313, 1319 (11th Cir.2010) (internal citations omitted).

While registration with the U.S. Copyright Office generally requires one application for each work an applicant wants to register, the Office has established group registration options for registering (1) multiple issues of a newspaper and (2) multiple published photographs. *See* 17 U.S.C. § 408(c)(1); 37 C.F.R. § 202.4(e) and (i); U.S. Copyright Office, Circular 62A, *Group Registration of Newspapers* (rev. March 2021);[6] U.S. Copyright Office, Circular 42, *Copyright Registration of Photographs* (rev. March 2021).[7] Here, Plaintiff relies on both.

"A registration for a group of newspapers covers each issue in the group and each issue is registered as a separate collective work." *See* Circular 62A at 2. "Furthermore, because each issue is registered as a collective work, the registration also covers the articles, photographs, illustrations, or other contributions that appear in each issue, as long as the claimant <u>fully owns the copyright in both the issue and the contributions</u>, and those contributions <u>have not been previously published</u> or registered and are not in the public domain." *Id*. (emphasis added). *See*

---

[6] Available at https://copyright.gov/circs/circ62a.pdf (last visited July 12, 2024).

[7] Available at https://copyright.gov/circs/circ42.pdf (last visited July 12, 2024).

*also id*. at 3 (registration covers all contributions appearing in each issue "that are fully owned by the claimant and that have not been previously registered or published"). In other words, the registration covers contributions appearing within each issue "if they were <u>first published</u> in those issues and if they are <u>fully owned</u> by the author/claimant <u>when the application is filed</u>." *See* Compendium of U.S. Copyright Office Practices § 1108.2 (3d ed. 2021)[8] (emphasis added). "By contrast, if an issue contains contributions that are not fully owned by the author/claimant, and/or if they were previously published, the registration will <u>not</u> extend to those contributions." *Id*. (emphasis added). "If the copyright in individual contributions is owned by parties other than the owner of the copyright in the issue as a whole, or if the contributions have been previously published or previously registered," a separate application must be submitted for each contribution. *See* Circular 62A at 3.

A group registration may be used to provide a presumption of validity "<u>for each registered issue</u>." *See* Compendium, § 1108.7 (emphasis added). In other words, a group registration creates a presumption "that the claimant owns the copyright in each issue listed in the certificate, and a presumption that the copyright law protects each issue as a whole." *Id*.

A group of published photographs may be registered with one application if "[a]ll the photographs [are] created by the same author," and "[t]he copyright claimant for all the photographs [is] the same person or organization." 37 C.F.R. § 202.4(i).[9] *See* Circular 42 at 2-3.

Any presumption of ownership and validity afforded by Plaintiff's certificates of registration is rebutted here because Plaintiff's copyright infringement list includes (1) thousands of articles that were published <u>before</u> they appeared in the registered e-editions; (2) hundreds of

---

[8] Available at https://www.copyright.gov/comp3/docs/compendium.pdf (last visited July 12, 2024).

[9] Available at https://www.ecfr.gov/current/title-37/chapter-II/subchapter-A/part-202/section-202.4 (last visited July 13, 2024).

articles that were <u>not</u> owned by Plaintiff and/or have been expressly relinquished; (3) hundreds

of articles that do <u>not</u> appear in e-editions covered by Plaintiff's copyright registrations; and (4) a

number of items that are simply *not* copyrightable.[10] Moreover, Plaintiff's group registration for

published photographs should be canceled because (1) it includes an Associated Press ("AP")

photograph Plaintiff does not own, and (2) the majority of the photos are not otherwise covered

by valid certificates of registration. Because registration of a copyright is a prerequisite to filing

suit for infringement, claims as to works not covered by a valid certificate of registration must be

dismissed. *See Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 892

(2019); *Emmerich Newspapers*, 2022 WL 843209, at *2.

### 1. <u>Thousands of articles included on the May Infringement List were published prior to the relevant e-editions.</u>

"[I]f an issue contains contributions that … were previously published, <u>the registration</u>

<u>will not extend to those contributions</u>." Compendium, § 1108.2 (emphasis added). Plaintiff has

acknowledged some stories were published online before they were published in print or in the e-

edition. *See* Ex. 11, 2024 EN 30(b)(6) at 198:20-201:25. According to Plaintiff, the publication

date for articles on the websites "is what shows up on [the] website." *Id*. And the publication

date of each e-edition is reflected in the e-edition itself and in its filename. *See* Ex. 12, Copyright

Office Correspondence Example.[11]

The spreadsheet attached as Exhibit 13 lists more than 3,500 articles on the May

Infringement List that were published online before they were published in the related e-

---

[10] Once Particle Media has submitted evidence casting doubts on the validity of the registration and ownership of a work on the May Infringement List, Plaintiff should no longer enjoy any presumption as to other works claimed from that issue. *See* Compendium, § 1108.7

[11] The Copyright Office instructed Mr. Emmerich to use the following convention: "GRNP_[Number]_[Date of Publication YYYYMMDD].pdf." *Id*.

editions.[12] Because these articles were previously published, they are not covered by Plaintiff's copyright registrations, and the Court should dismiss Plaintiff's infringement claims for the articles listed in Exhibit 13. *See* Compendium, § 1108.2; *Fourth Estate*, 139 S. Ct. at 892.

### 2. <u>Hundreds of items included on the May Infringement List were not owned by Plaintiff when the copyright applications were filed and have been expressly relinquished.</u>

Plaintiff simply does not own hundreds of the items included on its copyright infringement list, including (1) content from Mississippi Today, the AP, and others; (2) press releases; (3) syndicated columns; (4) content submitted by schools, other community groups and organizations, and individuals; (5) calendars and schedules; (6) honor rolls; and (7) other non-original content. Plaintiff has relinquished any claims related to articles that fall within these categories, *see* Ex. 8, Plaintiff's Discovery Resp. at Int. 26-37, 45-46 and RFA 1-12, 17-18.[13] Particle Media has identified nearly 1,000 articles on the May Infringement List as to which Plaintiff is not the owner, and, therefore, has relinquished its claims of copyright infringement.

---

[12] Exhibit 13 includes, as to each listed article, (1) an identification number; (2) the headline; (3) the online publication date; (4) the e-edition publication date; (5) the e-edition filename; (6) the copyright registration number for the e-edition; (7) the decision date; and (8) the URL. An electronic version will be provided to the Court and Plaintiff. Particle Media is also providing the Court and Plaintiff with a hard drive containing the evidence that supports this summary, saved using the identification number and headline of each article. As to each article, the evidence consists of the online version and the e-edition version. And in some instances, the evidence also includes additional proof regarding an earlier date.

[13] Plaintiff has relinquished any claims as to (1) articles published by third parties, including Mississippi Today, the AP, and Y'all Politics; (2) lunch menus; (3) legal notices; (4) obituaries; (5) engagement, wedding, anniversary, birth, and birthday announcements; (6) classified ads and/or streaming ads; (7) letters to the editor; (8) press releases; (9) articles from Mississippi State University (including the Mississippi State Extension), the University of Mississippi, the University of Southern Mississippi, the University of Tennessee, Jackson State University, Delta State University, Belhaven University, Mississippi College, Millsaps College, Coahoma Community College, East Central Community College, East Mississippi Community College, Hinds Community College, Holmes Community College, Itawamba Community College, Mississippi Delta Community College, Northeast Mississippi Community College, Pearl River Community College, and/or Southwest Mississippi Community College; (10) honor rolls; (11) submissions by schools and other community groups or organizations; (12) syndicated columns; (13) land transactions; (14) jail dockets; (15) crime reports; (16) arrest reports; (17) police reports; (18) fire reports; (19) 911 calls; (20) emergency calls; (21) public notices; (22) court decisions; (23) calendars; and (24) schedules. *Id.*

*See* Ex. 14, Relinquished Claims.[14] The Court should dismiss Plaintiff's claims as to the articles listed in Exhibit 14.

Moreover, Plaintiff claims ownership of hundreds of works submitted by people with whom it purports to have work for hire agreements, but the parties entered into the "agreements" long after the works in question were created and do not comply with 17 U.S.C. § 101(2). Under Section 101, a work for hire is allowed in two circumstances: "(1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned for use as a contribution to a collective work …, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. .…" 17 U.S.C. § 101(2) (emphasis added).

"There is a conflicting line of cases over whether or not [a] work-for-hire agreement is effective for conferring owner status after the work is completed." *Looney Ricks Kiss Architects, Inc. v. Bryan*, 2010 WL 4068885, at *5 (W.D. La. Oct. 14, 2010) (emphasis added). "The Seventh Circuit, in promoting a bright-line rule, has held that the parties must sign the work-for-hire agreement before the copyrighted work is created in order for the work-for-hire agreement to be valid." *Id.* (citing *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 413 (7th Cir. 1992) ("The writing must precede the creation of the property in order to serve its purpose of identifying the (noncreator) owner unequivocally.") (emphasis added). *See also Gladwell Govt. Services, Inc. v. County of Marin*, 265 F. App'x 624, 626 (9th Cir. 2008) ("The plain language of

---

[14] Exhibit 14 includes, as to each listed article, (1) an identification number; (2) the headline; (3) the online publication date; (4) the e-edition publication date; (5) the e-edition filename; (6) the copyright registration number for the e-edition; (7) the decision date; and (8) the URL. An electronic version will be provided to the Court and Plaintiff. Particle Media is also providing the Court and Plaintiff with a hard drive containing the evidence that supports this summary, saved using the identification number and headline of each article. As to each listed article, the evidence consists of the online version and the e-edition version. In some instances, the evidence also includes additional proof of non-ownership. Exhibit 14 is not an exhaustive list, as Particle Media expects to discover additional articles as to which claims have been relinquished.

the statute indicates that a work-for-hire agreement cannot apply to works that are already in existence."). In contrast, the Second Circuit has held that in certain circumstances writings executed after creation of the works at issue can satisfy the writing requirement of Section 101(2) **if** they "confirm[ ] a prior agreement, either explicit or implicit, made before the creation of the work." *Est. of Kauffmann v. Rochester Inst. of Tech.*, 932 F.3d 74, 77 (2d Cir. 2019).

Regardless of which rule is applied here, however, the agreements produced by Plaintiff are completely ineffective in retroactively granting Plaintiff ownership status. This is because the agreements were "signed" in 2022 and 2023, and none of them includes confirmation of any prior agreement made before the creation of the works. *See* Ex. 15, "Work for Hire" Summary.[15] Plaintiff's registrations thus cannot cover contributions by the individuals identified in Exhibit 15 because Plaintiff did not fully own them when it filed the copyright applications for those works. *See* Compendium, § 1108.2; Circular 62A at 3. Accordingly, the Court should dismiss Plaintiff's copyright claims as to articles written by the individuals listed in Exhibit 15, including the articles listed as part of that exhibit.  *See* Compendium, § 1108.2; Circular 62A; *Fourth Estate*, 139 S. Ct. at 892.

### 3.  Hundreds of articles included on the May Infringement List are simply not covered by a certificate of registration.

More than 400 of the articles included on the May Infringement List do not appear in the referenced e-editions. *See* Ex. 16, Articles Not In E-Edition.[16] For instance, 103 of the articles

---

[15] As noted in the summary, many of the alleged agreements were not signed by either party. *See id*. The files for the agreements were too large to file through ECF, but a copy will be on the hard drive provided to the Court and Plaintiff's counsel.

[16] Exhibit 16 includes, as to each listed article, (1) an identification number; (2) the headline; (3) the online publication date; (4) the alleged e-edition publication date; (5) the alleged e-edition filename; (6) the alleged copyright registration number for the e-edition; (7) the alleged decision date; and (8) the URL. An electronic version will be provided to the Court and Plaintiff. Particle Media is also providing the Court and Plaintiff with a hard drive containing the evidence that supports this summary, saved using the identification number and headline of each article. For some, a comparison of the online publication date

were actually published in 2021, but Plaintiff does not have any copyright registrations covering works published in 2021. *See id*. Because the articles listed in Exhibit 16 are not covered by certificates of registration, Plaintiff cannot maintain copyright infringement claims for these works and the Court should dismiss Plaintiff's claims as to them as well. *See Fourth Estate*, 139 S. Ct. at 892.

### 4.  <u>The May Infringement List include content that is not copyrightable.</u>

"[T]he copyright law does not protect works that do not constitute copyrightable subject matter or works that do not contain a sufficient amount of original authorship," such as facts; "[w]orks consisting entirely of information that is common property, such as schedules of sporting events[] and lists or tables taken from public documents or other common sources[;]" and "[w]orks that are in the public domain." Compendium, § 707. *See also id*. at § 313.6(D); 37 C.F.R. § 202.1(d). It is well-established law that "facts are not copyrightable," because "[t]o qualify for copyright protection, a work must be original to the author" and "facts do not owe their origin to an act of authorship." *Feist*, 499 U.S. at 344-45, 347. Rather, facts "'are part of the public domain available to every person.'" *See id*. at 347, 348 (quoting *Miller v. Universal City Studios, Inc*., 650 F.2d 1365, 1368 (5th Cir. 1981)). Moreover, "copyright protects only those constituent elements of a work that possess more than a *de minimis* quantum of creativity." *Id*. at 363. "Works that contain no expression or only a *de minimis* amount of original expression are not copyrightable and cannot be registered with the U.S. Copyright Office." Compendium, § 313.4(B). The May Infringement List includes several instances of content like calendars, schedules, and sports scores, which do not meet the requirements for copyright ownership or registration, either because they are factual in nature or because they contain no or only *de*

---

and the date of the alleged e-edition are enough to know they do not match.

*minimis* original expression. *See* Ex. 17, Non-Copyrightable Content.[17] Accordingly, Plaintiff

has relinquished claims related to these types of content, and the Court should dismiss its claims

as to them with prejudice.

   **5.  Plaintiff's registration for a group of published photographs should be
        cancelled, and the majority of the photos are not otherwise covered by valid
        certificates of registration.**

   Plaintiff relies in part on Registration Number VA 2-335-308, a copyright registration for

a group of 30 published photographs. *See* Ex. 18, Certificate for Photographs. A group of

published photographs may only be registered via a single application if (1) all of the

photographs were created by the same author (or the same employer, in the case of works made

for hire) and (2) the copyright claimant for all the photographs is the same person or

organization. *See* 37 C.F.R. § 202.4(i); Circular 42 at 2-3. One of the photographs listed in

Plaintiff's registration is "Storms hit Southeast," an AP photograph. *See* Ex. 19, AP Photograph;

Ex. 20, W. Emmerich Dep. at 38:8-40:9 (acknowledging the AP photograph). At the very least,

this evidence rebuts any presumption of validity as to Registration Number VA 2-335-308 for

that photo. *Id.* And more importantly, inclusion of the photograph is grounds for cancellation of

the registration as a whole because, as discussed above, *supra* 9, photos may only be registered

as a group where the same entity is the copyright claimant for all of the photos. *See*

Compendium, § 1807.1 (citing 17 U.S.C. § 410(b)) (the Register of Copyrights has the authority

to cancel a registration if the claim is invalid); *id.* at § 1807.4(D) (citing 37 C.F.R. §

201.7(c)(4)(i)-(xi) (examples of substantive defects that may prompt the Office to cancel a

---

[17] Exhibit 17 includes, as to each listed article, (1) an identification number; (2) the headline; (3) the
online publication date; (4) the e-edition publication date; (5) the e-edition filename; (6) the copyright
registration number for the e-edition; (6) the decision date. An electronic version of the exhibit will be
provided to the Court and Plaintiff. Particle Media is also providing the Court and Plaintiff with a hard
drive containing the evidence that supports this summary, saved using the identification number and
headline of each article. As to each listed article, the evidence consists of the online version and the e-
edition version.

registration include that "[t]he application does not identify the copyright claimant" or that "[t]he Office issued a registration for a group of related works, but subsequently determines that the applicable requirements for that option have not been met"). Particle Media respectfully requests that the Court issue an order directing Plaintiff to cancel the registration. *See* Compendium, § 1807.4(F) (citing *Brownstein v. Lindsay*, 742 F.3d 55, 75 (3d Cir. 2014)).

On July 5, 2024, Plaintiff voluntarily dismissed with prejudice "all claims related to every photograph covered by its group registrations with the exception of 29 photos." *See* [Dkt. 159. Those 29 photos are the ones listed in group Registration Number VA 2-335-308, minus the AP photo. *See* [Dkt. 159-1]. Plaintiff has stated that even if the registration is cancelled, the photographs are covered by other group registrations. *See* [Dkt. 64] at 5-6. But that is simply not true. All of the photographs listed in Plaintiff's July 5th submission are from the *Greenwood Commonwealth*. Photographs Nos. 2 and 3 were published online before they were published in the e-edition, so they are not covered by the e-edition certificates. *See* Ex. 21, Unregistered Photographs; Circular 62A at 2, 3; Compendium, § 1108.2. Photographs Nos. 16 through 20 and 22 through 30 on the list were published in February 2020. *See* Ex. 21, Unregistered Photographs. Plaintiff has not produced a registration certificate for the *Greenwood Commonwealth* e-editions published in February 2020, and upon information and belief, no registration for that time period had been completed when Plaintiff filed Case No. 3:23cv391 on June 20, 2023.[18] Moreover, photograph No. 21 was published online in 2021, so it is not covered

---

[18] The information available through the U.S. Copyright Office's website includes the <u>effective date of registration</u>, but not the <u>registration decision date</u>. "The 'registration decision date' is the date that the registration specialist completed his or her examination and approved the claim[,]" and "[t]he 'effective date of registration' is the date on which the Office received an acceptable application, complete deposit copy(ies), and the proper filing fee." Compendium, § 209 (citing 17 U.S.C. § 410(d)). It is the <u>registration decision date</u> that determines whether Plaintiff obtained a registration <u>before</u> filing this action. *Fourth Estate*, 139 S. Ct. 881 at 892. Plaintiff's May 14, 2024, copyright infringement list does not reference <u>any</u> e-editions from the *Greenwood Commonwealth* for February 2020.

by any of Plaintiff's copyright registrations. *See* Ex. 21, Unregistered Photographs. Thus, the Court should dismiss Plaintiff's claims as to Photographs Nos. 2, 3, 16-20, 22-30. *See* 17 U.S.C. § 411(a); *Fourth Estate*, 139 S. Ct. at 892; *Emmerich Newspapers*, 2022 WL 843209, at *2.

**B.  NewsBreak acting as a web browser is not copyright infringement.**

When the NewsBreak app worked as intended, a user who clicked on a news feed item from one of Plaintiff's websites was taken to Plaintiff's website, with the app acting as a web browser. *See* Ex. 1, Zhong Decl. at ¶5*;* Ex. 3, PM Discovery Resp. at Int. 17; Ex. 4, Gianturco Report at ¶¶10, 20.2, 20.2.5.4, 20.2.5.5. Plaintiff claims that when the NewsBreak app acted a web browser it violated 17 U.S.C.A. § 106(5) and "only created the appearance that the reader was on Emmerich's website." [Dkt. 68] at 3. To the contrary, however, the app <u>did</u> direct users to Plaintiff's URL, showing the publisher's website <u>from the publisher's server</u>. *See* Ex. 1, Zhong Decl. at ¶33; Ex. 4, Gianturco Report at ¶¶10, 20.2, 20.2.5.4, 20.2.5.5; Ex. 22, Google Analytics; Ex. 23, Referral Traffic to Emmerich Websites; Ex. 24, Prince Email. "<u>The web server running the external website</u> fulfills a NewsBreak browser request," and the external webpage is retrieved and shown in the same manner as other web browsers (such as Chrome or Safari) operate when they show web pages. *Id*. at 20.2.5.5 (emphasis added).

Contrary to Plaintiff's unsupported assertion, when the NewsBreak app links users to a publisher's website, it does not engage in any activity that implicates Plaintiff's exclusive copyright rights. Section 106(5) of the Copyright Act states that a copyright owner has the exclusive right "to display the copyrighted work publicly." *See* 17 U.S.C.A. § 106(5); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1160 (9th Cir. 2007). Under Section 101 of the Act, "[t]o 'display' a work means to <u>show a copy of it</u>, either directly or by means of a film, slide, television image, or any other device or process…." 17 U.S.C. § 101 (emphasis added).

17

Accordingly, to infringe the Section 106(5) right, a defendant must have publicly displayed the work from a copy, that is, from a fixation of the work. *Id.*

The meaning of "publicly display" was addressed in *Perfect 10, Inc. v. Amazon.com, Inc.*, where Perfect 10 sued Google and other companies, claiming that Google infringed its copyrighted images of nude models by, among other things, in-line linking and framing images that appear on a computer user's screen as a result of a search using the Google Image search engine. *Id.* at 1160-61.

The Ninth Circuit affirmed the district court's dismissal of that claim, holding that Google's framing and linking did not result in a "display" within the meaning of the Copyright Act. *Id.* The court first noted that under the Act's plain language, "a person displays a photographic image by using a computer to fill a computer screen with a copy of the photographic image fixed in the computer's memory." 508 F.3d at 1160. The court then applied the "Server Test," stating:

> a computer owner that stores an image as electronic information and serves that electronic information directly to the user ("i.e., physically sending ones and zeroes over the [I]nternet to the user's browser,") is displaying the electronic information in violation of a copyright holder's exclusive display right. Conversely, the owner of a computer that does not store and serve the electronic information to a user is not displaying that information, even if such owner in-line links to or frames the electronic information.

*Perfect 10, Inc.*, 508 F.3d at 1159 (citing 17 U.S.C.A. § 106(5)) (internal citations omitted). Under that test, Google's framing and linking did not constitute a "display," and thus did not infringe, because "[i]nstead of communicating a copy of the image, Google provides HTML instructions that direct a user's browser to a website publisher's computer that stores the full-size photographic image. Providing these HTML instructions is not equivalent to showing a copy." *Id.* at 1161.

Recently, in *Hunley v. Instagram, LLC*, 73 F.4th 1060 (9th Cir. 2023), the Ninth Circuit explained that the Server Test remains valid, noting that it has applied that test outside the search-engine context, including in cases involving blogs, online bulletin boards, and "reverse image searches," *id*. at 1070–71 (citations omitted), and that no circuit court has disapproved of it. *Id*. at 1071 (citing *Society of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 55 (1st Cir. 2012) (declining to adopt or reject Server Test); *Flava Works, Inc. v. Gunter*, 689 F.3d 754 (7th Cir. 2012)). Applying the server test here, it is clear that Particle Media does not "display" any of Plaintiff's works when its NewsBreak service acts as a browser and directs users to a publisher's own websites, for the simple reason that NewsBreak does not serve the information from the publisher's website directly to the user. *Perfect 10, Inc*., 508 F.3d at 1159-116.  In fact, it does the opposite, by delivering the user to the publisher's website where the publisher may then display its content to that user. *See* Ex. 1, Zhong Decl. at ¶33; Ex. 3, PM Discovery Resp. at Int. 17; Ex. 4, Gianturco Report at ¶¶10, 20.2, 20.2.5.4, 20.2.5.5. And the referral traffic proves it. *See id.*; Ex. 4, Gianturco Report at ¶¶10, 20.2, 20.2.5.4, 20.2.5.5. Ex. 22, Google Analytics; Ex. 23, Referral Traffic to Emmerich Websites; Ex. 24, Prince Email.

In sum, the NewsBreak app acting as a web browser was not and is not infringement.

**C. Plaintiff's copyright infringement claims as to pre-June 20, 2020 articles are time-barred.**

**1. The Court should apply the accrual rule, not the discovery rule.**

Civil actions under the Copyright Act must be "commenced within three years after the claim accrued." 17 U.S.C. § 507(b). In *Graper v. Mid-Continent Casualty Co.*, 756 F.3d 388 (5th Cir. 2014), the Fifth Circuit decided that "this limitations period starts running 'once the plaintiff knows or has reason to know of the injury upon which the claim is based,' which is also known as the discovery rule." *Martinelli v. Hearst Newspapers, L.L.C.*, 65 F.4th 231, 233 (5th Cir.

2023) (quoting *Graper*, 756 F.3d at 393). The Fifth Circuit was recently asked to replace that rule with a holding that the clock starts when the infringing act occurs, based, in part, on the Supreme Court's decision in *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014), but the Fifth Circuit explained that *Petrella* did not unequivocally overrule *Graper*. *See Martinelli*, 65 F.4th at 233.

Recently, however, the Supreme Court has signaled its willingness to entertain a resolution of the circuit split in the accrual/discovery rule.  In *Warner Chappell Music, Inc. v. Nealy*, 144 S. Ct. 1135, 1138-39 (2024), the Supreme Court opined:

> The question on which this Court granted certiorari is "[w]hether, under the discovery accrual rule applied by the circuit courts," a copyright plaintiff "can recover damages for acts that allegedly occurred more than three years before the filing of a lawsuit." … That question, which the Court substituted for Warner Chappell's, incorporates an assumption: that the discovery rule governs the timeliness of copyright claims. <u>We have never decided whether that assumption is valid—i.e., whether a copyright claim accrues when a plaintiff discovers or should have discovered an infringement, rather than when the infringement happened.</u> … <u>But that issue is not properly presented here</u>, because Warner Chappell never challenged the Eleventh Circuit's use of the discovery rule below. ... And as noted above, a division exists among the many Courts of Appeals applying a copyright discovery rule (11 at last count) about whether to superimpose a three-year limit on damages. … We therefore confined our review to that disputed remedial issue, excluding consideration of the discovery rule and asking only whether a plaintiff with a timely claim under the rule can get damages going back more than three years.

*Id*. at 1138-39 (internal citations omitted) (emphasis added). Particle Media urges this Court, and the Fifth Circuit, to reconsider the discovery rule and instead adopt the accrual rule.

"[W]hile some claims are subject to a 'discovery rule'…that is not a universal feature of the statute of limitations." *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 580 U.S. 328, 337 (2017). The Supreme Court has stated that "[i]f there are two plausible constructions of a statute of limitations, [it] generally adopt[s] the construction that starts the time limit running <u>when the cause of action ... accrues</u> because Congress legislates against the

standard rule that the limitations period commences when the plaintiff has a complete and present cause of action." *Rotkiske v. Klemm*, 589 U.S. 8, 13 (2019) (citations and quotations omitted) (emphasis added). Congress did not legislate against the standard rule in Section 507(b). The action is to commence within three years "after the claim accrued." 17 U.S.C. § 507(b) (emphasis added).

The May Infringement List consists only of articles as to which claims were brought in Case No. 3:23cv391 on June 20, 2023. Accordingly, the Court should apply the accrual rule and dismiss any claims for alleged infringement prior to June 20, 2020. *See* Ex. 25, Dated List.

**2. The filing of a similar copyright infringement lawsuit did not toll the statute of limitations applicable to Plaintiff's copyright infringement claims.**

Plaintiff's argument that the statute of limitations for these claims was tolled by the previous litigation between the parties is without merit. *See* [Dkt. 64] at 10. "[T]he question [of] whether a tolling rule applies to a given statutory time bar is one of statutory intent." *California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 506 (2017) (internal citations and quotations omitted). The Copyright Act does not provide for tolling of the statute of limitations in the event a claim is filed and later dismissed without prejudice by a Court. *See* 17 U.S.C. § 507(b). Moreover, "[i]t is [well] established that the fact that a dismissal of an earlier suit was without prejudice does not authorize the bringing of the suit later outside of an otherwise binding limitations period." *Goff v. United States*, 659 F.2d 560, 562 (5th Cir. 1981) (citations omitted).

When Plaintiff filed its initial lawsuit against Particle Media on January 15, 2021, it had registered nine articles. And on September 26, 2021, when Plaintiff filed its amended complaint attempting to assert copyright infringement claims as to unregistered works, it still had registered nine articles. On March 21, 2022, the Court held that based on the Copyright Act and Supreme Court precedent, Plaintiff's unregistered copyrights could not support independent copyright

21

infringement claims and dismissed all claims seeking relief based on infringement of unregistered copyrights. *Emmerich Newspapers*, 2022 WL 843209, at *2 (citing *Fourth Estate*, 139 S. Ct. at 892). The Copyright Act provides that "no civil action for infringement … shall be instituted until ... registration of the copyright claim has been made[.]" 17 U.S.C. § 411(a). Because Plaintiff had no right to bring its claims for unregistered works in the previous case, filing the amended complaint did not somehow stop the running of the statute of limitations clock. *See Brooks-Ngwenya v. Thompson*, 202 F. App'x 125, 127 (7th Cir. 2006) (stating that a new suit may be filed "[i]f the condition can be satisfied while time remains). Accordingly, there is no tolling of the statute of limitations with regard to any infringement actions occurring before June 20, 2020.

## IV.  **CONCLUSION**

For the foregoing reasons, Particle Media respectfully asks this Court to dismiss Plaintiff's copyright infringement claims as to the works discussed herein and as to the browser with prejudice. Moreover, the Court should enter summary judgment in favor of Particle Media on Plaintiff's claim that the NewsBreak app acting a web browser constituted a "display" under the Copyright Act. Particle Media requests such other relief as the Court deems just and proper.

Respectfully submitted, this the 22nd day of July, 2024.

Respectfully submitted,
**PARTICLE MEDIA, INC.**

By:   _ s/ *Stephen J. Carmody*_____
One of its Attorneys

OF COUNSEL:

Stephen J. Carmody, MSB #8345
Karen E. Howell, MSB #102243
Brunini, Grantham, Grower & Hewes, PLLC
Post Office Drawer 119
Jackson, Mississippi 39205
Telephone:    (601) 948-3101
Facsimile:    (601) 960-6902
scarmody@brunini.com
khowell@brunini.com