IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**EMMERICH NEWSPAPERS,**                                                        **PLAINTIFF**
**INCORPORATED**

**VS.**                                    **CIVIL ACTION NO. 3:23CV26 TSL-MTP**

**PARTICLE MEDIA, INC. D/B/A NEWS**                          **DEFENDANTS**
**BREAK and JOHN DOES 1-10**

**CONSOLIDATED WITH**

**EMMERICH NEWSPAPERS,**                                                         **PLAINTIFF**
**INCORPORATED**

**VS.**                                    **CIVIL ACTION NO. 3:23CV391 TSL-MTP**

**PARTICLE MEDIA, INC. D/B/A NEWS**                          **DEFENDANTS**
**BREAK**

---

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS RESPONSE
TO DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY
OF WYATT EMMERICH AS TO DAMAGES**

---

      COMES NOW Plaintiff Emmerich Newspapers, Incorporated ("Emmerich"), by and through counsel of record, which files this Memorandum in Support of its Response to Particle's Motion to Exclude the testimony of Wyatt Emmerich as to his company's actual damages. Particle contends that (1) Mr. Emmerich is not qualified to give the proffered testimony; and (2) his testimony is unreliable because it is based on insufficient and irrelevant facts and data that resulted in flawed methodologies. Moreover, Particle contends Mr. Emmerich's proffered expert testimony on damages would not assist the trier of fact to understand the evidence or to determine a fact in issue, but would serve only to confuse and mislead the jury.

1

For the reasons set forth below, the Court should deny Particle's motion. Particle's entire motion is based on arguments, disguised as *Daubert* challenges, that actually attack the weight of Mr. Emmerich's proposed expert testimony rather than its admissibility. Wyatt Emmerich is eminently qualified to provide expert testimony regarding the damages caused to his company by Particle and Emmerich has provided sufficient facts and data to support his analysis. His testimony will clearly assist the jury in understanding the evidence and reaching the appropriate conclusions.

## **RELEVANT FACTUAL AND PROCEDURAL BACKGROUND**

On February 8, 2024, Emmerich served its initial designation of experts, identifying Mr. Emmerich as an unretained expert on damages. *See* Ex. A, Plaintiff's Initial Designation. The designation stated that Mr. Emmerich "is expected to testify regarding the actual damages suffered by Emmerich Newspapers, Incorporated as a result of Particle Media's copyright infringement and violation of the DMCA" and "will utilize the three methodologies reflected in Exhibit 'A,'" which experts in the field of copyright and DMCA damage calculations "would reasonably rely on … in forming an opinion on the subject of Emmerich's actual damages." *Id*. at 4. The damage calculation methods listed in the designation were (1) Lost Revenue Methodology of ($8,564,531), (2) Value of Articles Stolen Methodology ($32,155,400), and (3) Ad Impressions Methodology ($6,443,294). The average of these three methodologies was $15,319,481. *Id*.

Discovery yielded two significant items which led to a downward adjustment of these calculations. First, the damage period was not as long as previously suspected and second, the number of articles in issue was significantly lowered in response to objections raised by Particle. Emmerich produced its calculations in the form of an Excel spreadsheet shared with Particle

specifically so it could tweak and modify the inputs and variables as new information arose. Ex. B, Wyatt Emmerich Affidavit, ¶ 2. On June 17, Emmerich provided its final updated actual damages calculation, consisting of (1) Lost Revenue Methodology ($7,027,896), (2) Value of Articles Stolen Methodology ($20,983,203), and (3) Ad Impressions Value Methodology ($5,851,282) *See* Ex. C.

Mr. Emmerich is plainly qualified to give any expert opinion regarding the calculation of actual damages for copyright infringement and violation of the DMCA. His calculations and opinions are based on easily understood facts or data. Particle quibbles over details of this proposed methodologies but does not challenge in any way the scientific validity or reliability of Emmerich's methodologies.

**LEGAL STANDARD**

Whether to admit or exclude evidence, including expert testimony, is within the discretion of the trial court. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141-43 (1997). "If . . . technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. . . ." FED. R. EVID. 702. The Court must determine whether (1) the expert is qualified by special knowledge, (2) his opinion is relevant, and (3) has a reliable basis. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

Under *Daubert* and Rule of Evidence 702, a court's "gatekeeping" responsibility is limited to ensuring that an expert's testimony rests on a reliable foundation. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) (citing *Daubert*, 509 U.S. at 597); *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002).

Courts should not be lured by arguments, disguised as *Daubert* challenges, that actually attack the weight of the expert testimony, not its admissibility. *Miss. Phosphates Corp. v. Furnace & Tube Serv.*, 2009 U.S. Dist. LEXIS 151541, *4. "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Hartley*, 310 F.3d at 1061 (quoting *Bonner v. ISP Tech., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001) (internal citations and quotations omitted)). Therefore, challenges to the factual bases or underpinnings of an expert opinion usually go only to weight and credibility of the evidence, not admissibility. *Moss v. Ole S. Real Estate, Inc.*, 933 F.2d 1300, 1307 (5th Cir. 1991); *Matador Drilling Co. v. Post*, 662 F.2d 1190, 1199 (5th Cir. 1981). Experts should be excluded only if their testimony is so fundamentally unsupported that it cannot possibly help the factfinder. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). Exclusion is not required even when the expert's opinion is tentative or speculative. *Int'l Adhesive Coating Co. v. Bolton Emerson Int'l, Inc.*, 851 F.2d 540, 545 (1st Cir. 1988).

Because the *Daubert* test focuses on the underlying theory upon which the opinion is based, the proponent of expert testimony need not prove the expert's testimony is correct, but that the testimony is reliable. *Moore v. Ashland Chem., Inc.,* 151 F.3d 269, 274 (5th Cir. 1998). This determination of reliability includes a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert,* 509 U.S. at 592. An individual offered as an expert need not have complete knowledge of or training in the field in question, as long as the knowledge the witness possesses will aid the trier of fact in performing its function. *See Sullivan v. Rowan Cos., Inc.,* 952 F.2d 141, 145-146 (5th Cir 1992). Ultimately,

the inquiry is "a flexible one" and relevant factors can vary with the needs of each case. *Daubert*, 509 U.S. at 594.

The proponent of the expert testimony bears the burden of establishing admissibility, or "coming forward with evidence from which the trial court could determine that the evidence is admissible under *Daubert*." *Anderson*, 2017 U.S. Dist. LEXIS 76614, 2017 WL 2189508, at *3 (quoting *Main St. Am. Grp. v. Sears, Roebuck, & Co.*, No. CIV JFM-08-3292, 2010 U.S. Dist. LEXIS 22667, 2010 WL 956178, at *3 (D. Md. Mar. 11, 2010)); *see also Casey*, 823 F. Supp. 2d at 340; *Daubert*, 509 U.S. at 592 n. 10 (explaining admissibility must be established by a "preponderance of proof").

### A. *Mr. Emmerich Clearly Has The Training, Experience And Knowledge To Qualify As An Expert*

Particle alleges that "Mr. Emmerich does not have any training, education, or specialized knowledge that would make him an expert on how to calculate damages for alleged copyright infringement . . . . He is not an accountant. He has no expertise in business valuation, nor has he served as a damages expert witness in any other lawsuit that does not involve his own company." Doc. 176, p. 10]. However, the federal rules of evidence do not require such specialized training to qualify as an expert and there is certainly no requirement that a proposed expert has testified previously on the subject.

Mr. Emmerich's educational credentials and experience in valuing media properties are impeccable.  He graduated first from Harvard University and then obtained his Masters in Business Administration from UCLA. Following graduation he worked for the New York Times Company as Senior Analyst for Strategic Planning.  Following that he spent four years in the media group at Merrill Lynch Investment Banking Division in New York City, focusing on

5

mergers and acquisitions and corporate finance for media companies. In that capacity he was directly involved in developing detailed valuations of media companies for both sellers and buyers.  Ex. B, Wyatt Emmerich Affidavit, ¶ 3.

In 1991  he moved back to Mississippi to work with his father as Vice-President of Emmerich Newspapers, Incorporated which, at that time, consisted of 15 newspapers.  Utilizing the skills learned at UCLA and honed on Wall Street Mr. Emmerich led the company in ten more newspaper acquisitions over a twenty-year period.  He also orchestrated the sale of a number of properties over the same time frame.  Every such transaction required a detailed assessment of gross revenues,  profits and EBITDA margins, all of which are directly relevant to the testimony he proposes to give in this case. *Id*. It would be difficult to find a more qualified expert to testify to Emmerich's losses in this case.

"Rule 702 does not require an expert to be highly qualified to testify, however, the court will evaluate the witness's knowledge, skill, experience, training, or education with respect to the subject matter of the testimony. *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009). Generally, a lack of specialization should go to the weight of the evidence rather than its admissibility and "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *United States v. Wen Chyu Liu*, 716 F.3d 159, 168-69 (5th Cir. 2013) (quoting *Daubert*, 509 U.S. at 596). . . . [A] lack of specialization does not affect the admissibility of the opinion, but only its weight." *Id.* (quoting *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991)). *Jackson v. Parker-Hannifin Corp.*, 645 F. Supp. 3d 577, 586, 2022 U.S. Dist. LEXIS 223126, *4-5.

Particle cites *Miss. Phosphates Corp. v. Furnace & Tube Serv.*, 2009 U.S. Dist. LEXIS 151541, for the proposition that Mr. Emmerich's testimony will be based on "personal knowledge, not expert knowledge." Doc. 176, p. 10. But in that case the proposed expert's *only* qualifications consisted his personal knowledge based on prior dealings with the plaintiff's company. Emmerich has clearly demonstrated qualifications and expertise far beyond that. Furthermore, the Court acknowledged that the proposed witness did not *need* to be qualified as an expert to testify to the matters in question: "It is apparent that Bohls's specialized knowledge is personal knowledge of his dealings with MPC and the DAP market in general. He need not be designated as an expert witness to testify to matters within his direct personal knowledge. *See Stinson Air Ctr., LLC v. XL Spec. Ins. Co.*, 2005 U.S. Dist. LEXIS 45994, 2005 WL 5979097 (W.D. Tex. July 8, 2005)." On that basis the Court concluded that, "[a]s there is the possibility that designating him as an expert witness will confuse the jury and give undue significance to his testimony, F&T's motion to strike Bohl's "expert" testimony will be granted. However, Bohls may testify as a fact witness." *Miss. Phosphates Corp. v. Furnace & Tube Serv.*, 2009 U.S. Dist. LEXIS 151541, *20.

Along the same lines Particle cites *Stinson Air Ctr., LLC v. XL Speciality Ins. Co.*, 2005 U.S. Dist. LEXIS 45994, *7-8, where the plaintiff sought to designate the owner of the business to testify regarding the "company's value and its lost future profits." *Id*. at *6. The Court concluded that he did not need to be qualified as an expert to provide the proffered testimony, noting that "any such designation will not assist the jury to understand the evidence or to determine a fact in issue." *Id*. at *7. Of critical importance, the Court ruled that the witness could still "testify as a *fact* witness about his opinion regarding lost profits, the business valuation, and any other matters within his direct personal knowledge." *Id*. at *8 (emphasis

7

added).  By the same token, even if Mr. Emmerich is not allowed to testify as an expert (despite his previously mentioned training and experience) he should still be allowed to testify as a fact witness about his opinions regarding lost profits and the value of Emmerich Newspapers, Incorporated.

**B.      *Mr. Emmerich's proposed methodologies are both reliable and admissible.***

Rule 702 was "intended to liberalize the introduction of relevant expert evidence," and the court need not ensure the expert's proposed testimony is "irrefutable or certainly correct." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999)(explaining that admissible expert testimony can still be vigorously tested before the jury by "cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" (quoting *Daubert*, 509 U.S. at 596)). *Brittney Gobble Photography, LLC v. Sinclair Broad. Grp., Inc.*, 2021 U.S. Dist. LEXIS 222009, *14-17, 2021 WL 5359671. The district court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. For testimony to be reliable, it must be based on "scientific . . . knowledge," grounded in scientific methods, and not mere speculation or subjective belief. *Id.* at 590, cited in *McGill v. BP Exploration & Prod.*, 830 Fed. Appx. 430, 433, 2020 U.S. App. LEXIS 32208, *5, 2020 WL 6038677.

Particle contends that the three methodologies proposed by Emmerich to quantify its actual damages are "unreliable, and therefore inadmissible." Doc. 176, p. 11.  However, it utterly fails to explain exactly what is wrong with any of the proposed *methodologies* or how they were applied to the facts in this case.  Instead,  it quibbles with a number of Emmerich's choices, decisions and assumptions going into each of its methodologies.  All of these arguments go to

the *weight* which a jury might afford to a given methodology, but none of them rise the level of challenging their admissibility. The reasoning and methodology underlying Emmerich's damage calculations is scientifically valid and has been properly applied to the facts in issue. Particle has failed to identify even a single point of Emmerich's calculations which rely on "speculation or subjective belief."

"Courts should not be lured by arguments, disguised as *Daubert* challenges, that actually attack the weight of the expert testimony, not its admissibility." *Miss. Phosphates Corp. v. Furnace & Tube Serv.*, 2009 U.S. Dist. LEXIS 151541, *4. "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Hartley*, 310 F.3d at 1061 (quoting *Bonner v. ISP Tech., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001) (internal citations and quotations omitted)). Therefore, *challenges to the factual bases or underpinnings of an expert opinion usually go only to weight and credibility of the evidence, not admissibility*. *Moss v. Ole S. Real Estate, Inc.*, 933 F.2d 1300, 1307 (5th Cir. 1991)(emphasis added); *Matador Drilling Co. v. Post*, 662 F.2d 1190, 1199 (5th Cir. 1981). Experts should be excluded only if their testimony is so fundamentally unsupported that it cannot possibly help the factfinder. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). Exclusion is not required even when the expert's opinion is tentative or speculative. *Int'l Adhesive Coating Co. v. Bolton Emerson Int'l, Inc.*, 851 F.2d 540, 545 (1st Cir. 1988).

Every argument advanced by Particle to exclude Emmerich's damage calculations goes to weight rather than admissibility. For example, Particle places great weight on the fact that Emmerich continued to modify and refine its damage calculations as discovery progressed and new information was obtained. However, these modifications simply reflect Emmerich's effort

to generate a good-faith damage calculation based on the number of articles which remained at issue in this lawsuit.  As discussed in detail elsewhere, on multiple occasions Emmerich voluntarily relinquished its claims to articles in a variety of categories which were challenged by Particle.  It did so despite the fact that most, if not all, of the articles in some of these categories (for example, obituaries and various calendars) actually possessed the requisite degree of originality to qualify for copyright registration.  Given the astounding number of indisputably original articles stolen and republished by Particle, it only made sense not to argue over the originality of articles in these contested categories.

And this explains why Emmerich's damage calculations *declined* with each iteration -- *"Lost Revenues"* declined from $15 million to $8 million to $7 million as more and more articles were deleted from the list of articles in issue. The *"Value of Stolen Articles"* declined from $20 million to $7 million for the same reason.  The *"Ad Impressions Value"* declined from $18 million to $5 million for the same reason.  See Doc. 176, p. 12. Rather than demonstrate the unreliability of Emmerich's methodologies these revisions demonstrate Emmerich's undeniable good faith in attempting to generate reliable and defensible damage calculations.  They are not, as Particle claims, mere "speculation and guesswork" but reflect a carefully studied and well-documented approach to calculating damages caused by copyright infringement on an unprecedented scale. This inevitably resulted in re-calibration and re-calculation of the damages as discovery progressed, which Emmerich did in a timely manner.

Particle faults Emmerich for his alleged failure to have his methods certified by yet another expert. Doc. 176, pp. 11-12. As a threshold matter, as discussed in detail above, Mr. Emmerich has extensive personal experience in valuing media companies based on years of work at the New York Times and at Merrill Lynch. Even without additional input from anyone

else Mr. Emmerich's methodologies meet the minimum requirements for admissibility under *Daubert*. Moreover, Particle gives short shrift to the fact that Emmerich also designated a CPA (Mr. Tony Huffman) with extensive experience in business loss and damage calculations. Mr. Huffman confirmed that he had reviewed Mr. Emmerich's methodologies and supported both the framework and conclusions. Ex. D, Tony Huffman Transcript, p. 28. Particle cites no authority for the proposition that Mr. Emmerich should have consulted with *another* expert (besides Mr. Huffman) to confirm the reliability of his methodologies.

It is also important to note that the staggering scale of Particle's theft of copyrighted material is unprecedented. There is simply no other recorded case involving the scope and scale of copyright infringement and DMCA violations. Mr. Emmerich has done the best an expert can do to quantify his company's damages under these unique circumstances.

**The Lost Revenue Methodology**

> Quoting from Particle,
>
> Under the Lost Revenue Methodology, Mr. Emmerich (1) used the "Actual Revenue" from all of Plaintiff's publishing subsidiaries for fiscal years 2018 through 2021, (2) determined the difference between the "Actual Revenue" numbers and the subsidiaries' "Normative Revenue" numbers (based on their collective growth rate from 2010 to 2017) to get a "Total Revenue Lost," (3) multiplied that "Total Revenue Lost" number by a 90% "marginal profit on incremental revenue," and (4) multiplied that number by 75.8% (the "percent of losses attributable to Newsbreak") to get "Damages Caused by Newsbreak" of $7,027,896.

Doc. 176, p. 12. While Particle quibbles about certain of Emmerich's inputs it makes no attempt at all to challenge the scientific validity or accuracy of this approach. For example, it contends Emmerich should not have included revenues from FY 2018 [Id. at 13]; it challenges Emmerich's inclusion of disputed articles [Id. at p. 14]; it insists Emmerich should have performed these calculations at the subsidiary rather than at the parent-company level [Id.]; it

11

disputes Emmerich's decision to base "normative" growth rates on a seven-year period from 2010 through 2017 [Id. at 14-15]; it insists there are other factors which impacted Emmerich's revenues over the damage period [Id. at 15]; it argues Emmerich had other lines of revenue which might have been similarly impacted [Id.]; it contends Emmerich should have performed what it calls an "incremental cost analysis" rather than simply applying a marginal profit on incremental revenue [Id. at 16].

*Every one* of these arguments go to weight, rather than to admissibility. As noted above, "challenges to the factual bases or underpinnings of an expert opinion usually go only to weight and credibility of the evidence, not admissibility." *Moss v. Ole S. Real Estate, Inc.*, 933 F.2d 1300, 1307 (5th Cir. 1991); *Matador Drilling Co. v. Post*, 662 F.2d 1190, 1199 (5th Cir. 1981).

**The Value of Stolen Articles Methodology**

Again quoting from Particle, "the Value of Articles Stolen Methodology, purports to quantify the revenue that Plaintiff allegedly lost as a result of Particle Media's alleged conduct based on a per article monetary value multiplied by the total number of articles allegedly stolen." Doc. 167, p. 17. Again, Particle utterly fails to explain why this methodology is scientifically unsound or unreliable. Instead, it quibbles over inputs.

For example, it claims this approach lacks "subsidiary-specific and expense-specific analysis [Id.]; it argues (completely without basis) that Emmerich "guessed" at the number of articles in dispute [Id. at 18]; it disputes Emmerich's decision to utilize calendar year 2020 in determining the total number of articles Emmerich generates in a given year [Id. at 19].

Again, *every one* of these arguments go to weight, rather than to admissibility.

**The Ad Impressions Value**

As noted by Particle, this approach is intended to calculate *Particle's* gross revenues derived from its wrongful publication of Emmerich's copyrighted material, as required by 17 U.S.C. 504 (b) ("The copyright owner is entitled to recover . . . any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages."). Particle's own expert previously testified that Particle only generated $26,243 in revenues from 4.1 million page views of Emmerich articles, a preposterously low number. Emmerich simply took Particle's methodology and revised it to include revenue streams which had been intentionally omitted. Particle disputes every such item, including the portion of the revenue stream which Particle splits with Google [Doc. 176, p. 19]; it disputes the number of ads per page which Emmerich used in making these calculations [Id.]; it disputes that Emmerich included ad revenue from the NewsBreak news feed when snippets of Emmerich articles appeared there [Id.]; it disputes Emmerich's determination of click-through rates [Id. at 21].

Again, *every one* of these arguments go to weight, rather than to admissibility.

**Averages of the Above Methodologies**

Merely to assist the court or jury in assessing its damage calculations, Emmerich included an average of the numbers generated by the first two methodologies. This in no way constituted "double counting" as alleged (without support) by Particle.

## CONCLUSION

Experts should be excluded only if their testimony is so fundamentally unsupported that it cannot possibly help the factfinder. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). Exclusion is not required even when the expert's opinion is tentative or speculative. *Int'l Adhesive Coating Co. v. Bolton Emerson Int'l, Inc.*, 851 F.2d 540, 545 (1st Cir. 1988). Particle

has utterly failed to demonstrate that Mr. Emmerich's proposed testimony is "fundamentally unsupported that it cannot possibly help the factfinder." Consequently, its motion to exclude the expert testimony of Mr. Emmerich should be denied.

      RESPECTFULLY SUBMITTED, this the 19th day of August, 2024.

      BY: /s/ Wilson H. Carroll
      Wilson H. Carroll (MSB#5894)

Wilson H. Carroll
WILSON CARROLL, PLLC
2506 Cherry Street
Vicksburg, Mississippi  39180
(601)953-6579
wilson@wilsoncarroll.com

## CERTIFICATE OF SERVICE

      I, Wilson H. Carroll, hereby certify that I have this day filed the foregoing document via the Court's automated filing system, which automatically forwarded copies to all counsel of record.

      So certified, this the 19th day of August, 2024.

      BY: /s/ Wilson H. Carroll
      Wilson H. Carroll (MSB#5894)