UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISON


EMMERICH NEWSPAPERS,                                    PLAINTIFF
INCORPORATED

VS.                          CIVIL ACTION NO.: 3:23cv26-TSL-MTP

PARTICLE MEDIA, INC.                                    DEFENDANT
D/B/A NEWSBREAK

CONSOLIDATED WITH

EMMERICH NEWSPAPERS, INCORPORATED                       PLAINTIFF

VS.                        CIVIL ACTION NO.: 3:23-cv-391-TSL-RPM

PARTICLE MEDIA, INC.
D/B/A NEWSBREAK                                         DEFENDANT

MEMORANDUM OPINION AND ORDER

In this case, plaintiff Emmerich Newspapers, Inc.

(Emmerich) alleges violations by defendant Particle Media, Inc.

d/b/a Newsbreak (Particle) of the Copyright Act, 17 U.S.C. §

101, et seq., and the Digital Millennium Copyright Act, 17

U.S.C. § 1201, et seq. (DMCA).[1]  By memorandum opinion and order

entered June 25, 2024, the court denied motions for summary

judgment filed by Emmerich.  Emmerich has again moved for

---

[1]    This is a consolidated action.  Emmerich filed the first
action, No. 3:23-cv-26-TSL-MTP, on January 12, 2023, with an
amended complaint filed on April 15, 2023.  The complaint in
Emmerich's second-filed action, 3:23-cv-391-TSL-MTP, filed June
20, 2023, is identical to the amended complaint in 3:23cv26-TSL-
MTP, except that it "includes another 11,818 articles" that were
allegedly infringed.  Consolidation was ordered on July 13,
2023.

1

summary judgment on various claims/issues.  [Dkt. 290].
Particle has separately moved for partial summary judgment on
certain of Emmerich's copyright infringement claims [Dkt. 284],
its circumvention and trafficking claims [Dkt. 179], and its
DMCA copyright management information claims [Dkt. 286].  The
motions have been fully briefed, and the court, having
considered the memoranda of authorities, together with
attachments, submitted by the parties, concludes that Emmerich's
motion for summary judgment is due to be granted in part and
denied in part and that Particle's motion for partial summary
judgment as to certain infringement claims is due to be granted
in part and denied in part while its motions for partial summary
judgment as to the circumvention and copyright management
information claims are due to be granted.

BACKGROUND

The parties' factual assertions are detailed in the court's
June 2024 memorandum opinion and order denying Emmerich's
summary judgment motions and will not be repeated here.  The
court will set out additional facts as necessary.

Over a period of several months following entry of the
court's prior opinion and order, Emmerich filed multiple motions
by which it sought to dismiss its claims relating to,
collectively, 27,100 of the over 33,000 articles on which its
complaints were originally based.  On January 6, 2025, the court

granted Emmerich's motions, leaving, as the court noted, some 6,634 articles at issue in the case.

As identified by lists attached as exhibits to its motion for summary judgment, Emmerich now asserts copyright infringement claims arising from 1,790 articles which it maintains that Particle displayed in full-text view,[2] 746 articles claimed to have been displayed in framed view, and fourteen photographs it claims Particle publicly displayed.

Emmerich further charges that Particle violated the DMCA by wrongfully accessing 1,542 articles from Emmerich's subscriber-only websites and by altering Emmerich's copyright management information, that is, its URLs, as to 3,177 full-text view

---

[2]    As stated in prior opinion, Particle is a company that "owns a free website and application called 'NewsBreak' which provides users with access to local news stories precisely tailored to the user's preferences.  To accomplish this, NewsBreak uses a 'web crawler' which systematically searches the internet for news content, then scans the pertinent websites, analyzes them for their content, copies the content verbatim and saves it on its website."  Emmerich Newspapers, Inc. v. Particle Media, Inc., No. 3:23-CV-391-TSL-RPM, 2024 WL 5701883, at *1 (S.D. Miss. June 25, 2024).  The genesis of this lawsuit (and prior litigation between the parties) was Emmerich's discovery that Particle had available for viewing on its website/app the full content of thousands of Emmerich's articles, albeit without Emmerich's ads and other content.  These articles are referred to as "full-view" articles or text.  Around the same time, Emmerich also discovered that NewsBreak also made available Emmerich's content including ads but with an overlay of Particle's ads, "print" and "share" buttons, so that the viewer was simultaneously exposed to Emmerich's and Particle's content.  Emmerich's articles displayed in this manner are referred to as "framed-view" articles.

articles and 2,232 framed-view articles and then distributing these works under the altered URLs.

<u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. <u>Lindsey v. Sears Roebuck & Co.</u>, 16 F.3d 616, 618 (5th Cir. 1994) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 333, 106 S. Ct. 2548, 2558, 91 L. Ed. 2d 265 (1986)).

A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). Conversely, "[n]o genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." <u>EEOC v. Simbaki, Ltd.</u>, 767 F.3d 475, 481 (5th Cir. 2014). When evaluating whether a genuine dispute as to any material fact exists, the court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." <u>Delta & Pine Land Co. v. Nationwide</u>

4

Agribusiness Ins. Co., 530 F.3d 395, 398-99 (5th Cir. 2008). In so doing, the court must draw all reasonable inferences in favor of the nonmoving party. Anderson, 477 U.S. at 255, 106 S. Ct. 2505. The court observes that even when the Rule 56 standard is satisfied, it has the discretion to deny the motion. See Kunin v. Feofanov, 69 F.3d 59, 62 (5th Cir. 1995) (quoting Anderson, 477 U.S. 242, 255-56 (1986)).

On cross motions for summary judgment, the court reviews each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party, determining for each side, whether judgment may be rendered in accordance with the Rule 56 standard. Amerisure Ins. Co. v. Navigators Ins. Co., 611 F.3d 299, 304 (5th Cir. 2010) (internal citation and quotation omitted); Shaw Constr. v. ICF Kaiser Engrs., Inc., 395 F.3d 533 fn. 8 & 9 (5th Cir. 2004).

COPYRIGHT INFRINGEMENT

In its motion addressed to Emmerich's copyright infringement claims, Particle argues that the court should dismiss the infringement claims relating to numerous articles as to which it contends Emmerich cannot show ownership and/or valid registration. It further argues that Newsbreak acting as a web browser did not infringe Emmerich's right to display its copyrighted material. Lastly, Particle argues that Emmerich's

5

infringement claims as to pre-June 20, 2020 articles are barred by the statute of limitations.

In response to the motion, Emmerich makes a couple of concessions. It agrees that the article written by Jason Pittman is subject to dismissal and that the three articles identified by Particle at Dkt. 284-5 were not part of the registered E-editions. Emmerich opposes all other aspects of the motion, and further, seeks summary judgment on the limitations issue and on the question of whether Particle's display of Emmerich's articles in framed view constitutes infringement.

Analysis: Ownership and Registration Issues

Copyright law affords protection to original works of authorship fixed in any tangible medium of expression. 17 U.S.C. § 101(a). "A copyright vests initially in the author of the work, unless the work is 'made for hire,' in which case the ownership of the copyright vests initially in the employer or commissioner of the work." Canada Hockey, L.L.C. v. Marquardt, No. 20-20530, 2022 WL 252186, at *3 (5th Cir. Jan. 26, 2022) (quoting 17 U.S.C. § 201(a) & (b)). The Copyright Act grants the owner of a copyright the exclusive right to both "distribute copies ... of the copyrighted work" and to "display the copyrighted work publicly." 17 U.S.C. § 106(3) & (5). "Anyone who violates any of the exclusive rights of the copyright owner

as provided in section[] 106 ... is an infringer of the
copyright...."  17 U.S.C. § 501(a).

    To prevail on a claim for copyright infringement, a
plaintiff must establish: "'(1) ownership of a valid copyright;
and (2) that a defendant violated one or more of the plaintiff's
exclusive rights under the Copyright Act.'"  Cooper v. Harvey,
108 F. Supp. 3d 463, 473 (N.D. Tex. 2015) (quoting Atl.
Recording Corp. v. Anderson, No. H-06-3578, 2008 WL 2316551, at
*6 (S.D. Tex. Mar. 12, 2008) (citations omitted)).  Copyright
ownership, is "'shown by proof of originality and
copyrightability in the work as a whole and by compliance with
applicable statutory formalities.'"  Batiste v. Lewis, 976 F.3d
493, 501 (5th Cir. 2020) (quoting Eng'g Dynamics, Inc. v.
Structural Software, Inc., 26 F.3d 1335, 1340 (5th Cir. 1994)).

     "The requisite statutory formalities are receipt of the
application for registration, fee, and deposit by the copyright
office."  UMG Recordings, Inc. v. Grande Commc'ns Networks,
L.L.C., 118 F.4th 697, 708 (5th Cir. 2024); see 17 U.S.C. §
410(c).  "'A certificate of registration, if timely obtained, is
prima facie evidence both that a copyright is valid and that the
registrant owns the copyright.'"  Batiste, 976 F.3d at 501
(quoting Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141
(5th Cir. 2004) (per curiam)).  "Once the plaintiff has shown a
certificate of copyright registration, the burden of proof

7

shifts to the defendant to show copyright invalidity." <u>Spectrum Creations, Inc. v. Catalina Lighting</u>, Inc., No. CIV.A.SA-00-CA-875-F, 2001 WL 1910566, at *4 (W.D. Tex. Aug. 1, 2001).

<u>Articles Not Covered by Emmerich's Group Registrations</u>

While the Copyright Office generally requires one application for each work that an applicant seeks to register, by § 408(c)(1), Congress authorized the Register of Copyrights to create administrative classifications to facilitate group registration of multiple works using a single application and single filing fee. <u>See</u> 17 U.S.C. § 408(c)(1). The administrative classification of works authorized by § 408(c)(1) "has no significance with respect to the subject matter of copyright or the exclusive rights provided by this title." <u>Id.</u>

Under the pertinent regulation, an applicant may register a group of newspapers

> with one application, the required deposit, and the
> filing fee required by § 201.3(c) of this chapter, if
> the following conditions are met:
>
> (1) Issues must be newspapers. All the issues in the
> group must be newspapers. . .
>
> (2) Requirements for newspaper issues. Each issue in
> the group must be an all-new collective work that has
> not been previously published (except where earlier
> editions of the same newspaper are included in the
> deposit together with the final edition), each issue
> must be fixed and distributed as a discrete, self-
> contained collective work, and the claim in each issue
> must be limited to the collective work.

(3) Author and claimant.  Each issue in the group must be a work made for hire, and the author and claimant for each issue must be the same person or organization.

(4) Time period covered.  All the issues in the group must be published under the same continuing title, and they must be published within the same calendar month and bear issue dates within that month. . .

(5) Application.  The applicant must complete and submit the online application designated for a group of newspaper issues. ...

(6) Deposit.

(i)     The applicant must submit one complete copy of the final edition of each issue published in the calendar month designated in the application.  Each submission may also include earlier editions of the same newspaper issue, provided that they were published on the same date as the final edition. ...

37 C.F.R. § 202.4(e).

Here, Emmerich, using this group registration process, registered thousands of e-print editions of its newspapers, which the Copyright Office defines as issues "that [are] published and distributed online or via email as a self-contained, downloadable work, such as a digital version of a tangible newspaper."  U.S. Copyright Office, Circular 62A: Group Registration of Newspapers, at 2.[3]  The registered issues

_____

[3]     The Copyright Office publishes circulars to provide up-to-date and authoritative information to a general audience.  Circulars are arranged ... by topic and cover the basics and fundamental concepts of copyright law, highlights of policies and procedures of the Copyright Office, and registration issues for

contained thousands of articles/contributions authored by plaintiff's employees (or alleged employees).

In its motion, Particle, relying on Circular 62A and on the Compendium of U.S. Copyright Office Practice (which is "the administrative manual of the Register of Copyrights concerning the Copyright Act and regulations promulgated thereunder")[4], argues that some 1,200 articles which Emmerich claims are covered by its group registrations are not within the scope of these registrations because they had been previously published online before they were included in Emmerich's e-editions.[5]

_____

specific categories of works.  For full details regarding the Office's policies and procedures, refer to the Compendium of U.S. Copyright Office Practices, Third Edition.
https://www.copyright.gov/circs/#:~:text=Circulars%20are%20published%20by%20the,Copyright%20Office%20Practices%2C%20Third%20Edition. (last accessed July 29, 2025).

[4]    The Compendium "provides instruction to agency staff regarding their statutory duties and provides expert guidance to copyright applicants, practitioners, scholars, the courts, and members of the general public regarding institutional practices and related principles of law."  Brunson v. Cook, No. 3:20-CV-01056, 2023 WL 2668498, at *5 (M.D. Tenn. Mar. 28, 2023) (internal citations and quotations omitted).

[5]    Particle does not assert, nor could it validly assert that Emmerich provided inaccurate information in its group registration applications for its e-editions by failing to identify previously published content.  In contrast to many other categories of copyright registrations, the online newspaper group registration application, which was first introduced in 2019, does not require the applicant to identify and/or disclaim pre-existing or previously published content contained therein.  This change was made to alleviate the burdens on applicants and encourage expansion of the public record.  See https:// www.federalregister.gov/documents/ 2017/11/06/2017-23917/group-registration-of-newspapers (last

Emmerich denies that the articles at issue were published before inclusion in the e-editions and contends they were merely displayed on its websites and thus fall within the scope of the group registrations.

Under copyright law, a newspaper is considered a collective work, that is, "a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole."  17 U.S.C. § 101. Newspapers contain two types of authorship:  the "compilation authorship in creating each issue, which involves selecting, coordinating, and/or arranging a number of separate and independent works and assembling them into a collective whole; and [th]e authorship in the separate and independent works included within each issue, such as articles, photographs, illustrations, or other contributions."  17 U.S.C. § 1108(2). While a "[c]opyright in each separate contribution to a

---

accessed July 29, 2025) (setting forth rationale for changes to group registration of newspapers and stating, "The scope of protection for a group registration issued under the Proposed Rule will have several consequences in infringement actions. First, a group registration may be used to satisfy the statutory requirements for instituting an infringement action involving any of the newspaper issues that were included within the group, or any of the individual contributions appearing within those issues—provided that the claimant fully owned those contributions at the time the application for registration is submitted, and provided that the contributions were first published in one of those issues.").

collective work is distinct from copyright in the collective work as a whole[,]" 17 U.S.C. § 201(c), where a "work [is] made for hire, the employer or other person for whom the work/[contribution] was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright."  17 U.S.C. § 201(b).

According to the Compendium,

a group registration may be used to satisfy the statutory requirements for instituting an infringement action involving any of the newspaper issues that were included within the group, or any of the individual contributions appearing within those issues—provided that the copyright claimant fully owned those contributions at the time the application was submitted, and provided that the contributions were first published in one of those issues.

Compendium, at § 1108.7 (citing § 411(a)); id. at § 1108.2 (if a registered newspaper issue "contains contributions that are not fully owned by the author/claimant, and/or if they were previously published, the registration will not extend to those contributions."); see also id. at § 503.5 ("A copyright registration covers the new expression that the author created and contributed to the work, but it does not cover any unclaimable material that the work may contain.  For purposes of registration, unclaimable material includes the following:

[p]reviously published material[,] [p]reviously registered material (including material that has been submitted for registration but has not been registered yet)[,] and [m]aterial that is in the public domain.").

Circular 62A similarly states that a registration in a newspaper issue "will also cover all of the articles, photographs, illustrations, or other contributions appearing in each issue that are fully owned by the claimant and that have not been previously registered or published."  Circular 62A, at 3.  The circular directs that "[i]f the copyright in individual contributions is owned by parties other than the owner of the copyright in the issue as a whole, or if the contributions have been previously published or previously registered, [the claimant] must submit a separate application for each contribution."  Id. at 3.

While the Copyright Act does not define "published", it defines "publication" as "the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending."  17 U.S.C. § 101.  "Publication" includes "offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display."  Id.  That said, "[a] public ... display of a work does not of itself constitute publication."  Id.  Rather, to display a work "means

13

to show a copy of it, either directly or by means of … any

other device or process." Id. To do so publicly is

> (1) to perform or display it at a place open to
> the public or at any place where a substantial number
> of persons outside of a normal circle of a family and
> its social acquaintances is gathered; or
> (2) to transmit or otherwise communicate a
> performance or display of the work to a place
> specified by clause (1) or to the public, by means of
> any device or process, whether the members of the
> public capable of receiving the performance or display
> receive it in the same place or in separate places and
> at the same time or at different times.

Id.

Neither the Act nor its implementing regulations purports

to address application of the definition of publication to works

posted on the Internet.  However, the Copyright Office

> considers a work "published" when it is made available
> online if the copyright owner authorizes the end user
> to retain copies. ... For example, the fact that a
> work is expressly authorized for reproduction or
> download by members of the public or is expressly
> authorized for distribution by the public creates a
> reasonable inference that copies ... have been
> distributed and that publication has occurred – it is
> not enough for the work to be "merely displayed or
> performed online."

Compendium, § 1008.3(B).  The Compendium further states, "It may

seem odd that allowing the whole world to view or hear a work

does not constitute publication of a work, but the statutory

definition is clear that the ... display of a work does not, in

and of itself, constitute publication." Id. § 1008.3(B).

Particle has established that the articles identified at Dkt 284-21 and 22 were posted to one of Emmerich's websites before they were included in the registered e-editions. Further, as Particle points out, Emmerich itself has presented evidence (on which it relies to support its DMCA claims) showing that its websites included a "print PDF" button "which produced a print-friendly presentation of the article." As Emmerich expressly authorized distribution of its articles by providing a print button, it follows that the articles were published before Emmerich included them in its group registration applications. Giving deference to the Copyright Office's interpretation of the laws and regulations, it further follows that the articles at issue do not come within the scope of the registrations.[6]  And

---

[6]    Such deference is permissible.  See Texas v. United States Env. Prot. Agency., 137 F.4th 353, 365 (5th Cir. 2025) (stating, "To be clear, discarding Chevron deference does not mean ignoring agency interpretations," and that "an agency's 'expertise has always been one of the factors which may give an Executive Branch interpretation particular "power to persuade, if lacking power to control."'" (quoting Loper Bright Enters. v. Raimondo, 603 U.S. 369, 402, 412, 144 S. Ct. 2244, 219 L. Ed. 2d 832 (2024) (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S. Ct. 161, 89 L. Ed. 124 (1944)); Rogers v. Better Bus. Bureau of Metro. Houston, Inc., 887 F. Supp. 2d 722, 732 (S.D. Tex. 2012) ("The Copyright Office's 'policy statements, agency manuals, and enforcement guidelines' do not carry 'the force of law,' but they are entitled to some deference given the 'specialized experience and broader investigations and information' of the agency." (quoting Clackamas Gastroenterology Assocs., P.C. v. Wells, 538 U.S. 440, 449 n.9, 123 S. Ct. 1673, 155 L. Ed. 2d 615 (2003) (quoting Christensen v. Harris Cnty., 529 U.S. 576, 587, 120 S. Ct. 1655, 146 L. Ed. 2d 621 (2000)) (referring to the Equal Employment Opportunity Commission's

since Emmerich does not have a certificate of registration covering these articles, its claim for their infringement fails as a matter of law. Therefore, Particle's motion will be granted as to these articles.

<u>Non-Owned Articles by Steve Wilson</u>

Particle contends that Emmerich does not own and hence does not have a valid registration in articles authored by Steve Wilson, a non-employee, so that claims based on those articles must be dismissed. In opposition, Emmerich has presented Wyatt Emmerich's affidavit in which he states that Wilson was an Emmerich employee when he wrote the articles at issue.

Wilson's employment records were purportedly attached as an exhibit to the affidavit, but they were not. Particle submits this is fatal to Emmerich's position. Not so. Wyatt's affidavit attesting to Wilson's status as an employee is sufficient to create an issue of fact as to the ownership of the articles authored by Wilson.[7] The claims based on these articles

Compliance Manual); (finding an agency administrator's rulings to "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.")).

[7]    In an effort to rectify the failure to attach this exhibit, on February 28, 2025, Emmerich filed its motion to file a corrected exhibit. While the motion will be granted, for the reasons set forth in Particle's opposition, the court concludes that the exhibit does not conclusively establish Wilson's employee status for all of the relevant time periods. Thus, this remains an issue for the jury, <u>see</u> <u>infra</u> at pp. 25-26. Owing to possible factual issues, Particle did not seek summary

thus remain viable.  It follows that Particle's motion will be denied as to this issue.

<u>Articles Not Included on Emmerich's Infringement Lists</u>

Particle asserts, and Emmerich does not dispute that it no longer asserts infringement claims as to forty-eight articles on the full-text view list and thirty-two articles from the framed-view list.  Despite this concession, Emmerich explains that it has not sought to dismiss the infringement claims based on these articles because it continues to maintain copyright management information (CMI) claims based on them.  The fact that Emmerich is asserting CMI claims relating to these articles does not preclude dismissal of the separate infringement claims based on these eighty articles.  Particle's motion will be granted as to these articles.

<u>Photographs</u>

Emmerich originally sought to recover for Particle's alleged infringement of thirty photographs, which Emmerich claimed were covered by Group Registration Number VA 2-335-308. In July 2024, following entry of the court's June 2024 opinion and order, Emmerich filed a notice of voluntary dismissal of its

---

judgment on claims based on articles written by alleged Emmerich employee, Calvin Stevens.  However, it does oppose Emmerich's motion as to articles written by Stevens, citing questions as to his employment status and as to efficacy of putative transfers of ownership.  Emmerich's motion as to claims based on these articles will be denied, <u>see</u> <u>infra</u> at pp. 25-26.

claim based on an Associated Press (AP) photograph which Emmerich had included in this group registration.  The notice of dismissal was accompanied by a numbered list of twenty-nine photographs as to which it continued to assert infringement claims.  The AP photograph was number 18 on the list.  See Dkt. 159-1.  Emmerich now seeks summary judgment on its infringement claims based on fourteen of the photographs, specifically numbers 1, 4-15, and 21 from the July 2024 list.[8]

In its motion, Particle seeks summary judgment on Emmerich's infringement claims on sixteen of the twenty-nine photographs, particularly, numbers 2, 3, 16 to 20[9], and 21-30, on account of various asserted deficiencies in the registration.

Thus, except as to photograph number 21, entitled "No Reports," Particle seeks dismissal of the photograph-based claims not put at issue by plaintiff's motion.  In response to Particle's motion, Emmerich asserts that its claim for infringement of photograph number 21 remains viable, but the remaining photographs that are the subject of Particle's motion (numbers 2, 3, 16 to 20, and 22 to 30) are no longer relevant and it has thus removed them from its list of infringing

---

[8]    Emmerich's current exhibit [Dkt. 290-15] is numbered differently from the exhibit attached to the July notice of voluntary dismissal.
[9]    As observed, photograph 18 was the subject of Emmerich's December 2024 notice of voluntary dismissal.

photographs.  The court interprets from this that Emmerich has thus abandoned its claims as to these photographs.  That leaves for the court's consideration whether photograph 21 is covered by a valid registration certificate and whether Emmerich is entitled to summary judgment as to photographs 1, 4 to 15 and 21.

Copyright regulations allow for group registration of multiple published photographs.  See 17 U.S.C. § 408(c)(1); 37 C.F.R. § 202.4(i); Copyright Office, Circular 42, Copyright Registration of Photographs (rev. March 2021).  In order to register a group of published photographs with one application, the following conditions, among others, must be met: "All the photographs must be created by the same author," and "[t]he copyright claimant for all the photographs must be the same person or organization." 37 C.F.R. § 202.4(i).  See also Circular 42, at 2-3.

Emmerich, as stated, using a group registration application, registered a group of thirty photographs, as VA 2-335-308, and in so doing, necessarily represented during the application process that all the photographs were created by the same author and that the claimant was the same as to all photographs in the group.  Emmerich does not dispute that it is not the author or claimant as to the AP photograph.  The application thus contained inaccurate information.

Citing 17 U.S.C. § 411(b), Particle argues that this inaccuracy of which Emmerich was surely aware necessitates invalidation of the group registration and consequently, dismissal of any infringement claim based on photograph 21. Emmerich, on the other hand, maintains that its inclusion of the AP photograph was an innocent mistake, which Particle has no evidence to controvert; and that this inadvertent mistake does not require invalidation of the entire registration.  It further contends that, in any event, photograph 21 is covered by the group registration of the e-edition of the newspaper in which it appeared.  In reply, Particle submits that including a clearly-designated AP photograph could not have been unknowing inadvertence; and as to Emmerich's alternative argument, asserts the record is devoid of proof that photograph 21 is covered by another registration.

Considering Emmerich's alternative argument first, the court concludes that Emmerich has not shown that the subject photograph is covered by an alternative registration.  Emmerich states that its e-edition group registration is listed in Exhibit Q to Docket 181-17.  It is not.  Instead, Exhibit Q, entitled, "Newsbreak Theft Log Photo Group Registration Number: VA0002335308 Photo Registration Decision Date: February 9, 2023," lists twenty-nine of the photographs covered by its group photograph registration, VA 2-335-308, but seemingly purports to

give the e-edition filename in which each photograph was published.[10]  Specifically, regarding photograph 21, it states that the e-edition filename is: grnp_08844569_20200213.pdf. Emmerich's position, as suggested by this naming convention, appears to be that the photograph was published in the February 13, 2020 e-edition of the Greenwood Commonwealth and is thus covered by Emmerich's registration of that issue.[11]  Particle asserts that the photograph was published in a March 2021 e-edition, which has not been registered.  The court, however, is unable to locate in the record a registration covering either a February 2020 or March 2021 e-edition of the Greenwood Commonwealth.[12]  As Emmerich has failed to show that photograph 21 is covered by the registration of *any* e-edition, the question becomes whether it is covered by VA 2-335-308.

---

[10]    When registering a group of newspapers, the claimant must provide a .pdf copy, i.e., a deposit, of each newspaper in the group.  Claimants are instructed to name the deposits as "GRNP_[ISSN_number]_[date of publication YYYYMMDD].pdf". https://www.copyright.gov/eco/help-newspapers.html **(**last accessed July 29. 2025).

[11]    This newspaper's Internal Standard Serial Number (ISSN) is 0884-4569.  "An ISSN is an 8-digit code used to identify newspapers, journals, magazines and periodicals of all kinds and on all media–print and electronic."  https://www.issn.org/understanding-the-issn/what-is-an-issn/ (last accessed July 29, 2025)

[12]    While the court is under no obligation to search the record for proof, the court did review Exhibits B 1-4 attached to the amended complaint in 3:24CV26-TSL-MTP at Dkt. 15 and Exhibits 2-4 to the Attachment to the complaint in 3:23CV291-TSL-MTP, which is at Dkt. 4 and identified no registration that would cover this photograph.

Moving on, Emmerich clearly inaccurately represented that it was the author and proper claimant as to all the photographs included in its application which resulted in the issuance of group photograph registration VA 2-335-308. Emmerich states, but offers no proof, that its inclusion of the AP photograph was inadvertent. Particle insists that Emmerich cannot claim lack of knowledge that it did not own the rights to the AP photograph, as the credit line on the photograph plainly indicates that it is an AP photograph. Particle further argues that the Copyright Register would have rejected this application had Emmerich advised that it contained an AP photograph. See 17 U.S.C. § 411(b)(1) (defendant may challenge the validity of a registration by asserting that the claimant knowingly provided inaccurate information in the application and that the Copyright Register would have refused registration had the information been known). On this basis, Particle seeks invalidation of the registration. The court, however, is not persuaded that the record establishes that Emmerich knowingly made inaccurate representations on its application. It does not follow from the fact that photograph 21 contains an AP credit that Emmerich's representations in the application were *knowingly* false and that the inclusion was not inadvertent.

Further, while it is true that under § 411(b)(1), a defendant may challenge the validity of a registration, even

were the court to conclude that Particle had satisfied both prongs, i.e., by showing that Emmerich knowingly provided inaccurate information in its application and that the Copyright Register would have refused registration had the information been known, invalidation does not automatically follow.  Rather, § 411(b)(2) states, "In any case in which inaccurate information described under paragraph (1) is alleged, the court shall request the Register of Copyrights to advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration."[13]  The Fifth Circuit, in rejecting a defendant's argument that the mere *allegation* of inaccuracy in an application warranted referral to the Register, has concluded that "the most reasonable reading of § 411(b) is that trial courts may, in their discretion, determine" whether the conditions set forth in § 411(b)(1) are met before making a referral to the Register.  Energy Intel. Grp., Inc. v. Kayne Anderson Cap. Advisors, L.P., 948 F.3d 261, 278 (5th Cir. 2020).  In so concluding, the court found the Seventh Circuit's interpretation and approach to the statute to be persuasive, to wit:

> [I]nput [from the Register] need not be sought
> immediately after a party makes such a claim.

---

[13]    While the parties cited § 411(b)(1) in the briefing with reference to Particle's argument that Emmerich's group registration of photographs contained inaccurate information, neither cited § 411(b)(2).

> Instead, courts can demand that the party seeking
> invalidation first establish that the other
> preconditions to invalidity are satisfied before
> obtaining the Register's advice on materiality. ...
> Once these requirements are met, a court may question
> the Register as to whether the inaccuracy would have
> resulted in the application's refusal.

Id. (quoting DeliverMed Holdings, LLC v. Schaltenbrand, 734 F.3d
616, 625 (7th Cir. 2013)).

In this case, as the court is not persuaded that Particle
has demonstrated that Emmerich knowingly included the AP
photograph in the group application, it will not, at this time,
refer the issue to the Register.  From the foregoing, it follows
that Particle's motion for summary judgment as to Emmerich's
infringement claim arising from photograph 21 is denied.

Particle does not contend that photographs 1 and 4 to 15
from Emmerich's July 2024 list are not covered by a valid
registration or deny that it violated Emmerich's exclusive right
to display the photographs when it posted them in full-text view
on NewsBreak.  It follows that Emmerich's motion for summary
judgment will be granted as to these photographs.

Analysis: Plaintiff's motion as full-view articles[14]

In the parties' previous litigation, see Emmerich
Newspapers, Inc. v. Particle Media, Inc., No. 3:21-cv-32-KHJ-
MTP, Judge Johnson granted Emmerich's motion for summary

---

[14]    See supra at n.2 (setting forth, inter alia, explanation of
full-view articles).

judgment by which it sought a ruling that Particle's full-view display of nine of its articles did not constitute "fair use." See Emmerich Newspapers, Inc., 2022 WL 3222892, at *5 (explaining that "the fair use doctrine recognizes an author's consent to a reasonable use of his copyrighted works ... [implicit in] the constitutional policy of promoting the progress of science and the useful arts") (internal citations and quotations omitted).

In reliance on Judge Johnson's reasoning, Emmerich seeks summary judgment in this case as to 1,790 articles which it contends Particle likewise displayed in full-view. Particle does not assert the fair use defense in opposition to the motion; rather, it argues the motion must be denied because many of the articles on the full-view article list are not validly registered either because they were or may have been previously published or because they were not owned by Emmerich.

In light of the court's conclusion that Particle's motion for summary judgment as to the registration issue is well taken, it follows that Emmerich's motion as to the articles set out in Dkt. 305-19 will be denied. The motion will also be denied as to the articles set out in Dkt. 305-24. Further, for the reasons explained in Particle's response is opposition to Emmerich's motion for leave to file a corrected exhibit, the court finds that Emmerich has not conclusively established

ownership of the articles written by Wilson and Cal Stevens, and
therefore, Emmerich's motion for summary judgment will be denied
as to claims based on these articles, as well.  Finally,
Emmerich is entitled to summary judgment as to any claims based
on the full-view articles which have survived the court's ruling
on Particle's motion, save those authored by Wilson and Stevens
and the ten in Dkt. 305-24 which remain at issue.[15]  But due to
the sheer number of full-view articles at issue, the court will
not endeavor to determine which of Emmerich's claims based on
full-view articles have survived the court's grant of summary
judgment to Particle on the registration and statute limitations
issue.

   Analysis: Newsbreak Acting as a Web Browser

   In addition to challenging Emmerich's infringement claims
on grounds relating to its registrations, Particle also seeks
summary judgment as to framed-viewed articles on its list,

---

[15]    Implicit in this conclusion is the court's rejection of
Particle's argument that Emmerich's failure to object to
Particle's use of Emmerich's content for nearly a year creates
an issue of fact as to an implied license.  Particle has not
purported to establish any of the three criteria required to
give rise to an implied license.  See Lulirama Ltd., Inc. v.
Axcess Broad. Servs., Inc., 128 F.3d 872, 879 (5th Cir. 1997)
("an implied nonexclusive license arises when '(1) a person (the
licensee) requests the creation of a work, (2) the creator (the
licensor) makes the particular work and delivers it to the
licensee who requested it, and (3) the licensor intends that the
licensee-requestor copy and distribute his work.') (quoting
I.A.E., Inc. v. Shaver, 74 F.3d 768, 774 (7th Cir. 1996)).

arguing that their presentation to NewsBreak users did not constitute infringement.  In this regard, Emmerich asserts infringement claims as to 748 frame-viewed articles which it contends NewsBreak publicly displayed by "framing."  Framing has been explained as follows:

> Webpages consist of data.  This data is stored on computers.  When a user instructs her web browser to access a webpage, the web-browser software interprets code stored on the computer that stores the website's data and displays the information as a webpage.  But a webpage can include code that instructs the web browser to retrieve code from another computer and to display that information at the same time as information retrieved from the first computer.  In such a situation, the user would see the website she has visited framing the content the website instructed the web browser to retrieve from the other computer.

Leader's Inst., LLC v. Jackson, No. 3:14-CV-3572-B, 2017 WL 5629514, at *10 (N.D. Tex. Nov. 22, 2017).

Emmerich maintains that framing constitutes infringement on a copyright holder's exclusive right to display its copyrighted content, as the court concluded in Leader's Institute.  See id. (citing § 106(5), which gives copyright owner the exclusive right to display copyrighted works and holding that "by framing the defendants' copyrighted works, the plaintiffs impermissibly displayed the works to the public").

Particle denies that NewsBreak employed framing to show Emmerich's content to NewsBreak users.  Instead, it asserts that "[w]hen the NewsBreak app worked as intended, a user who clicked

27

on a news feed item from one of Plaintiff's websites was taken
to that website, with the app acting as a web browser using the
Android WebView component for Android devices and the IOS
WebView component for iOS devices," so that the user viewed
*Emmerich's* content from *Emmerich's* website on *Emmerich's* server.
Particle does not dispute that the NewsBreak app has the
capability to and does place other content, such as Particle's
ads and "like," "share" and "comment" buttons, outside of the
WebView window, in which case a NewsBreak user is viewing a non-
partner's content and its own simultaneously.  But it is *still*
*Emmerich's* content on *Emmerich's* website, inside the window.
Particle submits, though, that even if its WebView method of
showing non-partner content in this manner could be correctly
characterized as "framing" (which it disputes), it does not
constitute infringement.

    In support, Particle relies on Perfect 10, Inc. v.
Amazon.com, Inc., 508 F.3d 1146 (9th Cir. 2007), which
established what is known as the "server test," that holds that
"the owner of a computer that does not store and serve the
electronic information to a user is not displaying that
information, even if such owner inline links to or frames the
electronic information."  Id. at 1160.  Particle contends that
application of the "server test" in this case to its WebView
method compels the same conclusion -- that it did not publicly

display the 748 frame-viewed articles and thus did not infringe upon Emmerich's display rights.

Emmerich urges the court to reject the "server test." Alternatively, it attempts to recast the "server test" as applicable to "search engines" only, and therefore inapplicable in the case at bar.  Based on the following, the court concludes the server test applies, and that under the server test, Particle did not infringe Emmerich's exclusive right to publicly display the 748 articles at issue here.

In <u>Perfect 10</u>, Perfect 10, the publisher and operator, respectively, of an adult magazine and a subscription website, both of which featured nude photographs, sued Google and Amazon, complaining that Google's image search engine directly infringed by (1) "display[ing] and distribut[ing] full-size images hosted by third-party websites, and (2) creat[ing], display[ing], and distribut[ing] thumbnails of [Perfect 10's] copyrighted full-size images."  <u>Perfect 10 v. Google, Inc.</u>, 416 F. Supp. 2d 828, 838 (C.D. Cal. 2006), <u>aff'd in part,</u> <u>rev'd in part and remanded sub nom. Perfect 10, Inc. v. Amazon.com, Inc.</u>, 487 F.3d 701 (9th Cir. 2007), <u>amended and superseded on reh'g</u>, 508 F.3d 1146 (9th Cir. 2007), and <u>aff'd in part, rev'd in part and remanded sub nom. Perfect 10, Inc. v. Amazon.com</u>, Inc., 508 F.3d 1146 (9th Cir. 2007).  While Google conceded that it created and stored the thumbnails on its own servers and displayed them when

prompted by a search inquiry, it denied that it displayed, created or distributed the full size images; instead, "Google 'in-line link[ed]' to and/or 'frame[d]' content that, in fact, [was] stored on and served by other websites." Id.

   To aid the district court's resolution of whether "'in-line link[ing]'" to and/or 'fram[ing]" content that, in fact, is stored on and served by other websites," constituted a 'display' for purposes of copyright law," Google and Perfect 10 proposed different tests, with Google advocating the server test and Perfection 10 an incorporation test. Id. at 838-40. According to the district court, from a "visual perspective," under the incorporation test, "one could define 'display' as the mere act of incorporating [another's] content into a webpage that is then pulled up by the browser." Id. at 839. Adopting the "server test" and rejecting the incorporation test for a variety of reasons, the court applied the server test and concluded that Google displayed the thumbnails, which admittedly were created and stored on Google's server, but did not display the full-size images which had been in-line linked from a third-party website. Id at 844.

   On appeal, the Ninth Circuit affirmed, concluding that the "server test" comported with the language of the Copyright Act, explaining as follows:

The Copyright Act explains that "display" means "to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process...." 17 U.S.C. § 101. Section 101 defines "copies" as "material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." Id. Finally, the Copyright Act provides that "[a] work is 'fixed' in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." Id.

We must now apply these definitions to the facts of this case. A photographic image is a work that is "'fixed' in a tangible medium of expression," for purposes of the Copyright Act, when embodied (i.e., stored) in a computer's server (or hard disk, or other storage device). The image stored in the computer is the "copy" of the work for purposes of copyright law. See MAI Sys. Corp. v. Peak Computer, Inc., 991 F.2d 511, 517–18 (9th Cir.1993) (a computer makes a "copy" of a software program when it transfers the program from a third party's computer (or other storage device) into its own memory, because the copy of the program recorded in the computer is "fixed" in a manner that is "sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration" (quoting 17 U.S.C. § 101)). The computer owner shows a copy "by means of a ... device or process" when the owner uses the computer to fill the computer screen with the photographic image stored on that computer, or by communicating the stored image electronically to another person's computer. 17 U.S.C. § 101. In sum, based on the plain language of the statute, a person displays a photographic image by using a computer to fill a computer screen with a copy of the photographic image fixed in the computer's memory. There is no dispute that Google's computers store thumbnail versions of Perfect 10's copyrighted images and communicate copies of those thumbnails to Google's users. Therefore, Perfect 10 has made a

prima facie case that Google's communication of its
stored thumbnail images directly infringes Perfect
10's display right.

Google does not, however, display a copy of full-
size infringing photographic images for purposes of
the Copyright Act when Google frames in-line linked
images that appear on a user's computer screen.
Because Google's computers do not store the
photographic images, Google does not have a copy of
the images for purposes of the Copyright Act.  In
other words, Google does not have any "material
objects ... in which a work is fixed ... and from
which the work can be perceived, reproduced, or
otherwise communicated" and thus cannot communicate a
copy. 17 U.S.C. § 101.

Instead of communicating a copy of the image,
Google provides HTML instructions that direct a user's
browser to a website publisher's computer that stores
the full-size photographic image.  Providing these
HTML instructions is not equivalent to showing a copy.
First, the HTML instructions are lines of text, not a
photographic image.  Second, HTML instructions do not
themselves cause infringing images to appear on the
user's computer screen.  The HTML merely gives the
address of the image to the user's browser.  The
browser then interacts with the computer that stores
the infringing image. It is this interaction that
causes an infringing image to appear on the user's
computer screen.

Perfect 10, 508 F.3d at 1160-61.

Initially, the court rejects Emmerich's attempt to recast

the server test as applicable only to search engines; it is not

so limited.  To the contrary, "application of the Server Test

depends on the method used for displaying [copyrighted content]

— not the context in which [it] is displayed."  Hunley v.

Instagram, LLC, 73 F.4th 1060, 1071 (9th Cir. 2023) ("We have

not limited Perfect 10 to search engines, and it is too late to argue that it is so limited.").

As the parties point out, there is no Fifth Circuit precedent to guide the court, and currently, the Ninth Circuit is the only circuit court to have ruled on this issue. Emmerich urges the court to follow the Leader's Institute court (and others) by rejecting the server test and thus concluding that Particle publicly displayed copies of Emmerich articles through a process and thereby infringed on Emmerich's display right.

The court acknowledges that Leader's Institute is not alone in eschewing the server test, see e.g. Goldman v. Breitbart News Network, LLC, 302 F. Supp. 3d 585, 590 (S.D.N.Y. 2018) (rejecting server test as not adequately grounded in text of Copyright Act) and Bowery v. Sites, No. 2:21-CV-00567-DBB-JCB, 2024 WL 3416038, at *8-9 (D. Utah July 15, 2024) (concluding "that a defendant who embeds a copyrighted image on a webpage, without hosting the image on its servers, may infringe the copyright holder's display rights"). The court is persuaded, however, that the server test is the more reasonable interpretation of the plain language of the statute. See 5 Patry on Copyright § 15:7, Infringement of the display right—Case law—Framing, Linking, and Embedding, and the Server Test (endorsing server test as consistent with Copyright Act's plain language and observing that the "fatal flaw" in the Leader's

33

Institute court's approach is "that defendant did not transmit a display of the 'work,' but rather merely sent to the user's browser instructions for where the copy resided (typically plaintiff's own website), and from which the instructions for actually displaying the work occurred").  Application of the server to test to the framed-view/WebView articles compels a conclusion that Particle, which did not store any of these images as electronic information and serve electronic information to NewsBreak users, did not violate Emmerich's exclusive right to display its copyrighted content.[16]

---

[16]    Emmerich takes issue with the fact that while in framed-view mode, its content was displayed on the same screen with NewsBreak's ads, suggesting, apparently, that readers would be confused about whose website they were on.  In Perfect 10, the court rejected Perfect 10's argument it was harmed by Google's framing of its photographs because it gave the impression that Google "is showing the image within a single Google webpage." 508 F.3d at 1161.  The court reasoned, "While in-line linking and framing may cause some computer users to believe they are viewing a single Google webpage, the Copyright Act, unlike the Trademark Act, does not protect a copyright holder against acts that cause consumer confusion."  Id. (citing cf. 15 U.S.C. § 1114(1) (providing that a person who uses a trademark in a manner likely to cause confusion shall be liable in a civil action to the trademark registrant)).

Emmerich also maintains in its rebuttal that the server test is inconsistent with the Supreme Court's decision in American Broadcasting Cos., Inc. v. Aereo, Inc., 573 U.S. 431, 433, 134 S. Ct. 2498, 2501, 189 L. Ed. 2d 476 (2014) (concluding that defendant publicly performed plaintiff's copyrighted work and thereby directly infringed upon its exclusive right under § 106(4) to "perform the copyrighted work publicly.").  The Ninth Circuit recently rejected this position as does the undersigned. See Hunley v. Instagram, LLC, 73 F.4th 1060, 1072-77 (9th Cir. 2023) (rejecting plaintiff's argument that server rule was

See Perfect 10, 508 F.3d at 1159.[17]  Particle's motion will be granted as to the 748 framed-view articles.

Analysis: Statute of Limitations - Infringement Claims

Both parties have moved for summary judgment on the statute of limitations.  Emmerich contends its infringement claims are timely under the Copyright Act's three-year statute of limitations in § 507(b) based on the applicable discovery rule, see Martinelli v. Hearst Newspapers, L.L.C., 65 F.4th 231, 233 (5th Cir. 2023), cert. denied, 144 S. Ct. 2561, 219 L. Ed. 2d 1227 (2024) (Copyright Act's three-year "limitations period starts running 'once the plaintiff knows or has reason to know of the injury upon which the claim is based,' which is also known as the discovery rule." (quoting Graper v. Mid-Continent Casualty Co., 756 F.3d 388, 393 (5th Cir. 2014) (cleaned up)).[18]

---

inconsistent with Aereo because, among other reasons, the performance and not the display right was at issue in Aereo).

[17]    See also Miller v. 4Internet, LLC, No. 22-16195, 2024 WL 3219716, at *1 (9th Cir. June 28, 2024) ("Under the 'server test,' a website publisher is only liable for direct infringement if the publisher stores the infringing image on its own server rather than embedding or linking from a third-party server."); Evox Prods., LLC v. Verizon Media, Inc., No. 21-56046, 2022 WL 17430309, at *1 (9th Cir. Dec. 6, 2022) ("The server test requires an image to be both stored on the infringer's servers and delivered by the infringer to website viewers' screens.  Simply linking to an image stored on a different server, or storing (without serving) the image on one's own server does not qualify as public display under copyright laws.").

[18]    The three-year statute of limitations applies to all civil actions brought "under the provisions of this title," which

Emmerich claims it first learned of Particle's infringing activity in February 2020, thereby making its claims in this action, filed on January 12, 2023, timely filed within three years of discovery.  It further argues that its claims are timely in any event, because the statute of limitations was tolled for fourteen months while an earlier infringement lawsuit was pending before Judge Kristi Johnson, see Emmerich Newspapers, Inc. v. Particle Media, Inc., No. 3:21-cv-32-KHJ-MTP.

Despite the Fifth Circuit's clear holding in Martinelli that the discovery rule applies, Particle advocates application of an "injury rule," under which it contends Emmerich's claims are time-barred.  See Nealy v. Warner Chappell Music, Inc., 60 F.4th 1325, 1330 (11th Cir. 2023), aff'd, 601 U.S. 366, 144 S. Ct. 1135, 218 L. Ed. 2d 363 (2024) (observing that under an "injury rule," claims accrue "when the harm, that is, the infringement, occurs, no matter when the plaintiff learns of it").  Alternatively, it argues that Emmerich's claims were not

---

includes both infringement and DMCA actions, see Diamondback Indus., Inc. v. Repeat Precision, LLC, No. 4:18-CV-902-A, 2019 WL 5842756, at *2 (N.D. Tex. Nov. 7, 2019); and the parties herein have moved for summary judgment on the limitations issue both as to Emmerich's infringement and DMCA claims.  In light of the court's conclusion that Particle is entitled to summary judgment as to Emmerich's DMCA claims on the merits, see infra at pp. 48-49, 57, it follows that the court need not consider Emmerich's argument that its DMCA claims are timely.

equitably tolled during the earlier lawsuit before Judge Johnson so that, even under the discovery rule, at least some of Emmerich's claims in Case No. 3:23cv391 are time-barred.

Based on the Fifth Circuit's binding ruling in <u>Martinelli</u>, the "discovery rule" applies to determine when Emmerich's claims accrued. Emmerich has presented proof that it learned of Particle's alleged infringing activity on February 10, 2020, when one of its publishers sent Wyatt Emmerich an e-mail reporting that he had seen an Emmerich article on Newsbreak.[19] For its part, Particle has not presented evidence to directly challenge this as the date of discovery. Instead, it suggests that in light of Emmerich's use of Google Analytics, which showed that NewsBreak was a top referral source in 2019, Emmerich had reason to know that its content was being used by NewsBreak. In the court's opinion, however, having reason to know that NewsBreak was a top referral site does not equate to facts from which a copyright holder could reasonably conclude that the referral site was infringing on its content. Accordingly, the court accepts February 10, 2020 as the discovery date.

---

[19]    By offering only February 10, 2020 as the discovery date, Emmerich seems to impliedly concede that once apprised of Particle's alleged activity, it was on notice to be aware of future acts of infringement.

According to Emmerich's complaints, Particle's infringing activity occurred from 2018 to 2021. Particle maintains (and Emmerich does not refute) that the infringement claims which remain after plaintiff's voluntary dismissals are those alleged in Case No. 3:23cv391-TSL-MTP, filed June 20, 2023, more than four months after the expiration of the three-year statute of limitations. Thus, absent tolling, any claims for acts of infringement that occurred before June 20, 2020, are time-barred.[20] See Hall v. Hall, 584 U.S. 59, 72, 138 S. Ct. 1118, 1130, 200 L. Ed. 2d 399 (2018) ("[T]hrough consolidation under Rule 42(a)[,] one or many or all of the phases of the several actions may be merged. But merger is never so complete in consolidation as to deprive any party of any substantial rights which he may have possessed had the actions proceeded separately.") (internal quotation marks omitted)); see also McCleary v. Singh, No. CV-24-08056-PCT-DWL, 2024 WL 4728649, at *2 (D. Ariz. Nov. 8, 2024) (citing Hall and recognizing consolidation has no effect on statute of limitations as to consolidated actions).

---

[20] Under "'the separate-accrual rule,' 'the statute of limitations runs separately from each violation' of the Copyright Act, meaning that 'each infringing act starts a new limitations period.'" Id. at 238 (quoting Petrella v. Metro-Goldwyn-Mayer, Inc., 572 U.S. 663, 134 S. Ct. 1962, 188 L. Ed. 2d 979 (2014)).

In "extraordinary circumstances," a court may allow late claims to proceed under the doctrine of equitable tolling, which "'preserves a plaintiff's claims when strict application of the statute of limitations would be inequitable.'" Davis v. Johnson, 158 F.3d 806, 810 (5th Cir. 1998) (quoting Lambert v. United States, 44 F.3d 296, 298 (5th Cir. 1995)). It is a narrow exception that is to be applied sparingly. Phillips v. Leggett & Platt, Inc., 658 F.3d 452, 457 (5th Cir. 2011).

> Equitable tolling "applies principally where the plaintiff is actively misled by the defendant about the cause of action or is prevented in some other extraordinary way from asserting his rights." Rashidi v. Am. President Lines, 96 F.3d 124, 128 (5th Cir. 1996). But a plaintiff who "fails to act diligently cannot invoke equitable principles to excuse that lack of diligence." Baldwin Cnty. Welcome Ctr. v. Brown, 466 U.S. 147, 152, 104 S. Ct. 1723, 80 L. Ed. 2d 196 (1984) (per curiam); see also Rashidi, 96 F.3d at 128 (declining to apply equitable tolling to claim where plaintiff "could have filed his claim properly with even a modicum of due diligence").

Jaso v. The Coca Cola Co., 435 F. App'x 346, 357 (5th Cir. 2011) (affirming denial of equitable tolling of plaintiff's copyright claims and stating that "a plaintiff who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence." (internal citations omitted)). Emmerich, as the party invoking equitable tolling, has the burden to demonstrate it applies in this case. Ramirez v. City of San Antonio, 312 F.3d 178, 183 (5th Cir. 2002). It has not satisfied this burden.

39

Emmerich declares that it "showed 'reasonable diligence' in pursuing all of the instant claims against Particle by filing suit and pursuing those claims for 14 months before part of those claims were dismissed without prejudice." Clearly, it did not, as it asserted infringement claims despite having no copyright registration for the bulk of the allegedly infringing content.

When Emmerich filed the prior lawsuit in January 2021 alleging that it had registered fifteen articles and that "[a]dditional copyright registrations have been (or are in the process of being) filed at the time of filing of this Complaint and will be incorporated herein when the registrations are received," and also when it later filed an amended complaint purporting to "clarif[y] that its allegations of copyright infringement apply to every instance where Particle Media extracts articles, in whole or in part, from Emmerich's websites, and republishes them on the News Break app,"[21] the Copyright Act plainly provided that "no civil action for infringement of the copyright in any United States work shall be

---

[21] The magistrate judge granted Emmerich's motion to amend over Particle's futility objection, observing that it was not clear from the face of the proposed amended complaint whether Emmerich was seeking to add claims arising from unregistered articles. See Emmerich Newspapers, Inc. v. Particle Media, Inc., No. 3:21-cv-32-KHJ-MTP, slip op. at pp. 3-4 (S.D. Miss Sept. 22, 2021).

instituted until ... registration of the copyright claims has been made." 17 U.S.C. § 411(a).  The law was equally clear, as Judge Johnson observed in granting Particle's motion to dismiss its claims for money damages, that § 411 acts as "'an administrative exhaustion requirement that the owner must satisfy before suing to enforce ownership rights.'"  Emmerich Newspapers, Inc. v. Particle Media, Inc., No. 3:21-CV-32-KHJ-MTP (quoting Fourth Est. Pub. Ben. Corp. v. Wall-Street.com, LLC, 586 U.S. 296, 139 S. Ct. 881, 887, 203 L. Ed. 2d 147 (2019)) (emphasis added).

Emmerich argues this court should take into consideration that it did not know of the extent of Particle's alleged infringement until it received discovery in the earlier case, suggesting that Particle hid its malfeasance.  Yet Emmerich has provided no explanation for its decision to pursue clearly unexhausted claims or for the timing of its efforts to register the articles with the Copyright Office.

Moreover, the court's review of the registration certificates appended to 3:23CV391-TSL-MTP shows that they were all issued by the Register prior to the expiration of the statute of limitations, with most having decision dates in September through December 2022 and with a handful being issued as late as mid-January 2023.  Emmerich has offered no explanation for its failure to timely file suit based on these

41

registrations.  The court is not persuaded that Particle "hid" the claims; but even if Particle did hide them,[22] Emmerich has shown that it acted with reasonable diligence in pursuing them.

As Emmerich has failed to sustain its burden to establish that equitable estoppel should apply, Particle's motion for summary judgment on the limitations issue will be granted in part and denied in part.[23]  Particle's motion is granted and Emmerich's motion denied as to claims for acts of infringement of the articles in 3:23CV391-TSL-MTP which are alleged to have occurred before June 20, 2020.  Particle's motion is denied, and Emmerich's granted as to claims for acts of infringement occurring after June 20, 2020.

---

[22]    Emmerich argues that Particle "hid" the articles solely in support of its tolling argument and not in support of any argument that there should be a later discovery date.  Such an argument, had it been raised, would not be well taken.  See Martinelli, 65 F.4th at 238 ("'Once [a] plaintiff is on inquiry that it has a potential claim, the statute can start to run,'" even if the plaintiff has not yet "'obtain[ed] a thorough understanding of all the facts.'")(quoting Prather v. Neva Paperbacks, Inc., 446 F.2d 338 (5th Cir. 1971)).

[23]    The parties' exhibits reflect the date of Emmerich's publication of the articles allegedly infringed by Particle, but the date on which the alleged infringements occurred is not discernable (or not readily so).  Without this information, the court is unable to discern precisely which articles can form the basis of infringement claims.

DMCA – CIRCUMVENTION AND TRAFFICKING CLAIMS

Both parties have moved for summary judgment on Emmerich's circumvention claims under the DMCA, and Particle also seeks summary judgment on Emmerich's trafficking claims.

Section 1201 of the Digital Millenium Copyright Act (DMCA) sets out three separate prohibitions. First, § 1201(a)(1)(A), the anti-circumvention provision, states that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under this title." § 1201(a)(1)(A). "To 'circumvent a technological measure' means to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." Id. § 1201(a)(3)(A).

In enacting the DMCA, "Congress noted that 'the conduct of circumvention was never before made unlawful,' S. Rep. 105-190, at 12, but explained the need for the new protection as akin to 'making it illegal to break into a house using a tool, the primary purpose of which is to break into houses.'" Green v. United States Dep't of Just., 111 F.4th 81, 89 (D.C. Cir. 2024) (quoting S. Rep. 105-190, at 11). That is, "the anticircumvention provision is designed to operate as a prohibition against digital trespass." Id.

The second and third substantive provisions are §§ 1201(a)(2) and 1201(b)(1), the "anti-trafficking provisions." "These sections are similar, except that § 1201(a)(2) covers those who traffic in technology that can circumvent 'a technological measure that effectively controls access to a work protected under' Title 17, whereas § 1201(b)(1) covers those who traffic in technology that can circumvent 'protection afforded by a technological measure that effectively protects a right of a copyright owner under' Title 17." Davidson & Assocs. v. Jung, 422 F.3d 630, 640 (8th Cir. 2005) (quoting §§ 1201(a)(2) and (b)(1)). As the Eighth Circuit explained, "although both sections prohibit trafficking in a circumvention technology, the focus of § 1201(a)(2) is circumvention of technologies designed to prevent access to a work, and the focus of § 1201(b)(1) is circumvention of technologies designed to permit access to a work but prevent copying of the work or some other act that infringes a copyright." Id. (quoting S. Rep. No. 105-190, at 11-12 (1998)); Universal City Studios v. Corley, 273 F.3d 429, 440-41 (2nd Cir. 2001) (same).

Analysis:  Circumvention

In support of its § 1201(a)(1) circumvention claim, Emmerich alleged in its complaint and argued in its original motion for summary judgment in this cause [Dkt. 48] that because the websites of two of its newspapers, Greenwood Commonwealth

and McComb Enterprise-Journal, operated behind "hard paywalls," meaning a subscription was required to view complete articles, and because there was no proof that Particle had a subscription and yet had obtained full-length articles, it had established that NewsBreak had employed circumventing technology, i.e., its web crawler, to gain unauthorized access to Emmerich's full-length articles.[24]  In opposing the earlier motion, Particle denied that its web crawler employed any circumventing technology, insisting it could only scrape content which would have been available without a subscription.  The court found that Particle's proof on this issue created a question of material fact precluding summary judgment.  See Emmerich Newspapers, Inc. v. Particle Media, Inc., No. 3:23-CV-391-TSL-RPM, 2024 WL 5701883, at *4 (S.D. Miss. June 25, 2024).

By its current motion, Emmerich posits a new theory.  It no longer claims Particle's web crawler circumvented Emmerich's access control measures to gain access to its content.  On this point, it proclaims that "[s]craping is not a problem so long as the party doing the scraping (1) does not republish the content on their own platforms without permission and (2) does not make pay-wall protected content available to non-subscribers."  It now contends that the illegal circumvention occurred when, after

---

[24]    Emmerich did not previously seek summary judgment on its trafficking claim.

the web crawler had scraped the entire webpage for each article, including the HTML paywall code, it "removed, deactivated and impaired" Emmerich's paywall and failed to save it along with the article's headline, images and content.  To put it in Congress's parlance, Emmerich's claim is not that Particle used a tool, i.e., its web crawler, to break into Emmerich's house; rather, Emmerich's claim is that Particle, _after_ accessing the house and "stealing" Emmerich's articles, _then_ used a tool, the parser, to delete the paywall, and then saved the "stolen content its server scraped where anyone using the NewsBreak app could read the article in its entirety without the inconvenience of paying."  In sum, Emmerich is complaining about Particle's _use_ of its content, not its unauthorized access to the content.

The DMCA defines circumvention as an activity undertaken "without the authority of the copyright owner, to gain access to the work."  17 U.S.C. § 1201(a)(3)(B) (emphasis added).  "The plain language of the statute, therefore, requires a plaintiff alleging circumvention (or trafficking) to prove that the defendant's access was unauthorized."  Chamberlain Grp. v. Skylink Techs., Inc., 381 F.3d 1178, 1193 (Fed. Cir. 2004), cert. denied, 544 U.S. 923, 125 S. Ct. 1669, 161 L. Ed. 2d 481 (2005) (emphasis added); Ground Zero Museum Workshop v. Wilson, 813 F. Supp. 2d 678, 691 (D. Md. 2011) (citing Chamberlain Grp.,

381 F..3d at 1193); Dish Network L.L.C. v. World Cable Inc., 893 F. Supp. 2d 452, 463 (E.D.N.Y. 2012).

In MGE UPS Systems, Inc. v. GE Consumer & Industrial, Inc., 622 F.3d 361 (5th Cir. 2010), in concluding that the plaintiff had not stated a valid circumvention claim, the Fifth Circuit found dispositive the fact that the plaintiff had not shown that the action of defendant's "own representatives amounted to circumvention." Id. at 366. This conclusion was the result of the court's recognition that the DMCA only targets the circumvention of the technological measure guarding copyrighted material and "does not concern itself with the use of those materials after circumvention has occurred." Id. (quoting Universal City Studios, Inc. v. Corley, 273 F.3d 429, 443 (2d Cir. 2001)); see also Chamberlain, 381 F.3d at 1195 ("The prohibition in 1201(a)(1) was necessary because prior to the DMCA, the conduct of circumvention was never before made unlawful.").

As the Fifth Circuit recognized, a defendant's subsequent use of copyrighted material, i.e., infringement, was well protected under existing law. Id. Here, Emmerich's reimagined circumvention claim is that the parser's stripping out the paywall code, enabled non-subscribers to view articles, which is only another way of saying that Particle infringed on its right to display and/or distribute Emmerich's copyrighted content. As

Emmerich has not demonstrated that Particle's <u>access</u> was unauthorized, Particle's motion for summary judgment on the circumvention claims will be granted and Emmerich's motion will be denied.[25]

<u>Analysis:  Trafficking</u>

Particle additionally seeks summary judgment on Emmerich's putative trafficking claims under §§ 1201(a)(2) and 1201(b)(1), denying that it has trafficked in circumvention technology under any of the three definitions set out in § 1201(a)(2) or (b)(1) (both providing, <u>inter alia</u>, three types of prohibited circumvention technology).

In opposition to the motion, Emmerich argues the third alternative, that is, that Particle trafficked in a technology that "is marketed by that person ... for use in circumventing a technological measure that [either] effectively controls access to a work [or effectively protects a right of a copyright owner]," §§ 1201(a)(2)(C) and 1201(b)(1)(C).  In support thereof, it states:

> There is no dispute that Particle marketed the
> NewsBreak app to millions of mobile phone users
> knowing that it would enable those readers to

---

[25]    To the extent Emmerich believes that it has a claim under § 1201(b)(1) based on Particle's alleged copying of its copyrighted material, it is mistaken.  Protection from copying is afforded by 17 U.S.C. § 106.  Section 1201(b)(1) provides a cause of action for trafficking in technology that circumvents a technological measure which protects a copyright owner's rights, including its right to distribute its content.

circumvent the paywalls of publishers like Emmerich.
Particle's own expert testified that Particle could
have programmed its parser to identify paywalls but
chose not to.  And in doing so Particle marketed the
NewsBreak app "for use in circumventing a
technological measure that effectively controls access
to a work protected under this title."  Particle
baldly asserts that the NewsBreak app "has never been
marketed for any circumventing use," but this is
transparently false.  The circumvention technology is
a central feature of the NewsBreak app and Particle
intentionally marketed it to millions of users, thus
enabling them to circumvent Emmerich's paywalls by
reading its paywall-protected stories without
subscribing.  This is the very essence of trafficking.

Particle is entitled to summary judgment on the trafficking

claims.

Emmerich pled in Count IV that "[t]he NewsBreak app was

designed to, and does, circumvent technological measures put in

place by copyright holders such as Emmerich to control access

to, or uses of, their copyright work in violation of 17 U.S.C. §

1201(a)(2) and (b)" and "Particle's distribution of the

NewsBreak app violates 17 U.S.C. §1201(a)(2), which prohibits

trafficking in any technology, product, service, device,

component, or part thereof, that is primarily designed or

produced for the purpose of circumventing a technological

measure that effectively controls access to a work protected

under the Copyright Act."  This ostensibly stated a claim under

§ 1201(a)(2)(A), prohibiting trafficking in technology that "is

primarily designed or produced for the purpose of circumventing

a technological measure that effectively controls access to a

49

work protected under this title."  However, in an apparent
concession that it cannot support a claim under § 1201(a)(2)(A),
by its response, Emmerich makes no mention of § 1201(a)(2)(A);
instead, it now purports to assert a claim that Particle
trafficked in a technology that "is marketed by that person . .
. for use in circumventing a technological measure that
effectively controls access to the work" under § 1201(a)(2)(C).
As Emmerich did not plead this claim, Particle is entitled to
summary judgment on this basis alone.  See <u>Cutrera v. Bd. of</u>
<u>Sup'rs of Louisiana State Univ.</u>, 429 F.3d 108, 113 (5th Cir.
2005) ("A claim which is not raised in the complaint but,
rather, is raised only in response to a motion for summary
judgment is not properly before the court.").[26]  Moreover, this
putative claim fails on the merits.  As Particle points out,
Emmerich has presented no proof that NewsBreak is marketed "<u>for</u>
<u>use</u> in circumventing a technological measure that effectively
controls access to a work."  Its allegations, if proven, would
only show that circumvention is a "central feature" of the
NewsBreak app and that Particle marketed the app knowing this,

---

[26]    It is not clear to the court that Emmerich has properly
pled a § 1201(b)(1) trafficking claim, but even if it did,
because it failed to offer any response to Particle's well-
supported motion, Particle's motion will be granted as to this
claim as well.

which is not the same as Particle holding NewsBreak out as an app which circumvents content provider paywalls.

Finally, as Particle is entitled to summary judgment on Emmerich's circumvention and trafficking claims, it follows that Particle is likewise entitled to summary judgment as to Emmerich's claims for injunctive relief premised on these substantive claims.  See DSC Commc'ns Corp. v. DGI Techs., Inc., 81 F.3d 597, 600 (5th Cir. 1996) (providing, inter alia, to prevail on claim for injunctive relief, movant must demonstrate substantial likelihood of success on the merits).

### DMCA – COPYRIGHT MANAGEMENT INFORMATION

Congress enacted § 1202 to "make it unlawful to intentionally provide false information, or to deliberately alter or delete information provided by a copyright owner which identifies a work, its owner or performer, and the terms and conditions for its use."  H.R. Rep. No. 105-551, Part 1, 105th Cong., 2d Sess. (1998).  The legislation aimed to "ensure the integrity of the electronic marketplace by preventing fraud and misinformation" and to "protect consumers from misinformation as well as authors and copyright owners from interference with the private licensing process."  Id.; see also Fischer v. Forrest, 286 F. Supp. 3d 590, 610-11 (S.D.N.Y. 2018), aff'd, 968 F.3d 216 (2d Cir. 2020) ("CMI exists to inform the public that a work is copyrighted and by whom.").

51

As enacted, CMI is defined as "any of the following information conveyed in connection with copies of ... a work or ... displays of a work":

>    (1) The title and other information identifying the work, including the information set forth on a notice of copyright.
>    (2) The name of, and other identifying information about, the author of a work.
>    (3) The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.
>        . . .
>    (6) Terms and conditions for use of the work.
>    (7) Identifying numbers or symbols referring to such information or links to such information.

17 U.S.C. § 1202(c).

Section 1202(a)(2) makes it unlawful to distribute or to import for distribution false CMI "knowingly and with the intent to induce, enable, facilitate, or conceal infringement." <u>Id</u>. 1202(a).  Section 1202(b), in turn, prohibits three kinds of acts: the intentional removal or alteration of any CMI, § 1202(b)(1); the distribution of CMI knowing that the CMI has been removed or altered without the authority of the copyright owner, § 1202(b)(2); and the distribution of works knowing that the CMI has been deleted or altered without the copyright owner's authority, § 1202(b)(3).  All three provisions of § 1202(b) require that the defendant take the prohibited act "knowing, or ... having reasonable grounds to know, that it will

induce, enable, facilitate, or conceal an infringement...."  17
U.S.C. § 1202(b).

Analysis: CMI

Emmerich maintains that each of its online articles is
presented to readers under a "unique digital filename or URL,"
which Emmerich uses to both "identify each article and limit its
location to its own websites."[27]  According to Emmerich, its
filenames/URLs are CMI.  It further contends that after Particle
scraped its articles and presented them to NewsBreak users in
one of two formats, full-text view or framed view, it failed to
utilize Emmerich's URLs and instead used altered URLs, which
were necessarily false.  It also complains that NewsBreak's
"like" and "share" buttons generated false CMI in the form of
URLs directing the reader to Newsbreak rather than to Emmerich's
website.  Emmerich charges that as a result of these deletions
and substitutions, none of the views of its articles were on one
of its websites and instead, were on Newsbreak, constituting
infringement.

---

[27]    Emmerich also claims that the news feed snippets ran afoul
of § 1202, not by displaying false or altered URLs, but rather
by showing NewsBreak's, and not Emmerich's logo, banner and
share button.  The court will not reconsider its ruling that
Emmerich failed to plead the alternate categories of CMI offered
in its first and now this motion for summary judgment.
Emmerich Newspapers, Inc., 2024 WL 5701883, at *6.

On this alleged factual basis, Emmerich seeks summary judgment against Particle under § 1202(a)(2), (b)(1) and (b)(3). Particle has moved for summary judgment contending, among other things, that Emmerich's URLs are not CMI.[28]

To prevail on a claim under § 1202(a)(2), a plaintiff must prove:

> (1) the . . . distribution of CMI; (2) that the CMI was false; (3) that the defendant knew the CMI was false; and (4) that the Defendant acted with the intent to cause or conceal copyright infringement. Penske Media Corp. v. Shutterstock, Inc., 548 F. Supp. 3d 370, 381 (S.D.N.Y. 2021). Section 1202(a) requires what has been called "double scienter": proof of both knowledge and intent. After II Movie, LLC v. Grande Commc'ns Networks, LLC, No. 1:21-CV-709-RP, 2023 WL 1422808, at *9 (W.D. Tex. Jan. 31, 2023).

Niehuss v. Colossal Biosciences, Inc., No. 1:20-CV-00617-RP, 2023 WL 8191905, at *3 (W.D. Tex. Nov. 27, 2023), report and recommendation adopted, No. 1:23-CV-617-RP, 2023 WL 8607021 (W.D. Tex. Dec. 12, 2023).

To succeed on a § 1202(b)(1) claim, a plaintiff must show that "a person (i) without authority of the copyright owner or the law (ii) intentionally remove[d] or alter[ed] any copyright management information (iii) knowing or having reasonable grounds to know that it [would] induce, enable, facilitate, or

---

[28]    In light of the court's conclusion that Emmerich's URLs are not CMI, the court need not reach Particle's alternative arguments in support of summary judgment.

conceal an infringement of the federal copyright laws.'" <u>Recif</u> <u>Res., LLC v. Juniper Cap. Advisors, L.P.</u>, No. CV H-19-2953, 2020 WL 5739138, at *10 (S.D. Tex. Sept. 24, 2020) (quoting <u>Gordon v.</u> <u>Nextel Commc'ns & Mullen Advert., Inc.</u>, 345 F.3d 922, 927 (6th Cir. 2003)) (emphasis added).

To prove a § 1202(b)(3) claim, a plaintiff must demonstrate: "(1) the existence of CMI in connection with a copyrighted work; and (2) that a defendant 'distribute[d] ... works [or] copies of works'; (3) while 'knowing that [CMI] has been removed or altered without authority of the copyright owner or the law'; and (4) while 'knowing, or ... having reasonable grounds to know' that such distribution 'will induce, enable, facilitate, or conceal an infringement.'" <u>Mango v. BuzzFeed,</u> <u>Inc.</u>, 970 F.3d 167, 171 (2d Cir. 2020) (quoting <u>Corley</u>, 273 F.3d at 435 (alterations in original) (emphasis added).

To reiterate, Emmerich complains that Particle violated the integrity of its CMI by (1) full-text displays on NewsBreak, (2) framed-view displays; and (3) Particle's share button that created URLs different from those under which Emmerich displayed its content. However, given that the court has concluded that framed-view does not amount to a display and thus is not infringement, <u>see supra</u> at pp. 32-33, it necessarily follows

that Particle did not violate § 1202(a) or (b) as to the 2,232 articles identified by Emmerich.[29]

Further, considering that Particle's share button produced only a URL link to Emmerich's websites, by which a user could choose to navigate to an Emmerich website, which would not constitute infringement, summary judgment in Particle's favor is appropriate as to this category as well. There then remains for the court's consideration Emmerich's § 1202 claims related to the category of the full-text articles which were viewed on Particle's website.

Emmerich takes the position that its URLs are filenames, which, if conveyed in connection with copies of a copyrighted work, can constitute CMI under Energy Intelligence, 948 F.3d at 277. In Energy Intelligence, the Fifth Circuit rejected the defendant's argument that a .pdf file name could not be CMI, observing that "[n]othing in § 1202 indicates that a digital file name cannot be CMI. Rather, a PDF's file name may be CMI if it is 'conveyed in connection with copies' of the underlying work and contains a 'title and other information identifying the work.'" Id. (quoting § 1202(c))

---

[29]    Emmerich's position as to both this category of material and its "share button" has been that Particle removed Emmerich's URLs and replaced them with Particle's counterfeit URLs to facilitate its own infringement of Emmerich's copyrighted material.

Pointing to <u>Energy Intelligence</u>, Emmerich contends it has established the existence of CMI because each of its articles "is presented under a unique digital file name or URL. Emmerich utilizes this naming convention to identify each article and limit its location to its own websites." Particle denies that Emmerich's URLs qualify as CMI and submits that Emmerich's reliance on <u>Energy Intelligence</u> is misplaced as the purpose of a URL differs fundamentally from that of a file name. Having considered the parties' arguments, the court is of the opinion that Emmerich's URLs are not file names and do not otherwise constitute CMI and that Particle is therefore entitled to summary judgment on Emmerich's CMI claims arising out of the full-view articles.

A file name is commonly understood to be "an identifying name given to an electronically stored computer file, conforming to limitations imposed by the operating system, as in length or restricted choice of characters." htps://www.dictionary.com/browse/filename (last accessed July 29, 2025); https://dictionary.cambridge.org/us/dictionary/english/filename (last accessed July 29, 2025) ("filename" is "a name that you give to a document or file on a computer"); (last accessed July 29, 2025) ("Computing: A series of characters used to identify a data file in a system.").

A URL on the other hand, is a "compact string of numbers, letters, and symbols that a computer uses to find a resource on a network and act upon it." https://www.britannica.com/ technology/URL (last accessed July 29, 2025). In short, a file name describes data while a URL is akin to a roadmap to data on the Internet. While it is perhaps conceivable that Emmerich could have named some kind of file (data) using the same information/characters contained in a URL, Emmerich has never purported to identify the type of file, i.e., data, to which it has assigned a URL-file name. Instead, the central thrust of its CMI argument is and has been that its URLs, "located in the address screen above the article," functioning as URLs, i.e., roadmaps leading to its articles, contain information identifying the author, copyright owner and/or title of the work, see § 1202(c)(1)-(3),[30] and were "conveyed in connection" with every online article scraped by Particle and thus, constitute CMI. There is no authority for the proposition that a URL appearing in the address bar above copyrighted content constitutes CMI and the court is not persuaded that it is.

As Particle points out, a URL, unlike a file name, is not an identifier associated with a particular work; rather it is a

---

[30]    Emmerich also contends that its URLs were links to other CMI on its webpages, see § 1202(c)(8), that is, its banners, logo and copyright notice. Emmerich cannot get in through the back door what has been barred through the front.

reference directing a user to place on the Internet where information can be retrieved, at a given time, but not necessarily permanently.  The content at the URL may be deleted or moved, or the link itself may be deactivated.  Indeed, Emmerich does not dispute that many of the URLs on its CMI lists no longer work or that when a person clicks on a URL for an article on one of its websites, the visitor sees not only the specific article on a particular page, but also sees other articles published on that same page, articles which may or may not belong to Emmerich.

As the URLs fail to provide notice that any of the information set out in § 1202(c)(1)-(8) is associated with a particular (copyrighted) work that appears at the online location indicated in the URL, the court concludes that the URLs are not conveyed in connection with a copyrighted work and therefore, do not constitute CMI.  See Fashion Nova, LLC v. Blush Mark, Inc., No. CV 22-6127 PSG (RAO), 2023 WL 4307646, at *4 (C.D. Cal. June 30, 2023) ("The central purpose of CMI is to inform the public that something is copyrighted and to prevent infringement.") (internal citation and quotation omitted); FurnitureDealer.Net, 2022 WL 891473, at *19 ("general purpose of CMI [is] to inform the public that something is copyrighted in order to prevent infringement."); Fischer, 286 F. Supp. 3d at

610-11 ("CMI exists to inform the public that a work is copyrighted and by whom.").

As Emmerich has failed to show that URLs are CMI, Particle's motion as to the CMI claims arising from the full-text view articles will be granted and Emmerich's will be denied. It follows that the court need not consider Emmerich's argument on the proper method for calculating statutory damages for Particle's alleged violations of § 1202. Relatedly, Emmerich's motion for sanctions based on spoliation of evidence will also be denied. By this motion, Emmerich urged that in order to support its CMI claims,[31] it needed evidence which Particle allegedly destroyed that would have shown the number of page views each of its articles had received. With the court's grant of summary judgment to Particle on the CMI claims, this motion is moot. The court further concludes that, in any event, Emmerich has not established that Particle's conduct was intentional or taken in bad faith. See Coastal Bridge Co., L.L.C. v. Heatec, Inc., 833 F. App'x 565, 574 (5th Cir. Nov. 6, 2020) (stating "spoliation claim has three elements: (1) the

---

[31]    While Emmerich's motion only specifically references seeking evidence of Particle's alleged alteration of its URLs, it recites that Particle's deletion of Emmerich's full-text articles from Particle's website eliminated Emmerich's ability to obtain additional "other evidence necessary for it to prove its case." Such a vague allegation does not warrant relief based on alleged spoliation.

spoliating party must have controlled the evidence and been under an obligation to preserve it at the time of destruction; (2) the evidence must have been intentionally destroyed; and (3) the moving party must show that the spoliating party acted in bad faith" and "[a] party seeking the sanction of an adverse-inference instruction based on spoliation of evidence must establish that: (1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the evidence was destroyed with a culpable state of mind; and (3) the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.").

CONCLUSION

Based on the foregoing, it is ordered that Emmerich's motion for summary judgment is granted in part and denied in part. It is further ordered that Particle's motion for partial summary judgment as to certain infringement claims is be granted in part and denied in part while its motions for partial summary judgment as to the circumvention and copyright management information claims are granted. Additionally, it is ordered that Emmerich's motion to file a corrected exhibit is granted and that its motion for sanctions based upon spoliation of evidence is denied.

SO ORDERED this 29th day of July, 2025.

/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE