UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISON


EMMERICH NEWSPAPERS,                                    PLAINTIFF
INCORPORATED

VS.                          CIVIL ACTION NO. 3:23cv26-TSL-MTP

PARTICLE MEDIA, INC.                                   DEFENDANT
D/B/A NEWSBREAK

CONSOLIDATED WITH

EMMERICH NEWSPAPERS, INCORPORATED                      PLAINTIFF

VS.                          CIVIL ACTION NO.: 3:23-cv-391-TSL-RPM

PARTICLE MEDIA, INC.
D/B/A NEWSBREAK                                        DEFENDANT

<u>MEMORANDUM OPINION AND ORDER</u>

This cause is before the court on the separate motions of
defendant Particle Media, Inc. (Particle) to exclude the expert
testimony of Wyatt Emmerich as to damages and to exclude the
expert testimony of Anthony Huffman pursuant to Federal Rule of
Evidence 702 and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>,
509 U.S. 579, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).
Plaintiff Emmerich Newspapers, Inc. (Emmerich) has responded in
opposition to the motions, and the court, having considered the
parties' memoranda and submissions, concludes that the motions
to exclude are well taken and should be granted.

1

The Designations

Emmerich has designated Wyatt Emmerich (hereafter "W. Emmerich"), president of plaintiff Emmerich, to testify as an unretained expert on copyright infringement damages, among other areas of alleged expertise.  The designation for Mr. Emmerich states that he is

> expected to testify regarding the actual damages suffered by Emmerich Newspapers, Incorporated as a result of Particle Media's copyright infringement and violation of the DMCA.
>
> Mr. Emmerich will utilize the three methodologies reflected in Exhibit "A" which include:
>
> (1) Lost Revenue, reflecting cumulative losses from 2017 through 2020 of $8,564,531;
>
> (2) Value of Articles Stolen, reflecting cumulative damages of $32,155,400 over the same time frame; and
>
> (3) Ad Impressions Value, reflecting damages of $6,443,294 over the same time frame.
>
> The average of these three methodologies is $15,319,481.[1]

---

[1]    Emmerich served its initial designation on February 8, 2024 accompanied by a document entitled "Damages Caused by Newsbreak" setting out these amounts.  It filed a revised designation on May 30, 2024 with a reflecting these same amounts.
Emmerich has since presented to Particle three revisions to its initial damages calculation.  The first, sent June 12, 2024, included the same three methodologies as the original but different amounts, and averaged the three amounts.  The second, sent June 17, 2024, changed the amounts for each of the three methodologies, but averaged the amounts for the first and second methodologies, and then added to that figure the amount from methodology three separately.

The designation recites, "Experts in the field of copyright and DMCA damage calculations would reasonably rely on these kinds of facts or data in forming an opinion on the subject of Emmerich's actual damages."[2]

Emmerich has additionally designated Anthony L. Huffman, its long-time certified public accountant, as an unretained expert on Emmerich's actual damages.  According to the designation, Huffman utilized the same methodologies identified Emmerich's designation of W. Emmerich.

The Motions

Particle has moved under Rule 702 and Daubert to exclude W. Emmerich's expert testimony, arguing that Emmerich cannot sustain its burden to demonstrate that W. Emmerich is qualified to give the proffered testimony or that his proffered testimony

_____

Emmerich sent a third revised damages calculation on June 19, 2024, on the eve of the depositions of Mr. Emmerich and Anthony Huffman, which changed the amount for the first methodology, averaged the first two amounts and added in the third, and then added a fourth methodology, "Damages to Emmerich:  Diminution of Enterprise Value Methodology."  On motion by Particle, the magistrate judge struck the fourth methodology as untimely disclosed.  See Emmerich Newspapers, Inc. v. Particle Media, Inc., No. 3:23-CV-26-TSL-MTP, 2024 WL 3418174 (S.D. Miss. July 15, 2024).

The amounts set forth in the designations, which are the amounts set out in the text, are not the same numbers as Emmerich's first, second or third revised damages calculation documents.

[2]  The court has recently dismissed Emmerich's DMCA claims. See Emmerich Newspapers, Incorporated v. Particle Media, Inc., No. 3:23-CV-391-TSL-RPM, 2025 WL 2146609 (S.D. Miss. July 29, 2025).

3

is reliable and/or relevant.  Particle likewise seeks to exclude Huffman's testimony since his opinions are premised entirely on W. Emmerich's unreliable methodologies, and also because Huffman is not an expert in the field of damages calculation for copyright infringement.

In response to the motion, Emmerich argues that W. Emmerich is qualified to give his expert opinion on damages, both by his education and lengthy career in the news industry, which has included valuing newspapers for sale and purchase, and that Huffman is qualified, as he is a CPA with decades of experience with Emmerich's businesses.  It further contends that the methodologies that both employed are sound and that Particle's criticisms go to the weight to mebe given to their opinions by the jury and do not go to their admissibility. Based on the following, the court concludes that Particle's motions will be granted.

Standards of Admissibility

Rule 702, which governs the admissibility of expert testimony, states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

4

(b) the testimony is based on sufficient facts or
data;

(c) the testimony is the product of reliable
principles and methods; and

(d) the expert has reliably applied the principles
and methods to the facts of the case.

Expert testimony is admissible under this rule only if it is
both relevant and reliable; and district courts are charged with
ensuring that both criteria are satisfied before an expert's
testimony is admitted. Johnson v. Arkema, Inc., 685 F.3d 452,
459 (5th Cir. 2012) (citing Daubert, 509 U.S. at 597). The
reliability requirement "mandates that expert opinion be
grounded in the methods and procedures of science and ... be
more than unsupported speculation or subjective belief." Id.

The party offering the expert testimony bears the burden
to establish by a preponderance of the evidence that the
challenged testimony is admissible. Moore v. Ashland Chem.
Inc., 151 F.3d 269, 276 (5th Cir. 1998) (citing Daubert, 509
U.S. at 592-93, and Fed. R. Evid. 104(a)). As recognized by the
court in BNJ Leasing, Inc. v. Portabull Fuel Serv., LLC, 591 F.
Supp. 3d 125, 137-38 (S.D. Miss. 2022),

> [e]xpert testimony must be supported by "more than
> subjective belief or unsupported speculation." Paz
> v. Brush Eng'red Materials, Inc., 555 F.3d 383, 388
> (5th Cir. 2009). It "must be reliable at each and
> every step or it is inadmissible. The reliability
> analysis applies to all aspects of an expert's
> testimony: the methodology, the facts underlying the
> expert's opinion, the link between the facts and the

conclusion, et alia." <u>Seaman v. Seacor Marine</u>
<u>L.L.C.</u>, 326 F. App'x 721, 725 (5th Cir. 2009).
"Overall, the trial court must strive to ensure that
the expert, whether basing testimony on professional
studies or personal experience, employs in the
courtroom the same level of intellectual rigor that
characterizes the practice of an expert in the
relevant field." <u>United States v. Valencia</u>, 600 F.3d
389, 424 (5th Cir. 2010).

That said, "the Court's role as gatekeeper is not meant to
supplant the adversary system because '[v]igorous cross-
examination, presentation of contrary evidence, and careful
instruction on the burden of proof are the traditional and
appropriate means of attacking shaky but admissible evidence.'"
<u>Id.</u> (quoting <u>Daubert</u>, 509 U.S. at 596, 113 S. Ct. 2786).  While
it follows that the court "should focus solely on the proposed
expert's 'principles and methodology, not on the conclusions
that they generate,'" <u>id.</u> (quoting <u>Daubert</u> at 595, 113 S. Ct.
2786), "'nothing in either <u>Daubert</u> or the Federal Rules of
Evidence requires a district court to admit opinion evidence
connected to existing data only by the ipse dixit of the
expert,'" <u>id.</u> (quoting <u>GE v. Joiner</u>, 522 U.S. 136, 146, 118 S.
Ct. 512, 139 L. Ed. 2d 508 (1997)).

   <u>Analysis</u>

   "Under 17 U.S.C. §§ 504(a)(1) and (b), a copyright owner
is permitted to recover his own 'actual damages,' including
lost profits and 'reasonable royalty rates,' or what a willing
buyer would have been reasonably required to pay a willing

seller as a licensing fee for the actual use of the copyrighted material by the infringers." MGE UPS Sys., Inc. v. GE Consumer & Indus., Inc., 622 F.3d 361, 366–67 (5th Cir. 2010) (quoting Davis v. Gap, Inc., 246 F.3d 152, 167 (2d Cir. 2001)). Additionally, "[a] copyright owner may also seek 'any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages.'" Id. (quoting 17 U.S.C. § 504(b). Where the "copyright owner chooses to claim infringer's profits, 'the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.'" Id. (quoting Davis, 246 F.3d at 167).

Emmerich maintains that W. Emmerich's undergraduate degree from Harvard and his master's degree in business administration from UCLA, together with his four years working in investment banking and decades of running newspapers, including the buying and selling of many properties, qualifies him to give expert testimony on Emmerich's alleged actual damages from Particle's alleged copyright infringement. It does not. While W. Emmerich has a notable educational background and experience in the newspaper industry, neither of these translates into expertise in determining actual damages for copyright

7

infringement.  As Particle points out, W. Emmerich is not an accountant and has not served as an expert witness in any case not involving his own company.[3]  Significantly, his lack of expertise in this area is amply demonstrated by his own deposition testimony.  In response to questioning by Particle's counsel about the source of the methodologies that were used to arrive at Emmerich's damages calculation, he testified that it was a collaborative effort between him and Huffman:

> I developed the spreadsheet from scratch and then sent it to Tony and said, "What do you think?  Does this make sense?" . . . [S]o I was sort of the designer. He was the reviewer and sanity checker.  . . .  So it was a collaborative effort, but it started with my trying to figure out, you know, what was a realistic damages number.

Asked where or how he came up with the three methodologies he used for the damages calculation, he responded simply, "Just from my understanding of my business and what would make sense."  He testified that he also read "lots" of (unidentified) "court decisions where they discuss how damages were calculated."  He "assumed that experts were involved in that process" and that he was thus in a sense relying on other experts in arriving at his methodologies; but he did not claim,

---

[3]    Because W. Emmerich is an unretained expert, Emmerich was not required to provide an expert report, which, if required, would have listed cases in which W. Emmerich had appeared as an expert.  In its response, Emmerich has not identified any case in which W. Emmerich has testified as an expert on damages, including on damages for copyright infringement.

nor does Emmerich in its response, that any of these cases actually involved experts who purported to use or apply the methodologies W. Emmerich purportedly developed "from scratch").

W. Emmerich is obviously an intelligent, capable and well-educated individual, with a wealth of business experience. But it is manifest from his deposition testimony that he lacks the expertise to offer opinions on his company's damages from Particle's alleged copyright infringement. By his own admission, he was making up the methodologies as he went along, using Huffman as a "sanity checker" for whether his ideas on how to calculate damages made sense. Considering his testimony, along with the fact of the numerous modifications to his initial damages formulations (including the belated but rejected attempt to add an additional, newly-conceived methodology), the court concludes without reservation that Emmerich has not demonstrated that W. Emmerich has employed the same level of intellectual rigor that characterizes the practice of an expert in the relevant field and has thus failed to carry its burden to show that he is qualified as an expert in the area of copyright damages. See Valencia, 600 F.3d at 424.

The court further finds that W. Emmerich's methodologies and/or application of the methodologies are not reliable and

therefore are not admissible.  As set forth above, W. Emmerich identified three methodologies by which he purported to calculate Emmerich's actual damages.  Each putative methodology is highly problematic.

For starters, his "Lost Revenue" method, by which he purports to arrive at Emmerich's lost profits of $7,027,896, included not only irrelevant years, as acknowledged by W. Emmerich in his deposition, but also does not account for the massive number of articles which have been dismissed from the lawsuit.  Further, his calculation combines all of Emmerich's subsidiaries' alleged damages, regardless of the number of works from each publication that appeared on NewsBreak.  Also, it uses an unsupported, seven-year "collected growth rate" that admittedly failed to include the year closest to the damages period, and it does not account for subsidiaries which were bought and sold over the preceding decade.

Two additional flaws that are most significant to the court are, first, W. Emmerich's attribution of one hundred percent of the alleged cumulative losses to Particle (75.8 percent) and SmartNews (24.2 percent), a defendant in another lawsuit, see Emmerich Newspaper, Inc. v. Smartnews International, Inc., Civ. Action No. 3:23-cv-118-HTW-LGI, without any consideration whatsoever of other market and external factors which could account for the loss of revenue,

and second, his application of a ninety percent "marginal profit on incremental revenue" rate with no incremental cost analysis.

Moving on to W. Emmerich's "Value of Articles Stolen" methodology, the court initially notes that this method does not appear to be a calculation of Emmerich's lost profits at all but rather an attempt to recoup Emmerich's costs associated with the production of its online content, and it admittedly fails to account for the fact that Emmerich derived some value from the articles which were "stolen." Emmerich has not cited, and the court has found no support for such a methodology. Moreover, even were it a valid methodology, it is so inadequately supported as not to be reliable. First, it lacks subsidiary-specific and expense-specific analysis, combining all expenses of all Emmerich subsidiaries, regardless of the extent to which each subsidiary had been affected by Particle's alleged infringement. W. Emmerich further used only a speculated number of articles created in 2020 -- 11,996 -- and then further assumed that NewsBreak used one hundred percent of the articles that year. He also included only Emmerich's operational costs for 2020 because he thought 2020 was the peak year for infringement.

Under the "Ad Impression Value "method, W. Emmerich concludes that $5,851,282 represents Particle's profit from its

11

infringement of Emmerich's articles.  While an infringer's profit is a recognized measure of damages, see MGE UPS Sys., 622 F.3d at 67 (5th Cir. 2010), to recover, "'a copyright holder must show more than the infringer's total gross revenue from all of its profit streams .... Rather, "gross revenue" refers only to revenue reasonably related to the infringement.'"  Id. (quoting Bonner v. Dawson, 404 F.3d 290, 294 (4th Cir. 2005)). Here, as Particle points out, W. Emmerich's calculation is premised on Particle's own assessment that $ 26,243 was the theoretical maximum gross revenue it could have realized from banner ads in relation to its use of all of Emmerich's articles, but that figure given by Particle included content that was not copyrightable and/or is not part of this lawsuit, and also did not reflect any deduction for Particle's costs and expenses. That is, Particle's $ 26,243 estimate included potential revenue from non-infringing activity.  Even setting aside the other deficiencies of W. Emmerich's formulation, it is apparent that his conclusion premised on Particle's theoretical maximum revenue is overbroad and does not refer to revenue reasonably related to the infringement and thus, it is not reliable.

Lastly, there is plainly no support for W. Emmerich's averaging of any combination of his damages methodologies, and the same would be contrary to § 504(b).

Although Emmerich contends otherwise, Particle has clearly explained what it accurately perceived as deficiencies both with W. Emmerich's methodologies and/or how the methodologies were applied to the facts in this case. And while Emmerich denies there are such deficiencies, it insists that Particle's "quibbles" with W. Emmerich's choices can be addressed by Particle on cross-examination. While often challenges to the underpinnings of an expert opinion are appropriately left to vigorous cross examination, here, cognizant of the court's gatekeeping duty, given the myriad deficiencies in both the choice and application of the identified methodologies, the court must strike W. Emmerich's expert testimony on damages as he is neither qualified and his proffered opinions are wholly unreliable. Emmerich's opinions clearly were not derived from the faithful application of any method recognized by damages experts but rather plainly represent his own personal view as to the quantum of injury to Emmerich by Particle.

Particle's motion seeking exclusion of Anthony Huffman's testimony will also be granted.[4] While Huffman is a certified public accountant, it is apparent from his deposition testimony that he is not an expert in the area of copyright law damages:

---

[4]    Particle sought to exclude Huffman's testimony as to both actual damages on the infringement claim and as to DMCA damages. Given the court's dismissal of the DMCA claims, this aspect of the motion is moot.

He has no professional experience in copyright law, and aside from this and Emmerich's other pending litigation, he has never been engaged to, nor has he ever offered, an opinion on actual damages caused by an alleged copyright infringement.

Moreover, Huffman testified that in preparing to give his opinions in this case, he did not review applicable copyright law and/or consult with another CPA or other professional who has expertise in calculating copyright damages. Instead, his "expertise" on copyright infringement damages was gained through "an internet search on damage calculations and on copyright violations," the results of which he could not specifically recall. Finally, and most significantly, Huffman's opinions are admittedly wholly predicated on W. Emmerich's discredited methodologies. Contrary to Emmerich's urging, it is clear these shortcomings cannot be overcome merely by vigorous cross-examination.

As Emmerich has failed to meet its burden to demonstrate that Huffman is qualified as an expert in the relevant field or that his proffered opinions are reliable, the motion to exclude his expert testimony will be granted.

Based on the foregoing, it is ordered that Particle's motion to exclude Wyatt Emmerich's expert testimony as to damages and its motion to exclude the testimony of Anthony Huffman are granted.

14

SO ORDERED this 8th day of August, 2025.


 /s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE